**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| GREATER BOSTON LATINO NETWORK, BRAZILIAN WORKER CENTER, INC., and MASSACHUSETTS COMMUNITIES ACTION NETWORK,<br><br>      Plaintiffs,<br><br>  v.<br><br>KRISTI NOEM, *in her official capacity as Secretary of the U.S. Department of Homeland Security*; U.S. DEPARTMENT OF HOMELAND SECURITY; TODD M. LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; and U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,<br><br>      Defendants. | Civil Action No. 26-10472<br><br>**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     JURISDICTION AND VENUE ........................................................................ 3

III.    PARTIES ........................................................................................................... 3

        A.      The Plaintiffs ......................................................................................... 3

        B.      The Defendants ...................................................................................... 6

IV.     FACTUAL ALLEGATIONS ............................................................................ 6

        A.      The Fourth Amendment requires a valid judicial warrant prior to
                law enforcement entry into constitutionally protected areas, chiefly
                the home. .............................................................................................. 6

        B.      The Immigration and Nationality Act and DHS Regulations limit
                certain ICE enforcement activities without a warrant ........................... 8

        C.      The Trump Administration has escalated ICE operations in the last
                year ....................................................................................................... 9

        D.      The Lyons Memorandum purports to authorize ICE officers to
                engage in unconstitutional, warrantless home invasions. ................... 11

        E.      The Lyons Memorandum sets forth an official agency policy that is
                being actively implemented by DHS and ICE. .................................... 13

        F.      ICE officers have carried out home invasions pursuant to Form I-
                205s. .................................................................................................... 17

        G.      The Lyons Memorandum directly harms the Plaintiffs. ...................... 22

V.      CLAIMS FOR RELIEF .................................................................................. 32

COUNT I VIOLATION OF ADMINISTRATIVE PROCEDURE ACT –
        CONTRARY TO CONSTITUTIONAL RIGHT .............................................. 32

COUNT II VIOLATION OF ADMINISTRATIVE PROCEDURE ACT – NOT
        IN ACCORDANCE WITH THE LAW .......................................................... 33

COUNT III  VIOLATION OF ADMINISTRATIVE PROCEDURE ACT –
        ARBITRARY AND CAPRICIOUS .................................................................. 34

COUNT IV VIOLATION OF ADMINISTRATIVE PROCEDURE ACT –
        NOTICE-AND- COMMENT RULEMAKING PROCESS ............................ 35

-ii-

COUNT V DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201, 2202 ...................................... 37

VI.    PRAYER FOR RELIEF ................................................................................................ 37

## I.    INTRODUCTION

1.    The Fourth Amendment to the U.S. Constitution is one of our nation's foundational protections, intentionally created by the Framers in response to "unrestrained search[es]" and seizures by the British. *Riley v. California*, 573 U.S. 373, 403 (2014); *see also Payton v. New York*, 445 U.S. 573, 583 (1980). As the Supreme Court has explained, "[o]pposition to such searches was in fact one of the driving forces behind the Revolution itself." *Riley*, 573 U.S. at 403.

2.    A person's home is particularly sacrosanct under our Constitution. "[W]hen it comes to the Fourth Amendment, the home is first among equals. At the Fourth Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).

3.    Accordingly, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton*, 445 U.S. at 586.

4.    The Fourth Amendment and its protections apply to all "people" in the United States, regardless of citizenship status or national origin. U.S. Const. amend. IV.

5.    Despite these longstanding and crucial constitutional protections, Defendant Todd M. Lyons, Acting Director of U.S. Immigration and Customs Enforcement (ICE), issued a memorandum in May 2025 authorizing ICE officers to enter homes to make immigration arrests—even using force to do so—without a judicial warrant. *See* Ex. A (the Lyons Memo).

6.    But the Defendants may not unilaterally change core constitutional principles and well-established jurisprudence governing judicial warrants. As the Chief Judge of the U.S. District Court for the District of Minnesota recently stated, "ICE is not a law unto itself." Order, *Juan T.R. v. Noem, et al.*, No. 26-CV-0107 (D. Minn. Jan. 28, 2026), Dkt. No. 10 at 3.

7.      In issuing the Lyons Memo, the Defendants have established an official policy that is unlawful and unconstitutional, that abrogates longstanding agency practices and regulations, and that bypasses the required rulemaking process—all without explanation or legal basis.

8.      Plaintiffs Greater Boston Latino Network (GBLN), Brazilian Worker Center (BWC), and Massachusetts Communities Action Network (MCAN) are three community-based non-profit organizations that serve the immigrant communities targeted by the Defendants' unprecedented immigration enforcement campaign, including by educating their constituencies about the rights that protect them in their homes. For years, the Plaintiffs assured the Massachusetts immigrant community that ICE officers could not enter their homes without a validly issued judicial warrant. The Lyons Memo has cast doubt on that advice, upending these organizations' educational programming on the topic and diminishing their credibility within the communities they serve. The Plaintiffs are scrambling to provide new guidance to account for the Lyons Memo's change in position regarding the dictates of the Fourth Amendment. Given the Lyons Memo's conflict with clear constitutional principles, they are uncertain of what that guidance should entail.

9.      In addition to providing advice and training regarding community members' rights with respect to immigration enforcement, these organizations' core activities include offering educational services, job training, and support in obtaining housing and healthcare to the immigrant community in the greater Boston area. The Plaintiffs are being forced to divert scarce resources away from these core activities to respond to the Lyons Memo, including by counseling and advising members concerning the unprecedented warrantless home invasions

purportedly authorized by the Lyons Memo, conducting revised Know-Your-Rights trainings to account for this new threat, and responding to community fears of home invasions by ICE.

10.    The Plaintiffs bring this action seeking a declaratory judgment and injunctive relief from the Court to hold unlawful, vacate, and set aside the Lyons Memo pursuant to the Administrative Procedure Act (APA) and to enjoin the Defendants and their officers from implementing or effectuating it.

## II.    JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over the claims stated herein under 28 U.S.C. § 1331, conferring jurisdiction over federal questions, and 28 U.S.C. § 1346, conferring original jurisdiction over suits against the United States.

12.    This Court has remedial authority pursuant to 5 U.S.C. §§ 702, 705 and 706, the Administrative Procedure Act; 28 U.S.C. § 1651, the All Writs Act; 28 U.S.C. §§ 2201–02, the Declaratory Judgment Act; Federal Rule of Civil Procedure 65, allowing for injunctive relief, and the inherent equitable powers of this Court.

13.    Venue is proper in this Court under 28 U.S.C. § 1391 because the Defendants are officers or employees of the United States, the Plaintiffs are based in this District, and the District is a site of the injuries at issue.

## III.    PARTIES

### A.    The Plaintiffs

14.    Plaintiff Greater Boston Latino Network (GBLN) is a coalition of seven non-profit member organizations that serve Latinx, immigrant, and low-income communities through a wide range of free programs, including educational, healthcare, and career-related services. GBLN and its member organizations reach over 50,000 people annually in partnership with

places of worship, schools, and housing communities. All GBLN member organizations maintain their principal places of business in Boston, Massachusetts.

15. GBLN member organizations operate core activities in: education equity, such as promoting culturally competent curricula, preparing youth to pursue postsecondary education, and teaching English as a Second Language (ESL) classes; civic engagement, including running bilingual vaccination clinics as a vehicle for public health advocacy; housing justice, including owning affordable housing units; and advancing Latinx leadership in decision-making positions at the local and state level.

16. GBLN member organizations have also long provided the greater Boston immigrant community with trainings and advice regarding their rights with respect to immigration enforcement, including their right to a validly issued judicial warrant prior to any search or entry into their home.

17. Plaintiff Brazilian Worker Center (BWC) is a non-profit corporation organized under the laws of the Commonwealth of Massachusetts with a principal place of business in Allston, Massachusetts.

18. The BWC is a membership-based organization with a mission to empower immigrants and promote economic and social justice. It represents a community largely comprised of Latinx immigrants, with a focus on the Brazilian population and Portuguese speakers. The organization also provides support to asylum seekers and individuals with humanitarian relief under Temporary Protected Status (TPS).

19. As part of its mission, the BWC provides training, education, and support regarding immigration enforcement. Many immigrants reach out to the BWC for guidance on

-4-

safely handling ICE interactions, and, as part of this counseling, the BWC regularly provides advice to immigrants regarding their Fourth Amendment rights.

20.    Additionally, as a state-designated Family Welcome Center, the BWC connects newly arrived immigrants with essential resources such as emergency housing, food and essential items, and transportation to ensure a safe and secure transition to the United States.

21.    The BWC also advances its mission by, among other core activities, providing trainings and workshops on workplace rights; assisting with rental and health insurance applications; offering health and wellness workshops and peer support; and teaching classes on ESL, computer literacy, and occupational safety and health.

22.    Plaintiff Massachusetts Communities Action Network (MCAN) is a statewide faith and values-based non-profit whose mission is to further racial equity and economic justice. MCAN has eight affiliates throughout Massachusetts. It is part of the national network Faith in Action, which also includes ISAIAH, a statewide multiracial group of faith communities located in Saint Paul, Minnesota. MCAN's principal places of business are Milton and Framingham, Massachusetts.

23.    To further its mission, MCAN engages in work around public safety, educational equity, housing, voter engagement, and economic justice. MCAN also engages in immigrant rights work, including supporting DACA recipients and TPS holders and uplifting immigrant-owned businesses. MCAN and its affiliates also regularly offer Know-Your-Rights trainings to immigrants regarding their rights with respect to immigration enforcement.

24.    Also to advance its mission, MCAN regularly hosts community gatherings and events on these topics, ranging from trainings on grassroots organizing; meetings with

government officials and social service agencies; conversations about state legislative priorities; town halls, teach-ins, and more.

**B.      The Defendants**

25.     Defendant Kristi Noem is the Secretary of the U.S. Department of Homeland Security (DHS) and is sued in her official capacity. As the current Secretary of DHS, she oversees component agencies, including ICE.

26.     Defendant U.S. Department of Homeland Security is the federal agency responsible for administering and enforcing the nation's immigration laws pursuant to 8 U.S.C. § 1103(a).

27.     Defendant Todd M. Lyons is the Acting Director of ICE and is sued in his official capacity. As Acting Director of ICE, he is responsible for overseeing its functions, including setting priorities for the agency's enforcement work; establishing agency-wide operational policies, including guidance and instructions for ICE stops, arrests, and warrant execution; and managing the civil immigration detention system.

28.     Defendant U.S. Immigration and Customs Enforcement is an agency of the United States and a division of DHS. Among its responsibilities, ICE enforces civil immigration law by conducting stops and arrests, executing immigration warrants and orders of removal, maintaining custody over individuals in immigration detention, and overseeing the operation of the civil immigration detention system.

## IV.    FACTUAL ALLEGATIONS

**A.      The Fourth Amendment requires a valid judicial warrant prior to law enforcement entry into constitutionally protected areas, chiefly the home.**

29.     Under the Fourth Amendment, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton*, 445 U.S. at 586.

30.     To satisfy constitutional requirements, a valid judicial warrant authorizing entry into a home or other private space must be issued by a "neutral and detached magistrate," *Johnson v. United States*, 333 U.S. 10, 14 (1948)—an independent judicial officer who is not aligned with, employed by, or financially connected to the law enforcement agency seeking the warrant. That judicial officer makes an independent determination of probable cause.

31.     A judicial warrant is distinct from what is often called an immigration or administrative warrant, referring to Form I-205. Form I-205s are created and executed entirely within DHS. They are drafted, signed, and issued by DHS immigration officers. *See* 8 C.F.R. § 241.2(a)(1) (2016). These administrative warrants are not reviewed, approved, or issued by any judicial officer, nor do they involve any neutral judicial assessment.

32.     Form I-205s are titled "Warrant of Removal/Deportation." A sample Form I-205, publicly hosted on ICE's website, is attached to this Complaint as Exhibit B.

33.     Form I-205s state that the signing officer acts "by virtue of the power and authority vested in the Secretary of Homeland Security." *See* Ex. B. Once signed by a DHS immigration officer, Form I-205s are then carried out by other DHS officers. All ICE officers and officers are authorized to carry out these administrative warrants. *See* 8 C.F.R. § 241.2(b) (2016); 8 C.F.R. § 287.5(e)(3) (2025); *see also* Ex. B (addressed to "any immigration officer of the United States Department of Homeland Security").

34.     Form I-205s allow immigration officers to "take into custody and remove from the United States" individuals who are subject to a final order of removal or deportation—orders that are typically issued by an immigration judge, employed by the U.S. Department of Justice, or the Board of Immigration Appeals. *See* Ex. B.

35.    Form I-205s are not judicial warrants and therefore do not authorize entry into a private residence without the resident's consent.

**B.    The Immigration and Nationality Act and DHS Regulations limit certain ICE enforcement activities without a warrant.**

36.    Federal statute and agency regulations prescribe certain requirements for immigration officers' enforcement activities, including regarding warrantless arrests.

37.    This includes the Immigration and Nationality Act (INA).

38.    Consistent with the Fourth Amendment, the INA prohibits ICE officers from making an arrest "without warrant" unless an officer "has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2).

39.    In addition, Congress has charged DHS with administering and enforcing immigration laws and establishing regulations to carry out the INA's authority. 8 U.S.C. § 1103(a). These regulations further enshrine the Fourth Amendment's limitations.

40.    DHS regulations state that "[a] warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained." 8 C.F.R. § 287.8(c)(2)(ii) (2025).

41.    DHS regulations prohibit ICE from "enter[ing] into the non-public areas of . . . a residence including the curtilage of such residence . . . for the purpose of questioning the occupants or employees concerning their right to be or remain in the United States unless the officer has either a warrant or the consent of the owner or other person in control of the site to be inspected." 8 C.F.R. § 287.8(f)(2) (2025).

42.    The term "warrant" as used in the INA and these regulations means a judicial warrant in compliance with the Fourth Amendment. *See Kidd v. Mayorkas*, 734 F. Supp. 3d 967,

984 (C.D. Cal. 2024); Enhancing the Enforcement Authority of Immigration Officers, 59 Fed. Reg. 42406, 42412 (Aug. 17, 1994) ("the rule incorporate[d] judicial precedent based on the Fourth Amendment to the Constitution concerning the issuance of warrants [and] the obtaining of consent to enter a premises . . ."). The term "reason to believe" is considered the equivalent of the constitutional requirement of probable cause. *Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015).

**C.    The Trump Administration has escalated ICE operations in the last year.**

43.    On the first day of his second term as President, Donald J. Trump issued Executive Order 14159, setting forth his Administration's immigration policy. *See* Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 29, 2025). The Executive Order describes immigrants as constituting an "[i]nvasion" that poses "threats to national security and public safety," and as engaged in "hostile activities, including espionage, economic espionage, and preparations for terror-related activities." *Id.* It directs federal officials to combat this "invasion" by "achiev[ing] the total and efficient enforcement" of federal immigration laws. *Id.*

44.    The Executive Order ordered the Secretary of DHS to enable the Director of ICE, among other officials, to "set priorities for their agencies that protect the public safety and national security interests of the American people, including by ensuring the successful enforcement of final orders of removal." *Id.* at 8444.

45.    Since January 20, 2025, the nation has witnessed an unprecedented escalation of federal immigration enforcement, characterized by increasingly aggressive tactics that numerous federal judges have found disregard the rule of law and constitutional rights. *See, e.g., Escobar Molina v. U.S. Dep't of Homeland Sec.*, No. 25-CV-3417, 2025 WL 3465518, at *26 (D.D.C. Dec. 2, 2025) (unconstitutional warrantless arrests); *Aparicio v. Noem*, No. 25-CV-01919, 2025 WL 2998098, at *2 (D. Nev. Oct. 23, 2025) (unconstitutional detention); *Osny Sorto-Vasquez*

-9-

*Kidd v. Mayorkas*, No. 20-CV-03512, 2021 WL 1612087, at \*7 (C.D. Cal. Apr. 26, 2021), *adhered to sub nom. Kidd v. Mayorkas*, 645 F. Supp. 3d 961 (C.D. Cal. 2022) (misrepresentation as different law enforcement agents).

46.    These ICE operations have been conducted nationwide, punctuated by "surges" in various metro areas such as Los Angeles, California in June 2025, Chicago, Illinois in September 2025, and Portland, Maine in January 2026.

47.    ICE has also heavily targeted Massachusetts, engaging in two month-long enforcement surges—"Operation Patriot" in May 2025 and "Operation Patriot 2.0" in September 2025—resulting in the arrests of thousands of individuals.[1] ICE officers in Massachusetts have consistently used tactics that involve violence and excessive force, including smashing car windows.[2]

48.    In December 2025, ICE began targeting Minneapolis and Saint Paul, Minnesota in an enforcement effort deemed "Operation Metro Surge." This ongoing effort, expanded throughout Minnesota, involved a massive influx of ICE officers employing dangerous and

---

[1] *See* Sarah Betancourt, *Immigration Arrests Increase in Massachusetts with a New ICE Operation,* GBH (Sep. 8, 2025), https://www.wgbh.org/news/local/2025-09-08/immigration-arrests-increase-in-massachusetts-with-new-ice-operation; *see also* Simón Rios, *ICE Enforcement in Mass. Nets 1,400 Arrests in September. Less than Half had 'Significant' Criminal Background*, WBUR (Oct. 16, 2025), https://www.wbur.org/news/2025/10/16/massachuessts-ice-arrests-september.

[2] *See* Compl. and Claims for Damages under the Fed. Tort Claims Act for Jose Pineda (Dep't of Homeland Sec. Aug. 6, 2025), https://lawyersforcivilrights.org/wp-content/uploads/2025/08/Matter-of-Pineda-FTCA-Amin-Letter-8.6.25.pdf; Compl. and Claims for Damages under the Fed. Tort Claims Act for Kenia Guerrero, Daniel Flores-Martinez, and their minor children, E.F., T.F., and R.F. (Dep't of Homeland Sec. June 5, 2025), https://lawyersforcivilrights.org/wp-content/uploads/2025/08/Matter-of-Pineda-FTCA-Amin-Letter-8.6.25.pdf; *see also* Nicole Foy, *"We'll Smash the Fucking Window Out and Drag Him Out,"* ProPublica (July 31, 2025), https://projects.propublica.org/trump-ice-smashed-windows-deportation-arrests/.

illegal tactics on immigration targets and protestors alike. In January 2026, ICE officers killed two unarmed U.S. citizens in Minneapolis: Renée Good and Alex Pretti. As the Chief Judge of the U.S. District Court for the District of Minnesota explained, ICE's conduct in Minnesota was characterized by lawlessness: ICE violated nearly 100 court orders there in less than a month, demonstrating a flagrant contempt for the rule of law. *See* Order, *Juan T.R.*, Dkt. No. 10 at 2.

**D.    The Lyons Memorandum purports to authorize ICE officers to engage in unconstitutional, warrantless home invasions.**

49.    As ICE enforcement was ramping up across the country, Defendant Lyons issued a signed memorandum on May 12, 2025 (the Lyons Memo), regarding the use of Form I-205s to forcibly enter people's homes without their consent.

50.    The Lyons Memo states that it implements Executive Order 14159. Ex. A at 1. The subject of the Lyons Memo is "Utilizing Form I-205, Warrant of Removal." *Id.*

51.    The Lyons Memo purports to authorize ICE officers to enter homes, including by force, without a judicial order, consent, or exigent circumstance. *Id.* at 2.

52.    Specifically, the Lyons Memo permits ICE officers to rely on only Form I-205—issued when a resident is subject to a final order of removal or deportation—to enter a resident's home. *Id.*

53.    In its second paragraph, the Lyons Memo acknowledges that this is a sharp departure from prior practice. The Lyons Memo states that "[a]lthough [DHS] has not historically relied on administrative warrants alone to arrest aliens subject to final orders of removal in their place of residence, the DHS Office of the General Counsel has recently determined that the U.S. Constitution, the Immigration and Nationality Act, and the immigration regulations do not prohibit relying on administrative warrants for this purpose." *Id.* at 1. It says nothing further about this recent "determination," but continues that "[a]ccordingly, in light of

this legal determination, ICE immigration officers may arrest and detain aliens subject to a final order of removal . . . in their place of residence." *Id.* at 1–2.

54.    The Lyons Memo states that "ICE immigration officers should consider all available enforcement mechanisms, including the use of a Form I-205 to arrest an alien in their place of residence, to achieve the requirements of E.O. 14159 in accordance with applicable law and policies." *Id.* at 2.

55.    Significantly, the Lyons Memo fails to provide any explanation for the reasoning underlying this purported legal determination, which is a substantial shift in the policy governing immigration and administrative warrants that undermines constitutional protections.

56.    There has been no change in the law—not by court opinion, court order, federal statute, or otherwise—to precipitate DHS's legal determination and the Lyons Memo.

57.    The policy set forth in the Lyons Memo represents a significant shift from other DHS materials, including DHS regulations, which make clear that Form I-205s cannot authorize entry into a private residence or other private space. Former general counsels and acting general counsels for the Department of Homeland Security for both Republican and Democratic administrations described the policy set forth in the Lyons Memo as "run[ning] counter to years of practice and precedent, as well as training designed to ensure constitutional compliance and protect the public from abuses of power."[3]

---

[3] *See* Stevan Bunnell, Gus Coldebella, Ivan Fong, Kara Lynum, Jonathan Meyer & John Mitnick, *We Were Top Homeland Security Lawyers. You Can't Wish Away the Fourth Amendment*, N.Y. Times (Feb. 2, 2026), https://www.nytimes.com/2026/02/02/opinion/ice-dhs-warrants-minnesota.html.

58.     The Lyons Memo also provides "General Guidelines" for implementation. This includes authorizing officers to use force to enter the home should the resident refuse to allow entry. *Id.*

59.     In a footnote, the Lyons Memo acknowledges the decision of *Kidd v. Mayorkas*. Ex. A at 2 n.3. In that case, the court held that "an [ICE] administrative warrant is insufficient to enter the constitutionally protected areas of a home . . . ." *Kidd*, 734 F. Supp. 3d at 980. Nonetheless, the Lyons Memo takes the position that this protection only exists in the federal judicial district where the *Kidd* case originated. The Lyons Memo states that "[u]nless and until [the *Kidd*] decision is vacated, [] officers may not enter into the curtilage for either a knock and talk or an immigration arrest absent a judicial warrant within the Central District of California." Ex. A at 2 n.3. The Lyons Memo makes clear that it applies in all other jurisdictions, notwithstanding the fact that the same constitutional principles apply nationwide.

60.     Although the Lyons Memo marks a sharp departure from well-settled Fourth Amendment law, longstanding agency practice, and DHS regulations, the Defendants issued the Lyons Memo without any notice-and-comment, without seeking to repeal or change the applicable regulations, and indeed without any public disclosure. The existence of the Lyons Memo only came to light when whistleblowers filed a complaint about it in January 2026, attached as Exhibit C.

**E.     The Lyons Memorandum sets forth an official agency policy that is being actively implemented by DHS and ICE.**

61.     The Lyons Memo sets forth an official agency policy. The Lyons Memo was issued and signed by Defendant Lyons, on official ICE letter letterhead, in written memorandum format, and addressed to "All ICE Personnel." *See* Ex A at 1.

-13-

62.     Since the Lyons Memo's existence was disclosed, high-ranking DHS officials and Vice President James David (JD) Vance have acknowledged its existence and spoken in support of it.[4]

63.     DHS also issued a statement addressing the agency's use of Form I-205s in response to public outcry over the leaked Lyons Memo.[5] The statement defended the practice of using Form I-205s to enter residences to make arrests.

64.     The whistleblower complaint describes that there was internal agency disagreement about the policy set forth in the Lyons Memo, and that the Lyons Memo has been shared internally only under strict access control, indicating the agency's cognizance of the Lyons Memo's illegality and unconstitutionality. *See* Ex. C at 7.

65.     When challenged about this policy, President Trump's current nominee for Secretary of Homeland Security, Senator Markwayne Mullin, testified that if confirmed as head of the agency, ICE officers "will not enter a home . . . without a judicial warrant unless we are

---

[4] *See* Rebecca Santana, *Immigration Officers Assert Sweeping Power to Enter Homes Without a Judge's Warrant, Memo Says*, AP News (Jan. 21, 2026), https://apnews.com/article/ice-arrests-warrants-minneapolis-trump-00d0ab0338e82341fd91b160758aeb2d; Amy Lu, *Fight Over Warrants: How Trump Administration Justifies Forcible Entry During Immigration Arrests*, WVTM (Jan. 22, 2026), https://www.wvtm13.com/article/whistleblower-ice-training-warrant-concerns/70098337; Press Release, U.S. Dep't of Homeland Sec., ICYMI – General Counsel James Percival's Wall Street Journal Op-Ed on Administrative Warrants (Feb. 3, 2026), https://www.dhs.gov/news/2026/02/03/icymi-general-counsel-james-percivals-wall-street-journal-op-ed-administrative.

[5] *See* Press Release, U.S. Dep't of Homeland Sec., DHS Sets the Record Straight on Administrative Warrants and American Public Support of President Trump's Deportations of Illegal Aliens (Feb. 4, 2026), https://www.dhs.gov/news/2026/02/04/dhs-sets-record-straight-administrative-warrants-and-american-public-support.

pursuing the individual that runs into . . . a house."[6] Mullins does not speak for the agency, but his statement further demonstrates recognition of the Lyons Memo's illegality.

66.    Ryan Schwank, one of the whistleblowers who disclosed the Lyons Memo, recently testified before Congress. Schwank was formerly employed by ICE as an Assistant Chief Counsel. He publicly testified to a Congressional forum about the "secretive orders" he received about the Lyons Memo and the "troubling manner" in which the Lyons Memo and policy it set forth were communicated to ICE personnel.[7] Schwank taught cadets at the ICE Training Academy prior to his resignation in February 2026. He was told by superiors to instruct ICE cadets to follow the Lyons Memo but was ordered "not [to] write down any of those instructions" nor "keep a record that [he] taught it to them."[8]

67.    The official policy set forth in the Lyons Memo is in effect and is being carried out across the country. Newly hired ICE officers are being instructed and trained to follow the Lyons Memo's guidance. *See* Ex. C at 3. Schwank testified that on his first day at the ICE Training Academy, he was directed "to teach new cadets to violate the Constitution by entering homes without a judicial warrant."[9] Schwank "was instructed to read and return a memo in [his] supervisor's presence which claimed ICE officers could enter homes without a judicial warrant. The Acting ICE Director authorized the very conduct that DHS in its own 2025 legal training

---

[6] *Markwayne Mullin's Senate Confirmation Hearing to Become Homeland Security Secretary*, Face the Nation (Mar. 18, 2026), https://www.youtube.com/watch?v=zUtGVXuRRBI, at 1:13:23–1:13:34.

[7] *Sen. Richard Blumenthal & Rep. Robert Garcia Host Forum on Constitutional Violations*, C-SPAN (Feb. 23, 2026), https://www.c-span.org/program/public-affairs-event/sen-richard-blumenthal-rep-robert-garcia-host-forum-on-constitutional-violations/673814 at 23:56–24:06; 27:55–28:04.

[8] *Id.* at 39:42–40:01.

[9] *Id.* at 23:56–24:06.

materials had called 'the chief evil against which the wording of the Fourth Amendment is directed.'"[10] In this manner, new ICE officers are being trained and directed to rely on Form I-205 to enter certain homes without consent and without a judicial warrant. *Id.*

68.     Compounding this guidance on warrantless home invasions are other troubling changes to the ICE Training Academy, including the elimination of classes that teach the Constitution, the United States legal system, and the limits of officers' authority, among other key components.[11]

69.     ICE has hired thousands of new ICE officers in the last year,[12] and this rapid expansion is ongoing. Many of these ICE officers have been trained—and will continue to be trained—to follow the Lyons Memo's guidance on warrantless arrests at homes. Thousands of newly hired and trained ICE officers have been deployed nationwide, and more to follow. They will engage in enforcement operations and make arrests, relying on guidance that violates the Fourth Amendment.

70.     Courts have already enjoined similar ICE policies that conflict with longstanding legal principles. For example, DHS and ICE promulgated a policy purporting to authorize warrantless arrests outside of the home. *See Hussen v. Noem*, No. 26-CV-324 (D. Minn. Jan. 30,

---

[10] *Id.* at 27:26–27:49.

[11] *Id.* at 24:10–24:33.

[12] *See* Press Release, U.S. Dep't of Homeland Sec., ICE Announces Historic 120% Manpower Increase, Thanks to Recruitment Campaign that Brought in 12,000 Officers and Agents (Jan. 3, 2026), https://www.ice.gov/news/releases/ice-announces-historic-120-manpower-increase-thanks-recruitment-campaign-brought (claiming 12,000 new ICE officers were hired in the last four-to-five months); *but see* Workforce Changes, OPM, https://data.opm.gov/explore-data/analytics/workforce-changes (last visited Jan. 28, 2026) (select "Department of Homeland Security" as Department and Agency, then "HSBB - Immigration and Customs Enforcement" as Sub-Agency) (data from the Office of Personnel Management suggests a net workforce growth of just over 5,000 ICE officers in the last year).

2026), Dkt. No. 85-1. This policy is also outlined in a memorandum issued and signed by Defendant Lyons, on official ICE letter letterhead, addressed to "All ICE Personnel," and implementing Executive Order 14159. *Id.* at 2. Among other pronouncements, the policy expands ICE officers' authority to make warrantless civil immigration arrests under the INA, including by changing the understanding of "likely to escape" that can prompt such arrests. *Id.* at 4–6; *see* 8 U.S.C. § 1357(a)(2). The U.S. District Court for the District Court of Oregon enjoined the implementation of this policy earlier this year. *See, e.g.*, Opinion & Order, *M-J-M-A- et. al. v. Hermosillo*, No. 6:25-CV-02011 (D. Ore. Feb. 27, 2026), Dkt. No. 88.

**F.     ICE officers have carried out home invasions pursuant to Form I-205s.**

71.     Since the Lyons Memo was issued, ICE officers have followed it. ICE has entered and made arrests inside homes with only Form I-205s in hand—lacking a valid judicial warrant.

72.     For example, on January 11, 2026, Garrison Gibson, a Liberian native and Minneapolis, Minnesota resident, was arrested after ten masked, heavily armed ICE officers forcibly entered his home using a battering ram.[13] Both Mr. Gibson and his wife, Teyana Gibson Brown, repeatedly asked ICE to show a judicial warrant. The ICE officers had only a Form I-205, signed by a DHS officer, when they made the entry and arrest. A federal judge later held that ICE officers' arrest of Mr. Gibson was illegal as it violated the Fourth Amendment. *See* Am.

---

[13] *See* Laura Ingle, *New Details Emerge in ICE Arrest Seen on NewsNation*, NewsNation (Jan. 15, 2026), https://www.newsnationnow.com/us-news/immigration/new-details-emerge-ice-arrest-video-newsnation/; Feven Gerezgiher & Matt Sepic, *Minneapolis Man Says ICE Agents Took 'Trophy' Photos, Locked Him in Overcrowded Cell*, MPR News (Jan. 18, 2026), https://www.mprnews.org/story/2026/01/18/garrison-gibson-says-ice-agents-took-trophy-photos-locked-in-overcrowded-cell; Eric Chaloux, *Minneapolis Family Raises Questions About the Warrant Given to them by Federal*, KSTP News (Jan. 12, 2026), https://kstp.com/kstp-news/top-news/minneapolis-family-raises-questions-about-the-warrant-given-to-them-by-federal-agents/; *Sen. Richard Blumenthal & Rep. Robert Garcia Host Forum on Constitutional Violations*, at 17:57–22:30.

Order, *Garrison G. v. Bondi*, No. 26-CV-172 (D. Minn. Jan. 17, 2026), Dkt. No. 10. At the same

Congressional forum where the whistleblower testified, Ms. Gibson Brown testified about the

terror she felt as Fourth Amendment protections shattered before her eyes.[14]



Screenshot from NewsNation live television footage.[15]

---

[14] *Sen. Richard Blumenthal & Rep. Robert Garcia Host Forum on Constitutional Violations*, at 17:57–22:30.

[15] Ingle, *supra*.



Ms. Gibson Brown in shock and terror after a federal immigration enforcement officer used a battering ram to break down the door of their home. Photo credit: John Locher, AP Photo.[16]

---

[16] Santana, *supra*.



Screenshot from Facebook video recorded by Ms. Gibson Brown.[17]

73.    Similarly, on January 18, 2026, ChongLy Scott Thao, an Asian American

grandfather, U.S. citizen, and resident of St. Paul, Minnesota, was arrested after ICE officers

forcibly entered his home without a judicial warrant.[18] Masked officers, many of whom carried

rifles and riot shields, knocked on his door several times. They then used a battering ram to break

---

[17] Chaloux, *supra*.

[18] Jack Brook, *A U.S. Citizen Says ICE Forced Open the Door to his Minnesota Home and Removed him in his Underwear After a Warrantless Search*, PBS News (Jan. 20, 2026), https://www.pbs.org/newshour/nation/a-u-s-citizen-says-ice-forced-open-the-door-to-his-minnesota-home-and-removed-him-in-his-underwear-after-a-warrantless-search; Maia Coleman, *ICE Arrest of a Citizen, Barely Dressed, Sows Fear in Twin Cities*, N.Y. Times (Jan. 20, 2026), https://www.nytimes.com/2026/01/20/us/chongly-scott-thao-ice-arrest.html.

down the door. Once inside Mr. Thao's home, approximately ten officers pointed guns at Mr. Thao and his family and immediately handcuffed Thao. They refused to review his identification. Mr. Thao was taken from his home, wearing only underwear and draped with a blanket as snow fell. ICE officers detained him in ICE vehicles for hours. After identifying Mr. Thao, ICE drove him home without explanation or apology.



Federal immigration enforcement officers entering Mr. Thao's home after breaking down his door with a battering ram. Photo credit: Leah Millis, Reuters.[19]

---

[19] Coleman, *supra*.



Mr. Thao being forcibly removed from his home in below-freezing temperatures. Photo credit: Leah Millis, Reuters.[20]

## G.     The Lyons Memorandum directly harms the Plaintiffs.

74.     The Lyons Memo and the policy it purports to authorize directly affect, interfere with, and perceptibly impair the Plaintiffs' core activities.

75.     The Lyons Memo is directly interfering with the Plaintiffs' ability to accurately counsel community members on their Fourth Amendment rights. The Plaintiffs can no longer safely advise community members, as the Plaintiffs have done for years, that immigration enforcement officers may not enter their homes without a judicial warrant. The Lyons Memo's contrary-to-law position not only frustrates the Plaintiffs' efforts to counsel community members but also undermines their credibility as trusted authorities on this topic.

---

[20] *Id.*

76.     Likewise, the Lyons Memo's abrupt shift in policy is requiring the Plaintiffs to unexpectedly expend considerable time and resources, *inter alia*, overhauling their Know-Your-Rights materials and re-training both staff and community members. This need—exacerbated by the increased demand for counseling services that the Lyons Memo has also caused—is forcing the Plaintiffs to divert their limited resources away from their other core activities. As a direct result of the Lyons Memo, the Plaintiffs are scaling back or limiting other core activities, such as education and career service programming, that form an essential part of their mission.

77.     The issue of ICE's ability to conduct warrantless home invasions is of critical importance to the Plaintiffs and the community members they serve: the threat of warrantless arrests is omnipresent and felt constantly. ICE is conducting enforcement activities in Massachusetts and has done so for the past year, punctuated by surges of activity that occur without warning. There is broad awareness in the immigrant community that ICE tactics have become increasingly aggressive and indiscriminate since the start of the second Trump Administration.

78.     Fear and anxiety about warrantless home arrests is particularly acute for the Plaintiffs and the community members they serve, many of whom are currently in immigration proceedings—with pending asylum applications, TPS, or otherwise seeking adjustment to their immigration status. Because such proceedings require individuals to disclose their home addresses to the federal government, ICE knows exactly where they live. A similar concern is shared by students participating in the Plaintiffs' postsecondary support programs who, when applying for college, fill out Free Application for Federal Student Aid (FAFSA) documents that reveal their home addresses. These students and their families now live in debilitating fear that they will be the targets of warrantless arrests in their homes.

79.    For years, each Plaintiff has provided support and education to immigrants around constitutional and civil rights, including well-established warrant requirements.

80.    For example, Know-Your-Rights education is a core part of Plaintiff Greater Boston Latino Network's (GBLN) and its member organizations' work. GBLN distributes wallet-sized cards—known as "red cards"—that inform individuals of their constitutional rights, including their Fourth Amendment right to protection from home entry without a judicial warrant. GBLN member organizations also host Know-Your-Rights education sessions that teach about Fourth and Fifth Amendment protections. These training sessions provide guidance on the hallmarks of a valid judicial warrant, including that such a warrant must be issued by a federal or state court and signed by a judge. GBLN member organizations present community members with sample images of judicial and administrative warrants so that they can distinguish between the two. Some GBLN member organizations also run youth workshops; for example, at a recent event in Hyde Square, youth participants learned about the role of consent in interactions with law enforcement. The organizations provide one-on-one counseling to address students' concerns about ICE enforcement and warrantless home arrests. One GBLN member organization that owns affordable housing units provides specialized education to tenants on their rights at home, as well as trainings for the property management team and staff.

81.    Plaintiff Brazilian Worker Center (BWC) also provides extensive one-on-one education to immigrants and other concerned community members on how to respond if law or immigration enforcement officers come to their homes, including how to request and review a judicial warrant. It also distributes "red cards" and trains individuals, especially immigrants, on their Fourth Amendment rights. The BWC frequently leads Know-Your-Rights sessions, where it advises community members not to open the door to their home unless presented with a

judicial warrant. The BWC instructs its members to ask officers to slide warrants under the door for inspection and to insist on reviewing such warrants before permitting entry. The BWC website includes examples of publicly available Know-Your-Rights pamphlets—formulated before the Lyons Memo came to light—advising community members:

- "Do not open the door unless ICE presents a warrant signed by a judge," and

- "Right to see a warrant: Always ask to see a warrant signed by a judge."[21]

82.     Plaintiff BWC has been a prominent and trusted resource for immigrants in the Boston area. In the months preceding the Lyons Memo's disclosure, the BWC ramped up its Know-Your-Rights education as ICE increased immigration enforcement in Massachusetts. For example, after the highly-publicized ICE raid of a car wash in Allston-Brighton in November 2025[22]—just one block away from the BWC office—frightened community members turned to the BWC for guidance on their rights and ICE arrests, including warrant requirements.

83.     Plaintiff Massachusetts Communities Action Network (MCAN) also offers Know-Your-Rights trainings to community members to help them understand their legal protections and navigate encounters with law enforcement. These trainings include instruction on how to distinguish between judicial and administrative warrants. MCAN's trainings have been primarily geared toward Latinx, undocumented individuals, and those from mixed status households.

---

[21] *Know Your Rights*, Brazilian Worker Ctr., Inc., https://braziliancenter.org/know-your-rights/ (last visited Mar. 19, 2026).

[22] *See* Camilo Fonseca, *Immigration Agents Raid Allston Car Wash and Detain Several Workers*, Bos. Globe (Nov. 4, 2025), https://www.bostonglobe.com/2025/11/04/metro/immigration-raid-allston-car-wash/.

84.     The Lyons Memo is significantly and directly impairing the Plaintiffs' ability to appropriately counsel community members. Because of the contradiction between longstanding constitutional protections (as well as the INA and DHS regulations) and the Lyons Memo, The Defendants' abrupt policy change is directly impeding the Plaintiffs' ability to confidently provide guidance to community members on their constitutional rights and how to safely handle ICE interactions.[23] Previously, the Plaintiffs could assure community members, through trainings, written resources, and staff counseling, that, absent a judicial warrant or other exigent circumstances, the Fourth Amendment protected their right to refuse immigration enforcement entry to their home. Now, the Plaintiffs cannot reliably advise community members when, if ever, they can safely and legally refuse such entry. During their conversations and counseling sessions with community members, the Plaintiffs must now explain the change in ICE policy and the attendant risks, which requires additional time and resources. They are also uncertain about what advice to even provide. For these reasons, the Lyons Memo is directly disrupting a core activity of each Plaintiff: accurate and clear guidance on Fourth Amendment protections.

85.     The Lyons Memo has also threatened the Plaintiffs' credibility as trusted authorities on the Fourth Amendment's protections and limits on ICE action, especially with respect to home entry. Having spent years assuring community members that ICE officers cannot enter their homes without a judicial warrant, the Plaintiffs are now forced to give contrary guidance, causing confusion. This confusion, directly rooted in the Lyons Memo's contrary-to-

---

[23] This confusion is compounded by Senator Mullin's testimony that, if confirmed, DHS and ICE will not enter homes without a judicial warrant. *See Markwayne Mullin's Senate Confirmation Hearing to Become Department of Homeland Security Secretary*, at 1:13:23– 1:13:34.

law policy, calls the Plaintiffs' reputation as reliable sources of immigration rights information into question.

86.    To carry out their pre-existing activity of providing guidance to community members through counseling, Know-Your-Rights trainings, and other forms of public education, the Plaintiffs must now expend substantial resources, including staff time, adjusting to account for the change announced by the Lyons Memo and its uncertain impact. Plaintiff GBLN and its member organizations are determining how to update their materials to reflect the ICE policy change regarding warrantless home arrests. This includes formulating a new kind of "red card" or other documents with quick steps for families to follow if ICE comes to their door. Plaintiff BWC is similarly in the process of determining how best to update its internal and external training and education materials in response to the Lyons Memo. Plaintiff MCAN and its affiliates are also making changes to educational materials to account for the Lyons Memo and its approval of warrantless home arrests.

87.    Each Plaintiff depends on staff and key local contacts to disseminate accurate information to community members. To do so effectively, the Plaintiffs undertake "train the trainer" events to educate staff on how best to conduct Know-Your-Rights sessions for community members. The Plaintiffs are planning to host events to relay their updated guidance when it is available. This will include re-training staff and other community educators who have guided community members using the old materials for years.

88.    Each Plaintiff is also engaging in similar planning for Know-Your-Rights presentations themselves. The Plaintiffs have conducted many Know-Your-Rights presentations just within the past year, reaching thousands of individuals. They are now assessing how to double back and re-educate groups to account for the Lyons Memo and its purported

-27-

authorization of warrantless home arrests. For example, one GBLN member organization is having ongoing discussions about when it can schedule trainings in the months ahead, who should attend the trainings, and what guidance the trainings should provide about the legality of warrantless home invasions. These trainings will take the organization dozens of hours over a period of months, straining resources that are already tight. Plaintiff MCAN is making plans to train and re-train key clergy in response to the Lyons Memo's purported authorization of warrantless home arrests. The Plaintiffs' re-education effort will likely confuse certain participants and community members, potentially leading to dangerous ICE interactions and tarnishing the Plaintiffs' reputation as trusted educators within the community.

89.    Not only is each Plaintiff making substantive changes to their materials and trainings, but they are also forced to expand the target audiences of their trainings, necessitating additional staffing, time, and other resource expenditures. This is because ICE's warrantless home arrest policy is a concern to a broader swath of the American public, including U.S. citizens, particularly in light of well-publicized incidents where ICE has invaded the wrong home or targeted U.S. citizens. For example, one of Plaintiff MCAN's member organizations is gearing up to expand trainings to reach members who are citizens and/or are non-Latinx community members.

90.    Each Plaintiff is also adjusting their core programmatic activities to account for the need to provide one-on-one counseling to community members about warrantless home invasions. As a result of the ICE policy change announced in the Lyons Memo, Plaintiff BWC is increasing its one-on-one counseling availability for community members. Community members frequently contact the BWC as their primary resource when they hear or see reports of enforcement activity or when they learn of updates to ICE enforcement, asking the BWC to

verify information or provide guidance. Plaintiff BWC is now fielding a large volume of questions from community members asking what to do if ICE comes to their home.

91.     Plaintiff MCAN has also had to act as a direct response support system for many community members. For example, one MCAN affiliate is fielding many calls from community members who reach out when someone is at their door, asking for guidance on what to do. The affiliate is diverting resources to ensure staff can be available as direct responders to provide real-time advice to community members who have ICE officers showing up at their homes. The fear they are addressing is acute: some family members of Plaintiff MCAN's staff and community members are literally hiding within their own homes. One individual frequently locks herself in the attic when she is home to avoid ICE detection; another remains at home in the dark all day, afraid to turn on lights or even the television, because she does not want ICE to know that she is there.

92.     To generate updated materials, trainings, and guidance, each Plaintiff is now spending significant time—which would otherwise be spent on other core activities—to monitor implementation of the Lyons Memo and reports of ICE conducting warrantless home arrests. For example, Plaintiff MCAN is in frequent communication with its national network Faith in Action, which includes Minnesota-based group ISAIAH, as well as colleagues with connections to Minnesota, to discuss warrantless arrests.

93.     Each Plaintiff is also dedicating considerable time to monitoring and engaging with state and local leaders in response to the new ICE policy around warrantless arrests. This includes implementing or otherwise addressing evolving guidance from government officials—

such as the Mayor of Boston's directive about involving local law enforcement[24]—regarding how to respond to the Lyons Memo and policy it purports to authorize.

94.    Each Plaintiff is also reallocating resources to strategize internally based on the Lyons Memo and ICE's policy regarding warrantless home arrests. Plaintiff GBLN and its member organizations are devoting substantial time at staff meetings to strategize around the new ICE policy, reducing time typically given to programmatic areas that are core to the organizations' work, such as upcoming arts performances to student tutoring. Similarly, staff at Plaintiff BWC have been holding ongoing hours-long meetings regarding how to counsel community members in light of the Lyons Memo, in addition to strategizing with state-wide Brazilian American community partners on a weekly basis. Plaintiff MCAN has had to extend the length of their weekly staff meetings because of the extra time they now need to devote to discussing immigration enforcement, including warrantless home arrests.

95.    The Lyons Memo and the confusion it has sown is forcing each of the three Plaintiffs to divert staff time and programming away from their other core activities. Rather than focusing the necessary attention on core work such as planning student field trips, organizing food distribution, offering postpartum support to new mothers, or teaching ESL classes, the Plaintiffs have to re-direct staff time and energy towards preparing guidance, re-training programs, and counseling in response to the Lyons Memo.

---

[24] City of Bos. Exec. Order (Feb. 5, 2026); *Mayor Michelle Wu Announces Executive Order to Protect Bostonians from Unconstitutional and Violent Federal Operations*, City of Bos. (Feb. 11, 2026), https://www.boston.gov/news/mayor-michelle-wu-announces-executive-order-protect-bostonians-unconstitutional-and-violent ("The Order confirms that calling 911 is an appropriate response to unlawful acts, like warrantless entry, and that the Boston Police will engage in de-escalation under those circumstances.").

96. The Lyons Memo has also stoked fear of warrantless invasions in other private spaces beyond the home, including the Plaintiffs' workplaces and events. This has destabilized the Plaintiffs' day-to-day operations, as they are now afraid that their buildings will be subject to forced, warrantless entry. As fear and anxiety escalate within the community, the Plaintiffs are experiencing a shrinkage of public participation at in-person events and community programming, which hinders their ability to provide core services to community members.

97. Altogether, the Lyons Memo is upending the Plaintiffs' ability to carry out their core activities and interfering with their ability to accurately counsel community members on their Fourth Amendment rights. But for the Lyons Memo and the illegal practices that it purports to authorize, the Plaintiffs would not be forced to update their Fourth Amendment educational materials, re-conduct training sessions, and redo Know-Your-Rights programming. They would be able to offer clear guidance on warrant requirements—a service the community has long relied on them to provide. And they would not be at risk of reduced community confidence and participation. The Lyons Memo has thwarted the Plaintiffs' activities and missions.

98. Because of the Lyons Memo, the Plaintiffs have been forced to divert resources away from many of their core initiatives: educational equity and tutoring, housing support, youth engagement and community empowerment, and family preparedness workshops and citizenship education courses. This diversion of resources has impaired their ability to provide regular programming and support to their community members and participants. Because of this diversion of resources, the Plaintiffs' core activities have and will continue to be undermined, and their capacity to serve members limited. The Plaintiffs' resources are being reallocated in real time and will continue to shift as unlawful ICE enforcement escalates.

V.      CLAIMS FOR RELIEF

COUNT I

**VIOLATION OF ADMINISTRATIVE PROCEDURE ACT – CONTRARY TO
CONSTITUTIONAL RIGHT**

99.     The Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein.

100.    The Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq.*, ensures that federal agencies are accountable to the public by providing a "right of review" to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702. Judicial review extends to "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704.

101.    The Lyons Memo is a final agency action. An agency action is considered "final" if it "mark[s] the 'consummation' of the agency's decisionmaking process," meaning "not [] of a merely tentative or interlocutory nature," and it is an action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted).

102.    The APA empowers the federal courts to "hold unlawful and set aside agency action[s]" that are "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

103.    The guidance set forth in the Lyons Memo violates the Fourth Amendment of the U.S. Constitution.

104.    The Fourth Amendment's core purpose is to protect the privacy and sanctity of the home from "unreasonable governmental intrusion." *Silverman*, 365 U.S. at 511. In providing the right of people to "be secure in their persons, houses, papers, and effects, against

-32-

unreasonable searches and seizures," U.S. Const. amend. IV, a key principle of Fourth

Amendment precedent is that "searches and seizures inside a home without a warrant are

presumptively unreasonable," *Payton*, 445 U.S. at 586.

105.    The Lyons Memo purports to authorize ICE officers to enter homes without a

judicial warrant and therefore violates this fundamental constitutional right. *See, e.g.*, *Kidd*, 734

F. Supp. 3d at 980 (holding that an ICE-issued administrative warrant was "insufficient to enter

the constitutionally protected areas of a home").

106.    As a result of the Defendants' unlawful actions, the Plaintiffs face irreparable

harm.

**COUNT II**

**VIOLATION OF ADMINISTRATIVE PROCEDURE ACT – NOT IN
ACCORDANCE WITH THE LAW**

107.    The Plaintiffs re-allege and incorporate each and every allegation made in the

preceding paragraphs as if fully set forth herein.

108.    The APA also empowers the federal courts to "hold unlawful and set aside agency

actions" that are "not in accordance with law." 5 U.S.C. § 706(2)(A). Administrative law

prescribes that agencies are required to follow their own regulations. *United States ex. rel.

Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954).

109.    The guidance set forth in the Lyons Memo violates DHS regulations.

110.    The Lyons Memo purports to authorize immigration officers to enter homes

without a judicial warrant, in violation of the INA, *see* 8 U.S.C. § 1357(a)(2), agency regulations,

*see* 8 C.F.R. §§ 287.8(c)(2)(ii), (f)(2), and the APA, *see* 5 U.S.C. § 706(2)(A); *Accardi*, 347 U.S.

at 268.

111.    As a result of the Defendants' unlawful actions, the Plaintiffs face irreparable harm.

## COUNT III

### VIOLATION OF ADMINISTRATIVE PROCEDURE ACT – ARBITRARY AND CAPRICIOUS

112.    The Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein.

113.    The APA empowers federal courts to "hold unlawful and set aside agency actions" that are "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A). An agency action is arbitrary or capricious "if it is not reasonable and reasonably explained." *Ohio v. Env'tl Prot. Agency*, 603 U.S. 279, 292 (2024) (citation omitted).

114.    This flows from the "basic procedural requirement[] of administrative rulemaking [] that an agency must give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

115.    An agency may change course on or reverse an existing policy so long as it provides a reasoned explanation for that change. *Id.* It "must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Id.* (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). The agency "must also be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account,'" and must therefore provide a reasoned explanation "'for disregarding . . . circumstances that . . . were engendered by the prior policy.'" *Id.* at 221–22 (quoting *FCC*, 556 U.S. at 515–16). "An 'unexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'" *Id.* at 222

-34-

(quoting *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

116.    The Defendants' actions are arbitrary and capricious. Defendant Lyons acknowledged a change in position, stating in the Memo that DHS "has not historically relied on" the enforcement practice that the Lyons Memo then purports to authorize. Ex. A at 1. However, the Defendants do not address any reliance interests engendered by centuries-old warrant practices pursuant to the Fourth Amendment, nor do they provide any explanation or reasoning for the significant policy change outlined in the Lyons Memo.

117.    The Lyons Memo references a "legal determination" made by the DHS Office of the General Counsel that the law does "not prohibit relying on administrative warrants for" arresting individuals subject to final orders of removal in their homes. However, the Defendants fail to offer any information about that legal determination, nor any justification for this sudden departure from longstanding constitutional principles and agency policy and practice.

118.    As a result of the Defendants' unlawful actions, the Plaintiffs face irreparable harm.

**COUNT IV**

**VIOLATION OF ADMINISTRATIVE PROCEDURE ACT – NOTICE-AND-COMMENT RULEMAKING PROCESS**

119.    The Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein.

120.    The APA requires agencies to follow a three-step notice-and-comment process when formulating, amending, or repealing an administrative rule. 5 U.S.C. §§ 553, 551(5). "Failure to abide by these requirements renders a rule procedurally invalid." *N.H. Hosp. Assoc. v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018).

-35-

121. Only interpretive rules; general statements of policy; or rules of agency organization, procedure, or practice are exempted from this three-step process. 5 U.S.C. § 553(b)(A).

122. "Agencies have never been able to avoid notice and comment simply by mislabeling their substantive pronouncements." *Azar v. Allina Health Servs.*, 587 U.S. 566, 575 (2019). "On the contrary, courts have long looked to the *contents* of the agency's action, not the agency's self-serving *label*, when deciding whether statutory notice and comment demands apply." *Id.* (emphasis in original).

123. An agency policy is considered a substantive rule if it "adopt[s] a new position inconsistent with any of the [agency's] existing regulations," *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 88 (1995), or is "inconsistent with another rule having the force of law," *Mass. v. Nat'l Inst. of Health*, 770 F. Supp. 3d 277, 315 (D. Mass. 2025) (citing *N.H. Hosp. Assoc.*, 887 F.3d at 73). Additionally, a policy is a substantive rule if it "creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself." *N.H. Hosp. Assoc.*, 887 F.3d at 70 (citation omitted).

124. In contrast, an interpretive rule is merely "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers," *Shalala*, 514 U.S. at 99; a general statement of policy is "issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power," *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n. 31 (1979) (citation omitted); and a rule of agency organization, procedure, or practice is one "primarily directed toward improving the efficient and effective operations of an agency," *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014).

125.    Despite not being labeled as such, the policy set forth in the Lyons Memo is a substantive rule subject to the APA's notice-and-comment process.

126.    The Lyons Memo establishes a policy that is inconsistent with DHS regulations, rules, operating procedures, and other preexisting policies.

127.    Because DHS and ICE did not go through the requisite notice-and-comment period, the Lyons Memo violates the procedural requirements of the APA. *See* 5 U.S.C. §§ 553, 551(5).

128.    As a result of the Defendants' unlawful actions, the Plaintiffs face irreparable harm.

## COUNT V

### DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201, 2202

129.    The Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein.

130.    For the reasons stated above, the Defendants have committed numerous violations of the APA.

131.    The Plaintiffs seek a declaration to that effect.

132.    The Defendants' illegal actions have injured and will continue to injure the Plaintiffs in numerous ways.

### VI.    PRAYER FOR RELIEF

Wherefore the Plaintiffs respectfully request that the Court grant the following relief:

A.    Issue a declaration pursuant to 28 U.S.C. §§ 2201 and 2202 that the Lyons Memo violates the Administrative Procedure Act and is therefore void and without legal force or effect;

B.      Hold unlawful, vacate, and set aside the Lyons Memo pursuant to 5 U.S.C. §§ 553, 551(5), 705, and 706;

C.      Issue a preliminary and permanent injunction enjoining the Defendants, their agents, servants, employees, attorneys and all persons in active concert with them from implementing or effectuating the Lyons Memo;

D.      Issue an order awarding the Plaintiffs reasonable attorneys' fees, costs, and expenses; and

E.      Such other and additional relief as the Court deems equitable, just, and proper.


Dated: March 20, 2026                          By their attorneys,

                                               /s/ Brooke Simone
                                               Brooke Simone (BBO #718168)
                                               Jillian Lenson (BBO #690653)
                                               Oren Sellstrom (BBO #569045)
                                               Iván Espinoza-Madrigal (BBO #708080)
                                               Lawyers for Civil Rights
                                               61 Batterymarch Street, 5th Floor
                                               Boston, Massachusetts 02210
                                               (617) 482-1145
                                               bsimone@lawyersforcivilrights.org
                                               jlenson@lawyersforcivilrights.org
                                               osellstrom@lawyersforcivilrights.org
                                               iespinoza@lawyersforcivilrights.org

                                               /s/ Thomas M. Sobol
                                               Thomas M. Sobol (BBO #471770)
                                               Hannah W. Brennan (BBO #688179)
                                               Michael H. Lavine (BBO #717587)
                                               Chris O'Brien (BBO #703767)
                                               Hagens Berman Sobol Shapiro LLP
                                               One Faneuil Hall Square, 5th Floor
                                               Boston, MA 02109
                                               Telephone: (617) 482-3700
                                               tom@hbsslaw.com
                                               hannahb@hbsslaw.com
                                               michael.lavine@hbsslaw.com
                                               chrisob@hbsslaw.com


-38-

-39-

## CERTIFICATE OF SERVICE

I, Thomas M. Sobol, hereby certify under penalty of perjury under the laws of the United States that the foregoing document was electronically filed with the United States District Court using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: March 20, 2026                         */s/ Thomas M. Sobol*
                                              Thomas M. Sobol