**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

GREATER BOSTON LATINO NETWORK, BRAZILIAN WORKER CENTER, INC., and MASSACHUSETTS COMMUNITIES ACTION NETWORK,

Plaintiffs,

v.

MARKWAYNE MULLIN, *in his official capacity as Secretary of the U.S. Department of Homeland Security*; U.S. DEPARTMENT OF HOMELAND SECURITY; DAVID VENTURELLA, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; and U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,

Defendants.

Civil Action No. 1:26-cv-10472-JEK

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR STAY**

# TABLE OF CONTENTS

**Page**


INTRODUCTION .......... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS .......... 2

ARGUMENT .......... 5

I. Plaintiffs are entitled to summary judgment on Counts I, II, and IV .......... 5

A. Legal Standard for Summary Judgment .......... 5

B. The Lyons Memo is reviewable under the APA. .......... 6

1. The Lyons Memo is a "final agency action for which there is no other adequate remedy in court." .......... 6

2. No statute precludes judicial review of the Lyons Memo, and no law commits its policy to agency discretion. .......... 9

C. The Lyons Memo violates the APA as contrary to constitutional right. .......... 10

1. The Fourth Amendment's protections apply to noncitizens. .......... 10

2. DHS Form I-205s do not satisfy the Fourth Amendment's requirement of probable cause of a criminal offense. .......... 11

3. DHS Form I-205s do not satisfy the Fourth Amendment's requirement that a warrant be issued by a neutral and detached magistrate. .......... 12

4. Home arrests pursuant to DHS Form I-205s alone will not satisfy the Fourth Amendment's reasonable-belief-of-residence-and-presence requirement in all instances. .......... 16

D. The Lyons Memo violates the APA as not in accordance with law. .......... 18

E. The Lyons Memo violates the APA's rulemaking requirements .......... 20

F. This Court should vacate the Lyons Memo. .......... 23

II. In the alternative, the Court should stay the Lyons Memo under 5 U.S.C. § 705 .......... 24

A. Legal Standard for a Stay under 5 U.S.C. § 705 .......... 24

B. Plaintiffs are likely to succeed on the merits. .......... 25

C. Plaintiffs will suffer irreparable harm absent a stay. .......... 25

1. The Lyons Memo upends Plaintiffs' ability to provide community members with clear counsel on their Fourth Amendment rights.......... 27

2. The Lyons Memo interferes with Plaintiffs' ability to conduct their other core activities. .......... 30

3. The Lyons Memo will erode community trust in Plaintiffs.......... 32

D. The balance of the equities and public interest favor granting Plaintiffs the requested relief. .......... 34

CONCLUSION.......... 35

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Abel v. United States*,
362 U.S. 217 (1960)....................14, 15

*Abuhajeb v. Pompeo*,
531 F. Supp. 3d 447 (D. Mass. 2021)....................9

*United States ex. rel. Accardi v. Shaughnessy*,
347 U.S. 260 (1954)....................18

*Akebia Therapeutics, Inc. v. Azar*,
976 F.3d 86 (1st Cir. 2020)....................25

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
594 U.S. 758 (2021)....................35

*Alianza Americas v. DeSantis*,
727 F. Supp. 3d 9 (D. Mass. 2024)....................11

*Almeida-Sanchez v. United States*,
413 U.S. 266 (1973)....................10

*Am. Acad. of Pediatrics v. Kennedy*,
2026 WL 733828 (D. Mass. March 16, 2026), *appeal docketed* No. 26-1503....................30, 33

*Am. Fed'n of Labor & Cong. of Indus. Orgs. v. NLRB*,
57 F.4th 1023 (D.C. Cir. 2023)....................22

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health*,
145 F.4th 39 (1st Cir. 2025)....................9

*Am. Steel Erectors, Inc. v. Loc. Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*,
536 F.3d 68 (1st Cir. 2008)....................6

*Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*,
187 F. Supp. 3d 217 (D. Mass. 2016)....................33

*Arizona v. United States*,
567 U.S. 387 (2012)....................12

*Ass'n of Am. Univs. v. Dep't of Def.*,
792 F. Supp. 3d 143 (D. Mass. 2025)....................25, 34, 35

*Azar v. Allina Health Servs.*,
587 U.S. 566 (2019)....................20, 22

*Baillargeon v. CSX Transp. Corp.*,
463 F. Supp. 3d 76 (D. Mass. 2020)....................35

*Barbara v. Trump*,
790 F. Supp. 3d 80 (D.N.H. 2025), *cert. granted before judgment*, 146 S. Ct. 879 (2025)....................35

*Barlow v. Collins*,
397 U.S. 159 (1970)....................9

*Beck v. Ohio*,
379 U.S. 89 (1964)....................11

*Bennett v. Spear*,
520 U.S. 154 (1997)....................6, 7, 8

*Berger v. New York*,
388 U.S. 41 (1967)....................11

*Bowen v. Massachusetts*,
487 U.S. 879 (1988)....................8

*California v. Dep't of Educ.*,
132 F.4th 92 (1st Cir. 2025), *stay granted on other grounds*, 145 S. Ct. 966 (2025)....................9

*California v. Kennedy*,
802 F. Supp. 3d. 273 (D. Mass. 2025)....................26

*California v. Trump*,
786 F. Supp. 3d 359 (D. Mass. 2025)....................26, 34

*Campos-Chaves v. Garland*,
602 U.S. 447 (2024)....................12

*Chadwick v. WellPoint, Inc.*,
561 F.3d 38 (1st Cir. 2009)....................5, 6

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979)....................21, 22

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
598 F.3d 30 (2d Cir. 2010)....................24

*Cmty. Econ. Dev. Ctr. of Se. Mass. v. Bessent*,
818 F. Supp. 3d 228 (D. Mass. 2026) ....................33

*Coolidge v. New Hampshire*,
403 U.S. 443 (1971) ....................12, 15

*Corner Post, Inc. v. Bd. of Govs. of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) (Kavanaugh, J., concurring) ....................22

*Cotzojay v. Holder*,
725 F.3d 172 (2d Cir. 2013) ....................10

*Ctr. for Taxpayer Rts. v. IRS*,
815 F. Supp. 3d 1 (D.D.C. 2025) ....................32

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ....................9

*Doe v. Trump*,
766 F. Supp. 3d 266, 286-87 (D. Mass. 2025) ....................26, 34, 35

*DraftKings Inc. v. Hermalyn*,
732 F. Supp. 3d 84 (D. Mass. 2024) ....................25

*El Badrawi v. Dep't of Homeland Sec.*,
579 F. Supp. 2d 249 (D. Conn. 2008) ....................14

*Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*,
653 F.3d 1 (D.C. Cir. 2011) ....................22, 23

*Garrison G. v. Bondi*,
No. 26-CV-172 (D. Minn. Jan. 17, 2026), Dkt. No. 10 ....................4, 16

*Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal*,
546 U.S. 418 (2006) ....................24

*Greenlaw v. United States*,
554 U.S. 237 (2008) ....................15

*Guerrero Orellana v. Moniz*,
802 F. Supp. 3d 297 (D. Mass. 2025) ....................35

*Hassenfeld-Rutberg v. United States*,
112 F. Supp. 2d 77 (D. Mass. 1998) ....................18

*Ill. Migrant Council v. Pilliod*,
531 F. Supp. 1011 (N.D. Ill. 1982) ....................11

*Johnson v. United States*,
333 U.S. 10 (1948)....................10, 12, 14

*Labrador v. Poe*,
144 S. Ct. 921 (2024) (Kavanaugh, concurring)....................25

*League of Women Voters of N.H. v. Kramer*,
No. 24-CV-73, 2025 WL 3260024 (D.N.H. Oct. 17, 2025), *R. & R. adopted sub nom. League of Women Voters of N.H. v. Steve Kramer, LLC*, No. 24-CV-73, 2025 WL 3257189 (D.N.H. Nov. 20, 2025)....................30

*M-J-M-A- v. Hermosillo*,
No. 6:25-CV-02011-MTK, 2026 WL 562063 (D. Or. Feb. 27, 2026)....................19

*Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*,
496 F. Supp. 3d 600 (D. Mass. 2020)....................26, 29, 30, 34

*Massachusetts v. Nat'l Insts. of Health*,
770 F. Supp. 3d 277 (D. Mass. 2025)....................20, 21, 23, 26

*Massachusetts v. Trump*,
790 F. Supp. 3d 8 (D. Mass. 2025)....................8, 23

*Massachusetts v. U.S. Dep't of Health & Human Servs.*,
811 F. Supp. 3d 183 (D. Mass. 2025)....................32

*Mendoza v. Perez*,
754 F.3d 1002 (D.C. Cir. 2014)....................22, 23

*Morales v. Chadbourne*,
793 F.3d 208 (1st Cir. 2015)....................19

*N.H. Hosp. Assoc. v. Azar*,
887 F.3d 62 (1st Cir. 2018)....................20, 21

*Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*,
779 F. Supp. 3d 149 (D.N.H. 2025)....................29

*Nat'l Educ. Ass'n-N.H. v. N.H. Att'y Gen.*,
806 F. Supp. 3d 166 (D.N.H. 2025)....................26

*Nat'l TPS All. v. Noem*,
166 F.4th 739 (9th Cir. 2026)....................12, 24

*Neighborhood Ass'n of The Back Bay, Inc. v. Fed. Transit Admin.*,
407 F. Supp. 2d 323 (D. Mass. 2005), *aff'd*, 463 F.3d 50 (1st Cir. 2006)....................34

*New England Synod v. Dep't of Homeland Sec.*,
No. 25-CV-40102, 2026 WL 412329 (D. Mass. Feb. 13, 2026) ....35

*New York v. McMahon*,
784 F. Supp. 3d. 311 (D. Mass. 2025) ....26

*New York v. U.S. Dep't of Just.*,
804 F. Supp. 3d 294 (D.R.I. 2025), *appeal dismissed*, 2025 WL 4717710 ....21

*Nken v. Holder*,
556 U.S. 418 (2009) ....25, 34

*NuVasive, Inc. v. Day*,
954 F.3d 439 (1st Cir. 2020) ....25

*Orr v. Trump*,
778 F. Supp. 3d 394 (D. Mass. 2025) ....6, 9, 24, 26

*Payton v. New York*,
445 U.S. 573 (1980) ....15, 16

*Perez Cruz v. Barr*,
926 F.3d 1128 (9th Cir. 2019) ....11, 18

*Pickus v. U.S. Bd. of Parole*,
507 F.2d 1107 (D.C. Cir. 1974) ....23

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
102 F.3d 12 (1st Cir. 1996) ....34

*Sanchez v. Sessions*,
904 F.3d 643 (9th Cir. 2018) ....18

*Shalala v. Guernsey Mem'l Hosp.*,
514 U.S. 87 (1995) ....20

*Steagald v. United States*,
451 U.S. 204 (1981) ....14, 15

*Syncor Int'l Corp. v. Shalala*,
127 F.3d 90 (D.C. Cir. 1997) ....22

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ....24

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*,
592 U.S. 261 (2021) ....7

*United States v. Brignoni-Ponce*,
422 U.S. 873 (1975) ........................................ 10

*United States v. Curzi*,
867 F.2d 36 (1st Cir. 1989) ........................................ 15

*United States v. Quintana*,
623 F.3d 1237 (8th Cir. 2010) ........................................ 10

*United States v. U.S. Dist. Ct. for E. Dist. of Mich.*,
407 U.S. 297 (1972) ........................................ 13, 14

*United States v. Werra*,
638 F.3d 326 (1st Cir. 2011) ........................................ 16

*Vaqueria Tres Monjitas, Inc. v. Irizarry*,
587 F.3d 464 (1st Cir. 2009) ........................................ 26

*Warder v. Shalala*,
149 F.3d 73 (1st Cir. 1998) ........................................ 21

*Webster v. Doe*,
486 U.S. 592 (1988) ........................................ 18

*Worthley v. Sch. Comm. of Gloucester*,
652 F. Supp. 3d 204 (D. Mass. 2023) ........................................ 25

*Yanez-Marquez v. Lynch*,
789 F.3d 434 (4th Cir. 2015) ........................................ 11

*Ybarra v. Illinois*,
444 U.S. 85 (1979) ........................................ 12

**Statutes**

5 U.S.C. § 552 ........................................ 7

5 U.S.C. § 553 ........................................ 20, 22, 23

5 U.S.C. § 551(5) ........................................ 20, 23

5 U.S.C. § 701 ........................................ 6, 9

5 U.S.C. § 704 ........................................ 6, 8

5 U.S.C. § 705 ........................................ *passim*

5 U.S.C. § 706 ........................................ *passim*

8 U.S.C. § 1227 ........ 12

8 U.S.C. § 1229 ........ 3, 12, 13, 17

8 U.S.C. § 1231 ........ 16

8 U.S.C. § 1252 ........ 3, 13

8 U.S.C. § 1357 ........ 19

**Other Authorities**

8 C.F.R. § 241 ........ 2, 3, 13, 14

8 C.F.R. § 287 ........ *passim*

8 C.F.R. § 1003 ........ 3, 13

8 C.F.R. § 1240 ........ 3, 12

8 C.F.R. § 1241 ........ 3, 13

59 Fed. Reg. 42,406, 42,412 (Aug. 17, 1994) ........ 18

U.S. Const. amend. IV ........ *passim*

Exec. Order 14159, 90 Fed. Reg. 8443 (Jan. 29, 2025) ........ 2

Fed. R. Civ. P. 56(a) ........ 5

*Immigration Enforcement Officials Testify at Oversight Hearing* (C-SPAN, Feb. 12, 2026), https://www.c-span.org/program/senate-committee/immigration-enforcement-officials-testify-at-oversight-hearing/673422 ........ 17

*DHS Secretary Krisi Noem Testifies on Agency Oversight Hearing, Part 1* (C-SPAN, Mar. 3, 2026), https://www.c-span.org/program/senate-committee/homeland-security-secretary-noem-testifies-on-agency-oversight-hearing-part-1/674062 ........ 4

## INTRODUCTION

This case asks the Court to do something unremarkable: affirm the foundational principle that the government cannot enter private homes without a judicial warrant. The current presidential administration is the first to violate this core protection as a matter of policy. It does so by instructing U.S. Immigration and Customs Enforcement (ICE) officers to invade homes to effectuate civil immigration arrests on the so-called authority of the agency alone. In so doing, the agency disregards the neutral judicial oversight that the Fourth Amendment has always required. Defendants' policy—set forth in a memorandum written by the former Acting Director of ICE, Todd M. Lyons (the Lyons Memo or Memo)—violates the Fourth Amendment and disrupts the centuries-old principle that private homes provide safety and security.

Plaintiffs Greater Boston Latino Network, Brazilian Worker Center, and Massachusetts Communities Action Network are non-profit organizations that support immigrant families in Massachusetts. Counseling and training community members on their Fourth Amendment rights—including how to safely navigate interactions with ICE officers at their homes—are core activities of each Plaintiff. Defendants' violation of the Fourth Amendment undermines Plaintiffs' ability to provide clear, reliable guidance regarding constitutional protections. Defendants' unprecedented actions have also forced Plaintiffs to divert resources away from their other programs towards addressing the community panic that Defendants' unlawful actions have caused. Plaintiffs challenge Defendants' policy to save a core component of their missions: to provide accurate information to community members regarding their constitutional rights.

The Lyons Memo—and the home invasion policy it purports to authorize—is a final agency action that violates the Administrative Procedure Act (APA) as a matter of law for three reasons. First, any final agency action that runs contrary to a constitutional right violates the APA. Because the Memo instructs ICE officers that they can enter private homes without judicial

warrants, it violates the Fourth Amendment. Second, any final agency action that contradicts existing law violates the APA. Because the Memo conflicts with U.S. Department of Homeland Security (DHS) regulations, it is contrary to law. Third, because the Defendants failed to follow the proper rulemaking process in promulgating the Lyons Memo, it violates the APA. Any one of these violations, standing alone, provides sufficient grounds to vacate the Lyons Memo.

Plaintiffs respectfully request that the Court vacate the Lyons Memo under 5 U.S.C. § 706(2), restoring the sanctity the Constitution grants the home and ensuring Plaintiffs can fulfill their missions. Alternatively, Plaintiffs ask the Court to stay implementation of the Lyons Memo "pending conclusion of the[se] review proceedings" pursuant to 5 U.S.C. § 705. Such a stay is appropriate: Plaintiffs are likely to succeed on the merits of their lawsuit; the Lyons Memo upends their ability to perform their core activities, causing them irreparable harm; and the balance of the equities and public interest favor staying unlawful government action.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. When President Donald J. Trump took office in January 2025, he directed federal officials to combat a so-called immigrant "invasion." Exec. Order 14159, 90 Fed. Reg. 8443 (Jan. 29, 2025).

2. Following this directive, on May 12, 2025, former Acting Director of U.S. Immigration and Customs Enforcement, Todd M. Lyons, issued a signed memorandum to "All ICE Personnel" titled "Utilizing Form I-205, Warrant of Removal." Ex. 1 (Lyons Memo).

3. This Memo tells ICE officers that they can use DHS Form I-205s to seize certain individuals from their homes for detention and removal. *Id.* at 1–2.

4. DHS Form I-205s are not judicial warrants. Rather, they are administrative documents that executive branch officials at DHS create. Ex. 6 (Form I-205); 8 C.F.R. § 241.2(b); *id.* § 287.5(e)(3).

5. DHS Form I-205s allow officers to detain individuals subject to "final" orders of removal—orders that other executive branch officials issue. Ex. 6 (Form I-205).[1]

6. An order of removal is issued upon a finding of "clear and convincing evidence that . . . the alien is deportable." 8 U.S.C. § 1229a(c)(3)(A); *see also* 8 C.F.R. § 1240.8(a).

7. Under the Lyons Memo, ICE officers do not need consent, exigent circumstances, court order, or a judicial warrant before they can enter private residences. *See* Ex. 1 (Lyons Memo).

8. The Memo instructs that officers may use "a necessary and reasonable amount of force" to enter private homes to effectuate arrest and detention. *Id.* at 2.

9. The Memo acknowledges that it marks a departure from prior practice: "Although [DHS] has not historically relied on administrative warrants alone to arrest aliens subject to final orders of removal in their place of residence, the DHS Office of the General Counsel has recently determined that the U.S. Constitution, the Immigration and Nationality Act, and the immigration regulations do not prohibit relying on administrative warrants for this purpose." *Id.* at 1.

10. The Memo offers no further explanation for this "legal determination." *Id.*

11. In a footnote, the Lyons Memo acknowledges *Kidd v. Mayorkas,* where the U.S. District Court for the Central District of California held: "an [ICE] administrative warrant is

[1] Plaintiffs use the phrase "final order of removal" to mirror the language of the Immigration and Nationality Act and agency regulations. *See, e.g.*, 8 U.S.C. § 1252 (referencing "final order of removal"); 8 C.F.R. § 1241.1 (titled "Final order of removal"); 8 C.F.R. § 1003.39 (discussing when an immigration judge's decision "becomes final"); 8 C.F.R. § 241.2 ("A Form I-205, Warrant of Removal, based on the final administrative removal order . . . ."). Plaintiffs do not, however, concede that such orders are in fact final. To the contrary, these orders can be rescinded upon the filing of a motion to reopen. *See* 8 U.S.C. §§ 1229a(5)(C); 8 C.F.R. § 1003.23. Between 2008 and 2018, fifteen percent of all final removal orders entered in *in absentia* were rescinded. *See* Ex. 17 at 4 (American Immigration Council Special Report). Additionally, immigration judges and the Board of Immigration Appeals can *sua sponte* reopen final orders of removal "at any time." 8 C.F.R. § 1003.23(b)(1); 8 C.F.R. § 1003.2(a). Practical issues with enforcing these orders are discussed *infra* in Section I.C.4.

insufficient to enter the constitutionally protected areas of a home." 734 F. Supp. 3d 967, 980 (C.D. Cal. 2024); *see* Ex. 1 at 2 n.3 (Lyons Memo). The Memo states that "immigration officers may not enter into the curtilage for either a knock and talk or an immigration arrest absent a judicial warrant within the Central District of California." Ex. 1 at 2 n.3 (Lyons Memo).

12. The Memo is effective in all other districts of the United States. *See id.*[2]

13. DHS officials are training ICE Enforcement and Removal Operations (ERO) cadets to follow the policy set forth in the Lyons Memo. Ex. 2 ¶¶ 7, 11–12, 16 (Schwank).

14. DHS officials are instructing ICE ERO cadets that they can enter homes without judicial warrants. *Id.* ¶¶ 6–7.

15. ICE ERO cadets become ICE deportation officers after completing required trainings. *See* Ex. 7 at 7 (ICE webpage Deportation Officer job posting).

16. Pursuant to the Lyons Memo, ICE officers have entered individuals' homes and detained them based on DHS Form I-205s alone.[3] High-profile examples include the January 11, 2026 warrantless home arrest of Garrison Gibson in Minneapolis, Minnesota and the January 18, 2026 warrantless home arrest of U.S. citizen ChongLy Scott Thao in St. Paul, Minnesota. *See* Am. Order ¶ 6, *Garrison G. v. Bondi*, No. 26-CV-172 (D. Minn. Jan. 17, 2026), Dkt. No. 10; Ex. 8 (NewsNation Article); Ex. 9 (MPR News Article); Ex. 10 (KSTP News Article); Ex. 11 (PBS Article); Ex. 12 (N.Y. Times Article).

[2] Defendants represent that the policy set forth in the Lyons Memo is currently paused, *see* ECF No. 16 ¶ 5, but have refused to file a stipulation or other legally binding document staying implementation of the Memo and ensuring that ICE officers have been trained on that stay, *see* ECF No. 19 at 3. Without such an order or stipulation, this brief treats the Memo as in effect.

[3] Administrative warrants have been used at least twenty-eight times to enter homes, according to the testimony of former-DHS Secretary Kristi Noem before Congress. *DHS Secretary Krisi Noem Testifies on Agency Oversight Hearing, Part 1*, at 40:30–41:19, (C-SPAN, Mar. 3, 2026), https://www.c-span.org/program/senate-committee/homeland-security-secretary-noem-testifies-on-agency-oversight-hearing-part-1/674062 (on file with Plaintiffs' counsel).

17. A former ICE employee publicly exposed the Lyons Memo in January 2026. *See* Ex. 13 (Whistleblower Disclosure).

18. In response, high-ranking DHS officials and the White House doubled down on the policy. Ex. 15 (WVTM Article); Ex. 16 (DHS Press Release). DHS issued a press statement defending the policy and branding individuals subject to final orders of removal "fugitives from justice." Ex. 16 (DHS Press Release) at 1.

19. DHS and ICE neither provided notice of nor solicited public comment on the policy laid out in the Lyons Memo before issuing it. *See* Ex. 2 ¶ 13 (Schwank).

20. DHS and ICE did not publicly disclose the Lyons Memo upon its issuance. *See id.*

21. DHS did not amend or repeal any agency regulations before issuing the Memo.

## ARGUMENT

### I. Plaintiffs are entitled to summary judgment on Counts I, II, and IV.

There are no genuine disputes as to any material fact with respect to Count I (APA violation: contrary to constitutional right), Count II (APA violation: not in accordance with the law), and Count IV (APA violation: notice-and-comment rulemaking process) of the Complaint. As a result, summary judgment is appropriate and the Lyons Memo should be vacated.

#### A. Legal Standard for Summary Judgment

Under Rule 56, "[a] party may move for summary judgment" on all claims or on a specific "part of [a] claim." Fed. R. Civ. P. 56(a). Summary judgment is intended "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56 advisory committee's note to the 1963 amendment. It is therefore proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is considered "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 43 (1st

Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is considered material if "it carries with it the potential to affect the outcome of the suit under the applicable law." *Am. Steel Erectors, Inc. v. Loc. Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 536 F.3d 68, 75 (1st Cir. 2008). Courts look at "the summary judgment record in the light most favorable to the nonmoving party [] and also draw all reasonable inferences in [the nonmoving party's] favor." *Chadwick*, 561 F. 3d at 43.

**B. The Lyons Memo is reviewable under the APA.**

Under the APA, plaintiffs may challenge an "agency action," 5 U.S.C. § 706, defined to "include[] the whole or a part of an agency rule, [or] order," *id.* § 551(13); *see id.* § 701(b)(2). An agency action is "subject to judicial review" if it is a "final agency action for which there is no other adequate remedy in court." *Id.* § 704. This presumption can be rebutted if review is precluded by statute or if the "agency action is committed to agency discretion by law." *Id.* § 701(a). Here, the Lyons Memo is a final agency action that is neither committed to DHS's discretion nor precluded from judicial review by statute.

**1. The Lyons Memo is a "final agency action for which there is no other adequate remedy in court."**

An agency action must satisfy two conditions to be considered "final": (1) it "must mark the consummation of the agency's decisionmaking process," meaning "not [] of a merely tentative or interlocutory nature," and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow . . . ." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotations omitted); *see also Orr v. Trump*, 778 F. Supp. 3d 394, 419–22 (D. Mass. 2025) (finding federal policy reviewable under the APA). Finally, there must be no other adequate remedy in court to ameliorate the final action. The Lyons Memo meets these conditions.

*First*, the Memo marks the consummation of the agency's decision-making process. It is a

formal memorandum issued and signed by former Acting Director of ICE, Todd M. Lyons, on ICE letterhead. *See* Ex. 1 at 1 (Lyons Memo). A DHS Deputy Chief Counsel instructed that the Lyons Memo was official agency policy. Ex. 2 ¶ 6 (Schwank). DHS leadership directed DHS attorneys to train ICE ERO cadets (i.e., future ICE officers) to follow the policy set forth in the Memo, including "instruct[ing] cadets that they may enter a residence using an I-205 administrative warrant . . . ." *Id.* ¶ 7; *see id.* ¶¶ 10–12, 13(e). ICE officers across the country have relied on the Memo to enter homes without judicial warrants, including in Chicago, Illinois and Texas. *See id.* ¶¶ 13(b)–(c). The "Memo was treated as mandatory guidance" by DHS officials, *id.* ¶ 13, and "[a]ttorney instructors were verbally warned by [] management that raising objections to teaching the Memo . . . would carry adverse professional consequences." *Id.* ¶ 10. Nothing about the Memo and its implementation is tentative.

Additional agency actions since the Lyons Memo's public disclosure have confirmed its finality. Significantly, ICE released the Memo in response to a Freedom of Information Act (FOIA) request. *Id.* ¶ 15(b). Agencies need not turn over pre-decisional and deliberative materials under FOIA's deliberative process exemption. *See* 5 U.S.C. § 552(b)(5); *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 267–68 (2021). But that exemption "does not apply . . . to documents that embody a *final decision*, because once a decision has been made, the deliberations are done." *U.S. Fish & Wildlife Serv.*, 592 U.S. at 268 (emphasis added). ICE's release of the Memo pursuant to a FOIA request underscores its finality. DHS and other executive branch officials have also publicly defended the policy. Ex. 15 (WVTM); Ex. 16 (DHS Press Release).

*Second*, the Lyons Memo "determine[s]" (and eliminates) "rights" under the Fourth Amendment—an action from which "legal consequences [] flow.'" *Bennett*, 520 U.S. at 178. The Memo explains that DHS "determined that the U.S. Constitution, the [INA], and the immigration

regulations do not prohibit relying on administrative warrants" to "arrest aliens subject to final orders of removal in their place of residence." Ex 1 at 1. Therefore, the Memo sets forth the agency's new and controlling interpretation of federal law and the Constitution. *Cf. Massachusetts v. Trump*, 790 F. Supp. 3d 8, 27 (D. Mass. 2025) (holding an agency action final where it "in effect amends several regulations by requiring that the agencies must not follow the usual, specified procedures for an unspecified period of time"). And the Memo has led to "direct and appreciable legal consequences": under its authority, ICE officers have subjected both citizens and noncitizens to destructive home invasions. *Bennett*, 520 U.S. at 177–78; *see supra* Statement of Facts ¶ ; Ex. 2 ¶ 13(c) (Schwank); Ex. 5 ¶ 17 (MCAN) (referencing two instances in spring 2025 where ICE officers entered the curtilage of individuals' private homes without judicial warrants).

The fact that DHS did not update certain written ICE materials to reflect the Memo does not undermine its finality.[4] Instead, this choice is evidence of DHS's intentional concealment of the policy while it endeavored to bring test cases in jurisdictions most likely to side with the agency's position. *See* Ex. 2 ¶¶ 13, 13(a)–(e) (Schwank).

Finally, this Court may review the Lyons Memo because Plaintiffs have no other remedy under the law. The Supreme Court has explained that the APA limits judicial review to "'final agency action for which there is no other adequate remedy in a court,' 5 U.S.C. § 704[,]" to avoid "duplicat[ing] the previously established special statutory procedures relating to specific agencies." *Bowen v. Massachusetts*, 487 U.S. 879, 903–04 (1988) (internal quotation marks omitted). Because Congress has not "provided a 'special and adequate review procedure'" that is

[4] The agency refused to incorporate the Memo into written training materials, disseminate written copies of the Memo to ICE personnel, document instruction of the Memo, and save the Memo to the agency's internal policy archive. Ex. 2 ¶¶ 13(a)–(e) (Schwank). According to the ICE whistleblower, these "actions in which the agency practice deviated from standard procedure" were an attempt "to hide the policy change." *Id.* ¶ 13.

applicable here, there is no risk of such duplication. *Abuhajeb v. Pompeo*, 531 F. Supp. 3d 447, 454–55 (D. Mass. 2021) (citation omitted).

**2. No statute precludes judicial review of the Lyons Memo, and no law commits its policy to agency discretion.**

Neither of the two exceptions to the APA's presumption of reviewability apply to the Lyons Memo. *See* 5 U.S.C. § 701(a); *Barlow v. Collins*, 397 U.S. 159, 166 (1970) ("judicial review of . . . administrative action is the rule, and nonreviewability an exception").

*First*, there is no statute precluding judicial review of the Memo. *See* 5 U.S.C. § 701(a)(1).

*Second*, the action at issue here is not committed to agency discretion by law. *See* 5 U.S.C. § 701(a)(2). This exception is construed "quite narrowly, restricting it to those rare circumstances where the relevant statute [conferring agency authority] is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (quotation and citation omitted) (holding that agency decision is subject to judicial review); *see also Orr*, 778 F. Supp. 3d at 421 (finding federal policy reviewable under the APA).

Here, the Constitution and DHS's own regulations are highly relevant and meaningful standards against which the Court can judge the Lyons Memo. *See, e.g.*, *California v. Dep't of Educ.*, 132 F.4th 92, 97–98 (1st Cir. 2025) (finding policy reviewable under the APA and noting that regulatory and statutory limits on agency discretion are meaningful standards by which to judge its action), *stay granted on other grounds*, 145 S. Ct. 966 (2025); *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 145 F.4th 39, 53 (1st Cir. 2025) ("Because there are appropriate, 'judicially manageable standards' for evaluating the Department's actions, . . . we conclude [that the agency's action] is reviewable under the APA"). Moreover, civil immigration arrests in private homes are not an area traditionally committed to agency discretion. *See, e.g.*, *Kidd*, 734 F. Supp. 3d at 987–

88 (granting summary judgment against DHS for using administrative warrants to conduct home arrests). The Lyons Memo is thus reviewable under the APA.

### C. The Lyons Memo violates the APA as contrary to constitutional right.

The Lyons Memo and the policy it sets forth violate the Fourth Amendment and therefore the APA. The Fourth Amendment generally prohibits law enforcement officers from entering homes without either consent or a valid judicial warrant. A judicial warrant requires probable cause of a crime and must be issued by a "neutral and detached magistrate." *Johnson v. United States*, 333 U.S. 10, 14 (1948). DHS Form I-205s meet neither requirement and, thus, are not judicial warrants. As a result, the Lyons Memo's instruction that ICE officers may enter homes to make arrests with only DHS Form I-205s in hand violates the Fourth Amendment. Under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). Plaintiffs are entitled to this relief.

#### 1. The Fourth Amendment's protections apply to noncitizens.

To begin, the Fourth Amendment provides "[t]he right of the *people* to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV (emphasis added). The Supreme Court—as well as appellate courts across the country—have unequivocally held that the Fourth Amendment protects all "people" within the United States, regardless of immigration status. *See Almeida-Sanchez v. United States*, 413 U.S. 266, 273 (1973) (holding that a noncitizen had a "Fourth Amendment right to be free of 'unreasonable searches and seizures'"); *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975) (Fourth Amendment applies to noncitizens stopped by Border Patrol); *Cotzojay v. Holder*, 725 F.3d 172, 181 (2d Cir. 2013) ("it is uncontroversial that the Fourth Amendment applies to aliens and citizens alike"); *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010) ("the Fourth

Amendment applies to arrests of illegal aliens"); *Yanez-Marquez v. Lynch*, 789 F.3d 434, 469 (4th Cir. 2015) (holding that ICE agents violated the Fourth Amendment rights of a noncitizen in removal proceedings); *Perez Cruz v. Barr*, 926 F.3d 1128, 1146 (9th Cir. 2019) (holding that ICE agents violated the Fourth Amendment rights of a undocumented noncitizen during an immigration raid); *Alianza Americas v. DeSantis*, 727 F. Supp. 3d 9, 61 (D. Mass. 2024) (denying a motion to dismiss Fourth Amendment claims filed by noncitizens).

**2. DHS Form I-205s do not satisfy the Fourth Amendment's requirement of probable cause of a criminal offense.**

The Fourth Amendment states: "no Warrants shall issue, but upon *probable cause*, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV (emphasis added). The Fourth Amendment requires law enforcement officers to have probable cause of a crime before they can obtain a judicial warrant.[5] *See Berger v. New York*, 388 U.S. 41, 59 (1967) ("The purpose of the probable cause requirement of the Fourth Amendment[] [is] to keep the state out of constitutionally protected areas until it has reason to believe that a specific crime has been or is being committed"). Without this requirement, DHS "would be able to arbitrarily 'seize' a large category of persons, many if not most of whom are presumably engaged in no wrongdoing." *Ill. Migrant Council v. Pilliod*, 531 F. Supp. 1011, 1017 (N.D. Ill. 1982) (enjoining immigration officials from conducting stops and searches without reasonable suspicion). This is "the sort of general seizure . . . [that] the fourth amendment prohibits." *Id.*

Home entries and arrests based on DHS Form I-205s alone, as the Lyons Memo instructs, cannot satisfy the probable cause requirement. DHS Form I-205s—and the underlying orders of

[5] Probable cause is also required to conduct a warrantless arrest. *Beck v. Ohio*, 379 U.S. 89, 91 (1964) (a warrantless arrest must be supported by probable cause of a crime).

removal on which they are based—do not require probable cause that their subject committed a crime.[6] Instead, the underlying removal order rests on "clear and convincing evidence" of removability.[7] 8 U.S.C. § 1229a(c)(3)(A); 8 C.F.R. § 1240.8(a). Removability is a civil question resolved through a civil determination. *See Arizona v. United States*, 567 U.S. 387, 396 (2012) ("Removal is a civil, not criminal, matter."); *id.* at 407 ("it is not a crime for a removable alien to remain present in the United States"). There is no requirement of criminality to support either a removal order or a DHS Form I-205.[8]

Finally, even if probable cause of a crime could be established, it must be particularized to the person seized. *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). The Memo greenlights home arrests of *all* "aliens subject to a final orders of removal" without requiring any particularized inquiry for a given individual. Ex. 1 at 1 (Lyons Memo). This cannot comport with the Fourth Amendment.

**3. DHS Form I-205s do not satisfy the Fourth Amendment's requirement that a warrant be issued by a neutral and detached magistrate.**

The Fourth Amendment also requires that a warrant be issued by a "neutral and detached magistrate" meaning "a judicial officer." *Johnson*, 333 U.S. at 14. This obligation reflects the Founders' commitment to the separation of powers: requiring a neutral, judicial arbiter prevents the executive branch from rubber-stamping its own law enforcement actions. *See Coolidge v. New Hampshire*, 403 U.S. 443, 450 (1971). The "Fourth Amendment does not contemplate the

---

[6] It seems at least some ICE officers understood the Fourth Amendment's probable cause requirement and sought judicial warrants "based on probable cause of *criminal* offenses rather than relying on I-205 as directed by the [Lyons] Memo." Ex. 2 ¶ 13(f) (Schwank) (emphasis added).

[7] A different showing is required for final orders of removal entered *in absentia*. They may only be ordered if the immigration judge finds "clear, *unequivocal*, and convincing evidence that . . . the alien is removable." 8 U.S.C. § 1229a(b)(5)(A) (emphasis added); *see Campos-Chaves v. Garland*, 602 U.S. 447, 452-53 (2024) (discussing standard).

[8] Civil removability can be—*but is not required to be*—based on a criminal offense. *See* 8 U.S.C. § 1227(a); *Arizona*, 567 U.S. at 396.

executive officers of Government as neutral and disinterested magistrates." *United States v. U.S. Dist. Ct. for E. Dist. of Mich.*, 407 U.S. 297, 317 (1972).

Because DHS Form I-205s are the product of executive branch action alone, they do not satisfy the Fourth Amendment's "neutral and detached magistrate" requirement. The process for issuing and executing these forms is as follows: First, an executive branch officer—either an immigration judge,[9] who works for the Department of Justice (DOJ), or the Board of Immigration Appeals (BIA), which is an administrative body within the DOJ—issues a removal order.[10] *See* 8 U.S.C. § 1229a(c)(3)(A); 8 C.F.R. § 1003.39 (describing when orders become final); Ex. 6 (Form I-205). Second, other executive branch officers, *i.e.*, DHS officers, use the final removal order to issue a DHS Form I-205. *See* 8 C.F.R. § 241.2(a) (2025); Ex. 6 (Form I-205) (stating that it is signed "by virtue of the power and authority vested in the Secretary of Homeland Security"); *id.* (DHS Form I-205s authorize the arrests only of individuals who are "subject to removal/deportation from the United States, based upon a final order"); Ex. 16 (DHS Press Release) (DHS Form I- 205s are "only used when an illegal alien has been given a final order of removal by a judge"). Third, executive branch officers within DHS use the Form I-205 to make an

[9] Immigration judges lack the authority and jurisdiction to issue judicial warrants. *See* 8 U.S.C. § 1229a (enumerating actions that immigration judges can take); 8 C.F.R. § 1003.10(b) (explaining "[p]owers and duties" of immigration judges).

[10] DHS Form I-205s imply that "a United States District or Magistrate Court Judge" can also issue a final order of removal. *See* Ex. 6 (Form I-205). However, the statutory scheme set forth by Congress and implemented through DHS regulations authorizes no such action. *See* 8 U.S.C. § 1229; 8 C.F.R. § 1003.1(d)(7); 8 C.F.R. § 1003.39; 8 C.F.R. § 1241.1; *see also* 8 U.S.C. § 1252. DHS has itself stated that "[a]n administrative warrant of removal can generally only be issued after an Immigration Judge . . . issued a final order of removal . . . ." Ex. 23 at 2 (Second DHS Press Release); *see also* Ex. 18 (ICE Website—Removal Process) ("As part of its mission, ERO removes individuals from the U.S. who are subject to final orders of removal, which may be issued by an immigration judge within the [DOJ] Executive Office for Immigration Review (EOIR) or through other administrative means."). Even assuming *arguendo* that an independent judicial officer issued a final order of removal, such an order would not render an ICE home entry pursuant to a DHS Form I-205 alone lawful. *See supra* Section I.C.2 and *infra* Section I.C.4.

arrest. *See* 8 C.F.R. § 241.2(b); 8 C.F.R. § 287.5(e)(3); Ex. 6 (Form I-205). Executive branch officials carry out every step in this chain—from the removal order that triggers the DHS Form I-205, to its use—to make an arrest. And the arrest process is even more self-contained: the same agency that issues the DHS Form I-205 effectuates the arrest.

This process offers a textbook example of the prosecutorial rubber-stamping the Founders sought to avoid through the Fourth Amendment. It affords no "independent check upon executive discretion . . . ." *U.S. Dist. Ct. for E. Dist. of Mich.*, 407 U.S. at 317 ("those charged with [] investigative and prosecutorial duty should not be the sole judges of when to utilize constitutionally sensitive means in pursuing their tasks"); *Johnson*, 333 U.S. at 14 (the Fourth Amendment's "protection consists in requiring that [] inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime"). As a result, DHS's process lacks the "objectivity" the Fourth Amendment demands. *See Steagald v. United States*, 451 U.S. 204, 212 (1981); *see* Ex. 2 ¶ 9 (Schwank) ("As an administrative warrant, the I-205 lacks any review by a neutral arbiter.").

Just so, courts have held that a DHS administrative warrant signed by a DHS officer does not satisfy the "neutral and detached magistrate" requirement for a valid judicial warrant. *See, e.g.*, *El Badrawi v. Dep't of Homeland Sec.*, 579 F. Supp. 2d 249, 275–76 (D. Conn. 2008) (explaining that "[t]he law places a high premium on arrest warrants because such warrants are issued by neutral magistrates who provide an independent check on executive discretion," and treating ICE enforcement activity in that case "as warrantless"); *Kidd*, 734 F. Supp. 3d at 978–80.

While Defendants may seek to rely on *Abel v. United States*, 362 U.S. 217 (1960), that decision is inapposite. There, the Supreme Court speculated—in *dicta*—that certain administrative warrants may satisfy the Fourth Amendment. *Id.* at 233-34. But the Court was careful to clarify

that the issue was "not entitled to our consideration in the circumstances before us. [The argument] was not made below; indeed, it was expressly disavowed." *Id.* at 230; *cf. Greenlaw v. United States*, 554 U.S. 237, 243-44 (2008) (party presentation principle). Further, whatever door *Abel* arguably cracked open has been nailed shut by an unbroken string of Supreme Court decisions confirming that the Fourth Amendment requires a judicial, not administrative, warrant. *See, e.g.*, *Coolidge*, 403 U.S. at 454–55 ("the most basic constitutional rule in this area is that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment" (internal quotation marks omitted)); *Payton v. New York*, 445 U.S. 573, 586 (1980) (stating that "[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable" and discussing the "warrant procedure" of judicial oversight (internal quotation marks omitted)); *id.* n.24 ("When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.").

Because DHS Form I-205s are not judicial warrants, home entry and arrests conducted pursuant to such forms alone violate the Fourth Amendment. *See Payton*, 445 U.S. at 586; *id.* at 586–90 ("the Fourth Amendment has drawn a firm line at the entrance to the house"); *Steagald*, 451 U.S. at 211 (the Supreme Court has "consistently held that the entry into a home to . . . make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant."); *United States v. Curzi*, 867 F.2d 36, 41 (1st Cir. 1989) ("warrantless searches of a dwelling-place are presumptively unreasonable").

Courts have affirmed this straightforward rule. In *Kidd*, the U.S. District Court for the Central District of California expressly held that "an administrative warrant," including a DHS Form I-205, "is insufficient to enter the constitutionally protected areas of a home . . . ." 734 F.

Supp. 3d at 978–80. Because such administrative warrants are not issued by "independent officer[s]," they "lack the independent assurance guaranteed by the Fourth Amendment." *Id*. Similarly, in *Garrison G. v. Bondi*, the U.S. District Court for the District of Minnesota found that ICE officers violated the Fourth Amendment when they entered an individual's home with only a DHS Form I-205. No. 26-CV-172-JMB-DJF, 2026 WL 157677, at *1, *4 (D. Minn. Jan. 17, 2026). No court has held otherwise.

**4. Home arrests pursuant to DHS Form I-205s alone will not satisfy the Fourth Amendment's reasonable-belief-of-residence-and-presence requirement in all instances.**

To enter a home, the Fourth Amendment also requires officers to have "reason to believe the suspect is within"—namely, that the target both resides at the home and is present at the time of entry. *Payton*, 445 U.S. at 603; *see also United States v. Werra*, 638 F.3d 326, 337 (1st Cir. 2011) (explaining the "two-prong inquiry").

DHS Form I-205s cannot satisfy this requirement in all instances. When an immigration judge or the BIA issues a removal order, that order includes the address of the individual subject to removal. Although the government is supposed to deport "an alien [] ordered removed . . . within a period of 90 days[,]" 8 U.S.C. § 1231(a)(1)(A), it often takes much longer, as the logistics and practicalities of removal are complex. Some individuals are not targeted for deportation for long periods of time due to DHS's discretionary enforcement priorities.[11] Many are unaware they are even subject to a removal order: in 2024, over 220,000 removal orders were issued *in absentia*—without the individuals' knowledge—and in 2025, that number exceeded 310,000.[12] As a result,

[11] These individuals may have not received DHS Form I-166, "Notice to Deportable Alien to Surrender," meaning DHS itself has not taken steps to effectuate their removal.

[12] Ex. 19 (U.S. Dept. of Justice *In Absentia* Removal Orders Adjudication Statistics); *see also* 8 U.S.C. § 1229a(b)(5)(A) (setting forth process of removal *in absentia*).

there are over one million individuals with final removal orders who remain in the United States.[13] As these removal orders age—with some dating back years—the likelihood that their subjects live at the addresses listed in those orders declines precipitously. So too does the likelihood that their subjects are present at the time ICE officers conduct their entry and arrest.

This reality was borne out in the case of ChongLy Scott Thao—a U.S. citizen who ICE officers arrested in his home with only a DHS Form I-205. *See supra* Statement of Facts ¶ 16. ICE officers were targeting two noncitizens with final removal orders who they mistakenly believed to live at Mr. Thao's address. *See* Ex. 12 (NY Times); Ex. 14 (ProPublica). Mr. Thao's story proves the failure of DHS Form I-205s to satisfy the Fourth Amendment's reasonable-belief-of-residence requirement in all instances. And it exemplifies the concrete harm that occurs when an agency acts without a neutral external check. DHS Form I-205s' inability to meet this requirement in all instances underscores the Memo's danger in practice.

* * *

Because the Lyons Memo violates the Fourth Amendment as a matter of law, Plaintiffs are entitled to summary judgment on Count I. *See* 5 U.S.C. § 706(2)(B).

---

An *in absentia* order establishes only absence and cannot be used to infer that the individual absconded or sought to evade the proceeding. Often, individuals never receive a notice of appearance, or such notices lack pertinent information. *See* Ex. 20 (NPR Morning Edition Article) ("Sometimes immigrants can move and addresses are not immediately updated with the court, or go to places like apartment buildings that have less consistent mail delivery . . . . Notices can also be sent to completely incorrect addresses"); Ex. 17 at 10 (American Immigration Council Special Report) ("In a 2018 oral argument before the U.S. Supreme Court, counsel for the government admitted that 'almost 100%' of notices to appear issued over the previous three years had omitted the time and date of the court proceeding").

[13] *See* Ex. 21 at 2 (American Immigration Council Removal System Fact Sheet); *Immigration Enforcement Officials Testify at Oversight Hearing*, at 42:06-42:17 (C-SPAN, Feb. 12, 2026), https://www.c-span.org/program/senate-committee/immigration-enforcement-officials-testify-at-oversight-hearing/673422 (on file with Plaintiffs' counsel) (Defendant Lyons stating the number is 1.6 million).

### D. The Lyons Memo violates the APA as not in accordance with law.

Under the APA, a reviewing court "shall . . . hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A). This includes an agency's failure to follow its own regulations. *United States ex. rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266-67 (1954); *Webster v. Doe*, 486 U.S. 592, 602 n.7 (1988); *Hassenfeld-Rutberg v. United States*, 112 F. Supp. 2d 77, 79, 81 (D. Mass. 1998).

The Lyons Memo conflicts with DHS's regulations setting "standards" that "must be adhered to by every immigration officer involved in enforcement activities." 8 C.F.R. § 287.8. The government "intended" these regulations "to reflect constitutional restrictions on the ability of immigration officials to interrogate and detain persons in this country—a doctrine rooted in the Fourth Amendment." *Sanchez v. Sessions*, 904 F.3d 643, 651 (9th Cir. 2018); *see also Perez Cruz*, 926 F.3d at 1137 ("the regulatory standards are at least as stringent as those imposed by the Fourth Amendment"). Simply put, 8 C.F.R. § 287.8 incorporates the Fourth Amendment's protections.

Section 287.8(c)(ii) states that "[a] warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained." 8 C.F.R. § 287.8(c)(2)(ii).[14] The term "warrant" means a judicial warrant in compliance with the Fourth Amendment. *See Kidd*, 734 F. Supp. 3d at 984; *see also* Enhancing the Enforcement Authority of Immigration Officers, 59 Fed. Reg. 42,406, 42,412 (Aug. 17, 1994) ("the rule incorporate[d] judicial precedent based on the Fourth Amendment to the Constitution concerning the issuance of warrants [and] the obtaining of consent to enter a premises"); *id.* at 42,411 (immigration officers are "clearly bound by" "judicial precedent" on related topics). And

[14] As a threshold, "[a]n arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States." 8 C.F.R. § 287.8(c)(2)(i).

"reason to believe," as used in the regulation, means probable cause. *Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015) (holding that "reason to believe," as used in the parallel statute 8 U.S.C. § 1357, "must be read in light of constitutional standards, so that reason to believe must be considered the equivalent of probable cause") (internal quotation marks omitted). As discussed above, *see infra* Section I.C, DHS Form I-205s are not judicial warrants. Therefore, before making an arrest with only a DHS Form I-205, ICE officers must have probable cause that an immigrant "is likely to escape" before a judicial warrant can be obtained.

Defendants cannot meet this requirement. *Cf. M-J-M-A- v. Hermosillo*, No. 6:25-CV-02011-MTK, 2026 WL 562063, at *14 (D. Or. Feb. 27, 2026) ("an immigration officer can know for certain that someone is present in violation of immigration laws, and *still* does not have authority to arrest them without a warrant or an individualized probable cause determination that the individual is 'likely to escape before a warrant can be obtained'" (quoting 8 C.F.R. § 287.8(c)(2)(ii)). DHS Form I-205s are issued without any determination that their subjects are "likely to escape." *See* Ex. 6 (DHS Form I-205). Yet the Lyons Memo instructs ICE officers that they may make arrests based solely on DHS Form I-205s. *See* Ex. 1 at 1–2 (Lyons Memo). This purported authorization to make a warrantless home arrest without probable cause that the individual is "likely to escape" puts the Lyons Memo in direct conflict with the DHS regulation.[15]

Because the Lyons Memo contradicts 8 C.F.R. § 287.8(c)(2)(ii), it is "not in accordance

[15] To the extent Defendants may argue that their home entries constitute investigative activities to locate and identify noncitizens subject to final orders, *see* 8 C.F.R. § 287.8(f)(1), the Lyons Memo violates another federal regulation. 8 C.F.R. § 287.8(f)(2) prohibits immigration officers from: "enter[ing] into the non-public areas of . . . a residence including the curtilage of such residence . . . for the purpose of questioning the occupants . . . concerning their right to be or remain in the United States unless the officer has either a warrant or the consent of the owner." This regulation similarly reflects the Fourth Amendment's requirement that government officers must have either a judicial warrant or consent before entering private spaces. The Lyons Memo conflicts with this regulation by purportedly permitting home entry and arrest without either.

with law" for purposes of the APA, 5 U.S.C. § 706(2)(A), and Plaintiffs are entitled to summary judgment on Count II.

**E. The Lyons Memo violates the APA's rulemaking requirements.**

The Lyons Memo also violates the APA's procedural requirements. The APA requires a three-step notice-and-comment process when formulating, amending, or repealing a substantive rule. 5 U.S.C. §§ 553, 551(5). "Failure to abide by these requirements renders a rule procedurally invalid." *N.H. Hosp. Assoc. v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (finding APA procedural violation). Only "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice" are exempt from this three-step process. 5 U.S.C. § 553(b)(A).

The Lyons Memo is a substantive rule with sweeping, seismic impact. A substantive rule is one that has the "force and effect of law," *Azar v. Allina Health Servs.*, 587 U.S. 566, 573 (2019), and "creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself." *N.H. Hosp. Assoc.*, 887 F.3d at 70 (internal quotation marks omitted). An agency policy is considered substantive if it "adopt[s] a new position inconsistent with any of the [agency's] existing regulations," *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 88 (1995), or if it is "inconsistent with another rule having the force of law . . . ." *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 315 (D. Mass. 2025) (citing *N.H. Hosp. Assoc.*, 887 F.3d at 73).

As discussed above, the Lyons Memo is inconsistent with the Fourth Amendment and DHS regulations. It is also inconsistent with DHS operating procedures, agency policies, and training materials. Ex. 2 ¶¶ 8–9 (Schwank). These conflicts alone are "dispositive" to show the Lyons Memo is a substantive rule. *New York v. U.S. Dep't of Just.*, 804 F. Supp. 3d 294, 317 (D.R.I. 2025) (finding likelihood of APA procedural violation), *appeal dismissed*, 2025 WL 4717710.

In assessing whether a rule is substantive, courts also "consider the manner in which the [] action[] fit[s] within the statutory and regulatory scheme." *N.H. Hosp. Ass'n*, 887 F.3d at 73.

Where an action "changes the entire field of play," it is substantive. *NIH*, 770 F. Supp. 3d at 316. That is precisely what the Lyons Memo does: it tells ICE officers they can enter homes to effectuate arrests in a way never previously allowed, upends longstanding Fourth Amendment compliance frameworks, and disrupts existing regulatory guidance across ICE enforcement operations. *See* Ex. 1 (Lyons Memo); Ex. 2 ¶¶ 8–9, 12 (Schwank). Therefore, it is substantive.

The Lyons Memo also does not fit any of the three exemptions from the APA's notice-and-comment requirements.

*First*, the Memo is not an interpretive rule. "[A]n interpretive rule is merely a clarification or explanation of an existing statute or rule." *NIH*, 770 F. Supp. 3d at 312 (quotation and citation omitted). Such interpretive rules are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979) (quoting Attorney General's APA Manual).[16] The Lyons Memo does not fit within this definition. DHS did not announce the Memo's policy publicly. *See* Ex. 2 ¶ 13 (Schwank). Rather, it came to light because of a whistleblower. Thus, DHS's intention was to change a rule *without* "advis[ing] the public." *Chrysler*, 441 U.S. at 302 n.31. And the Memo does much more than clarify or explain—it changes entire constitutional understandings.

*Second*, the Memo is not a general statement of policy. General statements of policy are "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Id.* A general statement of policy "does not seek to impose or elaborate or interpret a legal norm. It merely represents an agency position with respect to how it will treat—typically enforce—the governing legal norm." *Syncor Int'l Corp. v.*

[16] This manual is "[t]he most authoritative explanation of the substantive/interpretative distinction." *Warder v. Shalala*, 149 F.3d 73, 79 (1st Cir. 1998). "Courts have routinely quoted [its] definition [of interpretive rule] with approval." *Id.* (collecting cases).

*Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) (holding "Notice" document is a substantive rule).[17]

Again, the Lyons Memo does not advise the public on how DHS might exercise enforcement discretion, as DHS never disclosed the Memo to the public. The Memo instead reconceives a foundational legal norm—the Fourth Amendment's warrant requirement. Defendants' characterization of the Memo as "general guidance" and their statement that it "does not . . . create or modify any right," Ex. 1 at 3 (Lyons Memo), does not alter its status as a substantive rule. "Agencies have never been able to avoid notice and comment simply by mislabeling their substantive pronouncements." *Azar*, 587 U.S. at 575 (finding APA procedural violation). "On the contrary, courts have long looked to the *contents* of the agency's action, not the agency's self-serving *label*, when deciding whether statutory notice-and-comment demands apply." *Id*. (emphasis in original).

*Third*, the Lyons Memo is not a "rule[] of agency organization, procedure, or practice," 5 U.S.C. § 553(b)(A)—together, known as "procedural rules." *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. NLRB*, 57 F.4th 1023, 1034 (D.C. Cir. 2023). The "exception for procedural rules must be narrowly construed." *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 6 (D.C. Cir. 2011) (quotation and citation omitted). Procedural rules are "primarily directed toward improving the efficient and effective operations of an agency," *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014), and govern the "technical regulation of the form of agency action and proceedings." *Pickus v. U.S. Bd. of Parole*, 507 F.2d 1107, 1113 (D.C. Cir. 1974). They do *not* "include any action which goes beyond formality and substantially affects the rights of those over whom the agency exercises authority." *Id.* For this reason, courts examine a rule's effect on the

[17] The U.S. Court of Appeals for the "D.C. Circuit [] handles the lion's share of the country's administrative law cases," *Corner Post, Inc. v. Bd. of Govs. of Fed. Rsrv. Sys.*, 603 U.S. 799, 831 (2024) (Kavanaugh, J., concurring), and, thus, cases from that Circuit are particularly salient.

interests at stake in an agency proceeding. *See Massachusetts v. Trump*, 790 F. Supp. 3d at 28 (citing *Doe v. Trump*, 288 F. Supp. 3d 1045, 1074 (W.D. Wash. 2017)); *Elec. Priv. Info. Ctr.*, 653 F.3d at 5–6 ("[T]he distinction between substantive and procedural rules is one of degree depending upon whether the substantive effect is sufficiently grave so that notice and comment are needed to safeguard the policies underlying the APA." (quotation and citation omitted)).

The Lyons Memo does not govern the "*form* of agency action and proceedings." *Pickus*, 507 F.2d at 1113 (emphasis added). And it has nothing to do with improving the efficiency of internal DHS operations. *See Mendoza*, 754 F.3d at 1023. Instead, the Memo implements a new policy with a "grave" "substantive effect": removing the longstanding constitutional and regulatory protections available to individuals in their homes. *Elec. Priv. Info. Ctr.*, 653 F.3d at 5. The Lyons Memo "effectively remov[ed] rights" from community members. *Massachusetts v. Trump*, 790 F. Supp. 3d at 28.

The Lyons Memo is a substantive rule subject to the APA's notice-and-comment requirements. Because Defendants did not comply with these requirement when promulgating the Lyons Memo, this Court should grant summary judgment to Plaintiffs on Count IV. *See* 5 U.S.C. §§ 553, 551(5).

**F. This Court should vacate the Lyons Memo.**

Vacatur is the presumptive remedy for unlawful agency action under the APA. 5 U.S.C. § 706(2); *NIH*, 770 F. Supp. 3d at 329 ("The normal remedy for a successful APA challenge is vacatur of the rule and its applicability to all who would have been subject to it."). This universal relief is appropriate here. *See Trump v. CASA, Inc.*, 606 U.S. 831, 847 n.10 (2025) ("Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action"); *Nat'l TPS All. v. Noem*, 166 F.4th 739, 767-68 (9th Cir. 2026) (granting "universal relief"). Furthermore, relief cannot be limited to Plaintiffs.

They do not challenge the Lyons Memo as it affects them; they instead challenge Defendants' very authority to act. Should this Court grant summary judgment on any of Counts I, II, and IV, the proper remedy under the APA is to set aside the Lyons Memo.

## II. In the alternative, the Court should stay the Lyons Memo under 5 U.S.C. § 705.

Should the Court decline to grant summary judgment, Plaintiffs alternatively request that this Court stay implementation of the Lyons Memo "pending conclusion of the[se] review proceedings." 5 U.S.C. § 705; *cf. Orr*, 778 F. Supp. 3d at 430 (explaining that a motion "to stay enforcement of [a government] Policy during the pendency of [] litigation . . . is a prototypical example of a stay"). Under the APA, a court reviewing agency action may issue "all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending . . . review" "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. Courts have acknowledged that even in cases where material facts are in dispute, an injunction or stay may still be appropriate. *See, e.g.*, *Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal*, 546 U.S. 418, 428 (2006) (finding that movant established "likelihood of success on merits" by presenting a prima facie case, despite the fact "the evidence [was] found to be in equipoise" on the government's affirmative defense); *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35–37 (2d Cir. 2010) (noting that "the Supreme Court . . . has counseled in favor of a preliminary injunction standard that permits the entry of an injunction in cases where a factual dispute renders a fully reliable assessment of the merits impossible.").

### A. Legal Standard for a Stay under 5 U.S.C. § 705

When deciding whether to issue a stay under 5 U.S.C. § 705, courts consider the four factors used to assess a motion for preliminary injunction: "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be

irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009); *see Ass'n of Am. Univs. v. Dep't of Def.*, 792 F. Supp. 3d 143, 164 (D. Mass. 2025) (same factors apply). "The first factor weighs most heavily in the [] analysis, and is considered the main bearing wall of the four-factor framework." *DraftKings Inc. v. Hermalyn*, 732 F. Supp. 3d 84, 106 (D. Mass. 2024) (quotations and citations omitted). The third and fourth factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.

**B. Plaintiffs are likely to succeed on the merits.**

First, a plaintiff must show a "substantial likelihood of success on the merits." *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020); *see also Labrador v. Poe*, 144 S. Ct. 921, 929 n.2 (2024) (Kavanaugh, concurring) (describing a likelihood of success as "a fair prospect of success"). The merits need not be "conclusively determine[d]"; instead, at this "stage, decisions are to be understood as statements of probable outcomes only." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 93 (1st Cir. 2020) (quotations and citations omitted). The facts and arguments set forth in Section I establish a substantial likelihood that Plaintiffs will ultimately prevail on at least one of their APA claims. *See Worthley v. Sch. Comm. of Gloucester*, 652 F. Supp. 3d 204, 215 (D. Mass. 2023) (plaintiff need only satisfy this factor on one of their asserted claims).

**C. Plaintiffs will suffer irreparable harm absent a stay.**

Courts next consider whether a plaintiff will suffer irreparable harm absent a stay. "Irreparable harm is 'an injury that cannot adequately be compensated for either by a later-issued [vacatur] after a full adjudication on the merits, or by a later-issued damages remedy.'" *Orr*, 786 F. Supp. 3d at 426 (quoting *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005)). This factor "is measured on 'a sliding scale, working in conjunction with a moving party's likelihood of success on the merits.'" *Id.* (quoting *Vaqueria Tres Monjitas, Inc. v. Irizarry,* 587 F.3d

464, 485 (1st Cir. 2009)). Where "the likelihood of success on the merits is great," a plaintiff may "show somewhat less in the way of irreparable harm." *Vaqueria Tres Monjitas*, 587 F.3d at 485 (citation omitted); *see also Doe v. Trump*, 766 F. Supp. 3d 266, 278 (D. Mass. 2025) (applying sliding scale analysis).

To start, any harm the Memo inflicts on Plaintiffs is irreparable because they have no access to a monetary remedy. *See California v. Kennedy*, 802 F. Supp. 3d. 273, 283 (D. Mass. 2025) ("The APA does not waive federal sovereign immunity from money-damages claims.") (quoting *Kentucky v. Biden*, 23 F.4th 585, 611 (6th Cir. 2022)). "[B]ecause the APA does not provide for monetary damages, these harms are not recoverable if the [challenged r]ule is allowed to go into effect but later vacated." *Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 496 F. Supp. 3d 600, 611 (D. Mass. 2020) (granting motion against federal agency under 5 U.S.C. § 705).

Plaintiffs also cannot afford to wait for future vacatur. If a government policy impairs an organization's ability to carry out its core activities, "[s]uch harm to [an organizational plaintiff]'s core activities constitutes irreparable harm for purposes of [] preliminary [relief]." *Nat'l Educ. Ass'n-N.H. v. N.H. Att'y Gen.*, 806 F. Supp. 3d 166, 208 (D.N.H. 2025). Courts have consistently found "obstacles [that] unquestionably make it more difficult for the [plaintiff] to accomplish [its] primary mission . . . provide injury for purposes . . . [of] irreparable harm." *NIH*, 770 F. Supp. 3d at 322 (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)); *accord New York v. McMahon*, 784 F. Supp. 3d. 311, 362 (D. Mass. 2025) ("the detriment to Plaintiffs' organizational missions . . . cannot be remedied through retroactive relief.").

The Lyons Memo directly impairs Plaintiffs' ability to carry out their core activities and accomplish their missions in at least three ways. First, it prevents Plaintiffs from providing clear and reliable advice to community members on their Fourth Amendment rights, while forcing the

Plaintiffs to expend resources updating trainings and guidance. Second, it requires Plaintiffs to divert resources away from—or forego entirely—other core activities. Third, it threatens Plaintiffs' institutional credibility by undermining the community trust they have spent decades building.

**1. The Lyons Memo upends Plaintiffs' ability to provide community members with clear counsel on their Fourth Amendment rights.**

Advising community members on their Fourth Amendment rights is a core activity of each Plaintiff. Each Plaintiff offers both Know-Your-Rights trainings in group settings and one-on-one counseling. Ex. 4 ¶¶ 8–10, 19–20 (BWC); Ex. 5 ¶ 8, 23 (MCAN); Ex. 3 ¶¶ 8–10, 12 (GBLN). Each Plaintiff distributes educational materials, such as wallet-sized "red cards" and online pamphlets, that explain Fourth Amendment rights. Ex. 4 ¶¶ 11–13 (BWC); Ex. 5 ¶ 9 (MCAN); Ex. 3 ¶ 11 (GBLN). Community members also call Plaintiffs seeking immediate advice on how to respond to ICE officers at their homes. Ex. 4 ¶ 10 (BWC); Ex. 5 ¶ # 23 (MCAN). Through this counseling and these materials, Plaintiffs teach community members "how to identify a judicial warrant, as compared to an administrative warrant," and that a judicial warrant is required for law enforcement to enter a home. Ex. 5 ¶ 8 (MCAN); *see also* Ex. 3 ¶¶ 10–11, 21 (GBLN); Ex. 4 ¶ 9, 12 (BWC). For years, Plaintiffs have confidently and consistently advised community members that ICE officers cannot enter their homes without a valid judicial warrant. *See* Ex. 4 ¶ 12 (BWC); Ex. 5 ¶ 8 (MCAN); Ex. 3 ¶¶ 10, 21 (GBLN).

The Lyons Memo upends that advice, undermining Plaintiffs' Fourth Amendment activities in two principal ways. First, the Lyons Memo vitiates Plaintiffs' ability to provide community members with clear and reliable advice on their constitutional rights. Second, it forces them to expend their resources—both time and money—modifying now-outdated Fourth Amendment materials and retraining community leaders and members.

*First*, where an organization's core activities include providing advice and counseling, a

policy change that makes such counseling more difficult can constitute irreparable harm. In *National Education Association-New Hampshire*, the court found irreparable harm where new state laws targeting diversity, equity, and inclusion (DEI) policies prevented an educators' organization from offering clear guidance. 806 F. Supp. 3d at 207–08. As the court explained, "[t]he vague nature of, and potential for arbitrary enforcement engendered by, the anti-DEI laws prevent[ed] [the organization] from: (1) adequately advising its members on how to avoid discipline for running afoul of state and federal law; [and] (2) counseling its members on how to adjust collective bargaining agreements regarding when a school may discipline a teacher for violating state or federal law." *Id* at 208. Because providing counsel was one of the organization's "core activities" and the new laws disrupted the organization's ability to provide such counsel, the laws caused the organization irreparable harm. *Id.*

The fundamental conflict between the Lyons Memo and the Fourth Amendment likewise prevents Plaintiffs from "adequately advising" community members on their Fourth Amendment rights. *Id.* at 207. Plaintiff BWC is "struggling to navigate what advice to give" "[b]ecause of the uncertainty caused by the Lyons Memo." Ex. 4 ¶ 28 (BWC); *see also id.* ¶¶ 23–24, 26–27, 29 ("when people call the BWC to ask questions about their Fourth Amendment rights at home, we don't know what answer to provide"). "[T]he conflict between long-standing Fourth Amendment law and the policy set forth in the Lyons Memo . . . leaves [GBLN] hesitant and unsure about how to advise community members." Ex. 3 ¶ 18 (GBLN). And while Plaintiff "MCAN and [their] affiliates used to be able to confidently advise community members that they do not have to open the door without a judicial warrant," Ex. 5 ¶ 21 (MCAN), now they are "wary" of "counseling community members that they are protected at home, because [they] don't want people to have a false sense of security," *id.* ¶ 21; *see also id.* ¶ 22 ("I feel lost on how to support our community

members"). The Lyons Memo has made it impossible for Plaintiffs to provide reliable and clear counsel—causing irreparable harm to a core function.

This harm is compounded by the surge in urgent calls from community members seeking advice when they believe ICE is at their door. For example, the BWC is "being forced to counsel families in potentially life-threatening situations where the law is now unclear." Ex. 4 ¶ 33 (BWC); *see also id.* ¶ 29. "Each of these calls has [] become more time-intensive and often requires the attention of multiple staff members" due to legal ambiguity. *Id.* ¶ 32; *see also id.* ¶¶ 30–31; Ex. 5 ¶ 23 (MCAN) ("MCAN affiliates must provide counseling in these moments of crisis and are now unsure how to advise individuals regarding warrantless home entry.").

*Second*, courts have found irreparable harm where an unlawful policy renders an organization's programming and educational materials outdated or unusable. In *Massachusetts Fair Housing Center*, the Court found that a rule change weakening disparate impact liability in housing discrimination cases would "force[] [the plaintiff] to expend additional resources to . . . modify its education and training programs," among other impacts. 496 F. Supp. 3d at 608. The Court held that these were irreparable harms, as they altered "the burdens, cost, and effectiveness" of the plaintiff's continued performance of its core activities. *Id.* at 611; *see also Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 149, 200 (D.N.H. 2025) (finding irreparable harm where the government policy "diminishes or eliminates the value of much of their programming").

Similarly, the Lyons Memo renders Plaintiffs' Know-Your-Rights programming and materials outdated, unreliable, and even dangerous.[18] Plaintiffs "can no longer confidently rely on prior training and educational materials to advise community members on what to do if ICE shows

[18] Because the Lyons Memo authorizes ICE officers to use force to enter private homes, Ex. 1 at 2 (Lyons Memo), refusing entry risks escalating the interaction in life-threatening ways.

up at their home." Ex. 3 ¶ 24 (GBLN); *see also* Ex. 5 ¶ 30 (MCAN) (noting that MCAN "affiliates spent money and time on creating and printing Know-Your-Rights flyers and materials, and the Lyons Memo has made them obsolete"); Ex. 3 ¶ 24 (GBLN) ("many of the materials we created, printed, and disseminated are now going unused, frustrating our mission"). Instead, Plaintiffs are "struggl[ing] to determine how to best update [their] internal and external training and educational materials in response to the ICE policy change." Ex. 4 ¶ 38 (BWC). For example, some MCAN affiliates are reducing the frequency of their trainings, afraid to "give bad advice," Ex. 5 ¶¶ 26–27 (MCAN), while others are expending *more* time and resources to conduct new trainings and update materials. *Id.* ¶¶ 28, 29; *see also* Ex. 3 ¶¶ 25–27 (GBLN is also spending more time conducting new trainings). Like the rule change at issue in *Massachusetts Fair Housing Center*, the Lyons Memo forces Plaintiffs to "expend additional resources" to "modify [their] education and training programs," causing irreparable harm. 496 F. Supp. 3d. at 608.

**2. The Lyons Memo interferes with Plaintiffs' ability to conduct their other core activities.**

Courts have further found irreparable harm where plaintiffs "have been forced to divert resources away from their usual tasks and initiatives in response to the [challenged policy]." *Am. Acad. of Pediatrics v. Kennedy*, 2026 WL 733828, at *18 (D. Mass. March 16, 2026), *appeal docketed* No. 26-1503; *see also League of Women Voters of N.H. v. Kramer*, No. 24-CV-73, 2025 WL 3260024, at *5 (D.N.H. Oct. 17, 2025) ("The [organizational plaintiff] will suffer further irreparable harm if [defendant] is not enjoined from his illegal activities because [plaintiff] likely will again have to divert resources and staff from its core functions to respond"), *R. & R. adopted sub nom. League of Women Voters of N.H. v. Steve Kramer, LLC*, No. 24-CV-73, 2025 WL 3257189 (D.N.H. Nov. 20, 2025).

The Lyons Memo forces Plaintiffs to divert staff time and resources away from their other

core activities to respond to the threat of warrantless home arrests. For example, GBLN member organizations are "having to redirect time away from core course focuses—such as ESL, citizenship questions, and academic help—to accommodate classroom discussions about the ICE policy change regarding warrantless home arrests." Ex. 3 ¶ 29 (GBLN). The BWC and MCAN are fielding a high volume of calls about ICE presence at homes. Ex. 4 ¶ 31 (BWC); Ex. _ ¶¶ 23, 32 (MCAN). These calls are now more complicated and time-consuming. Ex. 12 ¶¶ 30–32, 36 (BWC); *see also* Ex. 13 ¶ 24 (MCAN) ("confusion" around the Lyons Memo "makes it more difficult to do community outreach, as conversations and counseling take longer than they did previously. We must now explain the nuances and uncertainty at play . . . ."). To make time for this counseling, the BWC has been forced to cancel regularly scheduled core activities like domestic worker advocacy workshops, and it cannot serve as many individuals as it once did. Ex. 12 ¶¶ 31, 39–42 (BWC). As for MCAN, there are as many as twelve grassroots-organizing trainings it would have offered over the last few months if not for the Lyons Memo and the forced reallocation of resources. Ex. 13 ¶ 34 (MCAN). MCAN's affiliates are also forced to shift resources away from core activities like housing, educational equity, and family preparedness workshops. *Id.* ¶¶ 32–33.

These harms are analogous to those at issue in *American Academy of Pediatrics*. There, the Court found the plaintiff faced irreparable harm absent preliminary relief when the government changed its policies related to childhood vaccine recommendations. 2026 WL 7333828, at *18. The Court held that "the expense of counseling members constitutes harm" when it requires resource diversion away from usual core activities. *Id.* The same is true here.

The Lyons Memo has also disrupted Plaintiffs' ability to help community members apply for certain social services—another core activity. The Memo has caused fear that DHS will obtain home addresses from certain applications, such as Medicaid and Free Application for Federal

Student Aid (FAFSA). Plaintiffs have long helped community members fill out these applications, but "no longer know" whether their addresses remain protected from DHS.[19] Ex. 14 ¶ 22 (GBLN); *cf. Ctr. for Taxpayer Rts. v. IRS*, 815 F. Supp. 3d 1, 59 (D.D.C. 2025) (nonprofit organization that provided tax advice could no longer ensure taxpayers their information was safe). As a result, "GBLN is unsure whether to reassure [students] that it is okay to fill out the FAFSA forms and that doing so will not affect the safety and wellbeing of their families." Ex. 14 ¶ 22 (GBLN). The BWC has similar concerns for Medicaid applicants. Ex. 12 ¶ 43 (BWC).

Finally, responding to the Lyons Memo has impaired Plaintiffs' fundraising activities. The BWC missed at least one funding application it otherwise would have pursued because its staff were preoccupied handling community questions regarding the Lyons Memo. Ex. 4 ¶ 39 (BWC). The Lyons Memo has foreclosed other funding opportunities altogether: The BWC has decided not to apply for a federal grant it obtained in past years to conduct workplace safety training because the grant requires submitting participants' home addresses. *Id.* ¶ 46. Such reporting requirements risk exposing community members to warrantless ICE home invasions or, at least, creating enough fear of exposure to scare participants away from the training. *See id.*

**3. The Lyons Memo will erode community trust in Plaintiffs.**

The Lyons Memo undermines Plaintiffs' institutional viability by threatening the community trust and reputation they have built over decades. "[H]arm resulting from [the] loss of trust is irreparable because it is difficult to replace or measure and one the [plaintiff] should not be

[19] The United States Department of Health and Human Services (HHS), which oversees Medicaid (called MassHealth in Massachusetts), has an agreement with DHS to share Medicaid enrollees' personal information with ICE for immigration enforcement purposes. *See* Ex. 22 (MassHealth flyer). This prompted multiple lawsuits, leading to some information-sharing being enjoined, but HHS can still share some data with ICE. *See Massachusetts v. U.S. Dep't of Health & Human Servs.*, 811 F. Supp. 3d 183 (D. Mass. 2025).

expected to suffer." *Cmty. Econ. Dev. Ctr. of Se. Mass. v. Bessent*, 818 F. Supp. 3d 228, 255 (D. Mass. 2026) (quoting *Ctr. for Taxpayer Rts. v. IRS*, 815 F. Supp. 3d 1, 59 (D.D.C. 2025)); *see also Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 187 F. Supp. 3d 217, 223 (D. Mass. 2016) (finding that injury to the organizational plaintiff's "goodwill and reputation" that "it expended significant effort and investment to develop" was "irreparable").

In *Bessent*, the Court found that an abrupt change in government policy irreparably harmed the plaintiffs "due to the erosion of trust between the organization[] and [its] members" that the policy change caused. 818 F. Supp. 3d at 255. In that case, the plaintiffs had long advised their members that the IRS would not disclose their personal information to immigration enforcement authorities. *Id.* But, in 2025, the IRS changed its policy to allow DHS access to filers' data, contradicting the plaintiffs' earlier guidance. *Id.* at 241-42, 255. The Court held that because of the new policy, "[p]laintiffs' trustworthiness and reputations [we]re being irreparably harmed as organizations, no matter how difficult that harm may be to measure." *Id.* at 255.

Here, Plaintiffs face an identical dilemma. As discussed above, the Lyons Memo renders the Fourth Amendment guidance that Plaintiffs have provided for decades unreliable. *See, e.g.*, Ex. 4 ¶¶ 23, 26 (BWC). Plaintiffs' inability "to provide reliable advice" "risks undermining [their] reputation and hard-earned community trust." *Id.* ¶ 34; *see also* Ex. 3 ¶ 18 (GBLN); Ex. 5 ¶¶ 24–25, 27 (MCAN); *cf. Am. Acad. of Pediatrics*, 2026 WL 733828, at *19 ("Plaintiffs need not demonstrate that the anticipated [irreparable] harm is certain, merely that it is likely." (citation omitted)). This is precisely the "kind of harm [] often held to be irreparable" because "[b]y its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996).

**D. The balance of the equities and public interest favor granting Plaintiffs the requested relief.**

Finally, when considering a motion for stay under § 705, "the Court must weigh the balance of the equities and determine whether a [] [stay] would be in the public interest." *Ass'n of Am. Univs.*, 792 F. Supp. 3d at 180. Because Plaintiffs seek this stay against government Defendants, these factors merge. *Nken*, 556 U.S. at 435 (2009). Together, they weigh heavily in Plaintiffs' favor.

"'[I]t is always in the public interest to prevent the violation of party's constitutional rights.'" *Doe v. Trump*, 766 F. Supp. 3d at 286–87 (quoting *Dorce v. Wolf*, 506 F. Supp. 3d 142, 145 (D. Mass. 2020)). And "the government has no legitimate interest in pursuing unconstitutional [] action.'" *Id.* at 286. Similarly, "the public has an important interest in making sure government agencies follow the law," *Neighborhood Ass'n of The Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005), *aff'd*, 463 F.3d 50 (1st Cir. 2006), and "agencies have no countervailing interest in perpetuating unlawful practices," *California v. Trump*, 786 F. Supp. 3d 359, 394 (D. Mass. 2025) (citations omitted), *on appeal* No. 25-1726.

Here, where the Lyons Memo both violates the Constitution and constitutes an unlawful agency action, the balance tips heavily in Plaintiffs' favor. Furthermore, "it is in the public interest to require agencies to adequately justify significant changes to its regulations," which occurs through the notice-and-comment process. *Mass. Fair Hous. Ctr.*, 496 F. Supp. 3d at 611. Here, where no process was followed, the public interest was deliberately disregarded.

"[T]he fact that there is a public interest in achieving a particular end, such as effectively enforcing immigration law, does not mean that any and all means of achieving that end are necessarily in the public interest." *New England Synod v. Dep't of Homeland Sec.*, No. 25-CV-40102, 2026 WL 412329, at *29 (D. Mass. Feb. 13, 2026). "[O]ur system does not permit agencies to act unlawfully even in the pursuit of desirable ends." *Ala. Ass'n of Realtors v. Dep't of Health*

*& Hum. Servs.*, 594 U.S. 758, 766 (2021); *see Guerrero Orellana v. Moniz*, 802 F. Supp. 3d 297, 313 (D. Mass. 2025) (citing cases where the First Circuit "repeatedly rejected" the argument that a stay would interfere with the government's "important interest in enforcing the immigration laws and executing removal orders" where the government's enforcement action was illegal), *appeal* No. 25-2152 (argued May 4, 2026).

Even if a court were to later find the Lyons Memo lawful, a stay would not harm Defendants. Where "[a] continuation of the status quo during the pendency of [] litigation will only shortly prolong the longstanding practice and policy of the United States government, while imposition of the [challenged policy] would impact the plaintiffs . . . [in] unnecessarily destabilizing and disruptive" ways, these factors tilt in Plaintiffs' favor. *Barbara v. Trump*, 790 F. Supp. 3d 80, 103 (D.N.H. 2025) (collecting cases), *cert. granted before judgment*, 146 S. Ct. 879 (2025). Here, a stay will maintain the status quo,[20] reinstating long-held agency policy and affirming constitutional rights that have existed for over a century. *Cf. Doe v. Trump*, 766 F. Supp. 3d at 287. Meanwhile, "the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *Assoc. of Am. Univs.*, 792 F. Supp. 3d at 181 (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). The balance of equities and the public interest weigh heavily in favor of granting a stay of the Lyons Memo.

## CONCLUSION

Plaintiffs respectfully ask the Court to enter partial summary judgment on Counts I, II, and IV, or in the alternative, to stay the Lyons Memo under 5 U.S.C. § 705.

---

[20] The "status quo" refers to "the last uncontested status which preceded the pending controversy." *Baillargeon v. CSX Transp. Corp.*, 463 F. Supp. 3d 76, 82 (D. Mass. 2020) (quoting *Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc*., 622 F.3d 36, 41 n. 5 (1st Cir. 2010)). Here, the status quo is Defendants' policies and the understanding of the Fourth Amendment that existed before the Lyons Memo was issued.

Dated: June 5, 2026

Respectfully submitted,

LAWYERS FOR CIVIL RIGHTS

By: */s/ Brooke Simone*
Brooke Simone (BBO #718168)
Jillian Lenson (BBO #690653)
Oren Sellstrom (BBO #569045)
Iván Espinoza-Madrigal (BBO #708080)
61 Batterymarch Street, 5th Floor
Boston, MA 02210
Telephone: (617) 482-1145
bsimone@lawyersforcivilrights.org
jlenson@lawyersforcivilrights.org
osellstrom@lawyersforcivilrights.org
iespinoza@lawyersforcivilrights.org

HAGENS BERMAN SOBOL SHAPIRO LLP

By: */s/ Hannah W. Brennan*
Hannah W. Brennan (BBO #688179)
Thomas M. Sobol (BBO #471770)
Michael H. Lavine (BBO #717587)
Chris O'Brien (BBO #703767)
One Faneuil Hall Square, 5th Floor
Boston, MA 02109
(617) 482-3700
tom@hbsslaw.com
hannahb@hbsslaw.com
michael.lavine@hbsslaw.com
chrisob@hbsslaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on June 5, 2026, the above-captioned document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants.

/s/ *Hannah W. Brennan*_____
Hannah W. Brennan