**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

GREATER BOSTON LATINO NETWORK, BRAZILIAN WORKER CENTER, INC., *et al.*,

*Plaintiffs*,

*v.*

MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security,[1] *et al.*,

*Defendants*.

No. 1:26-cv-10472-JEK

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

[1] The Complaint names as a Defendant Kristi Noem in her official capacity as then-Secretary of Homeland Security. Under Federal Rule of Civil Procedure 25(d), Markwayne Mullin, current Secretary of Homeland Security, is automatically substituted as a Defendant.

## TABLE OF CONTENTS


INTRODUCTION .......... 1

BACKGROUND .......... 2

I. The Lyons Guidance .......... 2

II. The Amended Complaint's Allegations .......... 4

III. Statement of Supplemental Undisputed Material Facts .......... 6

LEGAL STANDARD .......... 8

ARGUMENT .......... 9

I. This Court Does Not Have Jurisdiction .......... 9

A. All Plaintiffs Have Failed to Allege Article III Standing .......... 9

1. All alleged injuries are speculative and cannot support forward-looking declaratory and injunctive relief. .......... 10

2. No Plaintiff has pleaded an injury in fact. .......... 13

3. Plaintiffs have failed to plead the Lyons Guidance caused any injury. .......... 18

4. Plaintiffs cannot show any injury is redressable by a court order. .......... 19

B. Plaintiffs Do Not Challenge Any Final Agency Action .......... 20

C. The Case Is Moot Because Defendants Are No Longer Implementing the Lyons Guidance. .......... 23

II. Plaintiffs Fail to State a Claim .......... 23

A. Plaintiffs Cannot State a Claim for a Violation of the Fourth Amendment Because They Allege Violations Only for Third Parties .......... 24

B. Administrative Warrants May Be Permissibly Used in the Manner Described in Lyons Guidance .......... 27

C. The Lyons Guidance Is Otherwise Lawful Under the APA. .......... 34

D. Plaintiffs Fail to Plead the Other Elements of a Stay. .......... 37

E. Plaintiffs Are Not Entitled to a Declaratory Judgment. .......... 38

F. If the Court Grants Any Relief, It Should Be Limited to Affected Members. .......... 39

CONCLUSION .......... 40

# TABLE OF AUTHORITIES

## Cases

*Abel v. United States*,
362 U.S. 217 (1960) ........ *passim*

*ACLU of Mass. v. U.S. Conf. of Cath. Bishops*,
705 F.3d 44 (1st Cir. 2013) ........ 23

*Alderman v. United States*,
394 U.S. 165 (1969) ........ 2, 24, 26

*Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Nat'l Lab. Rels. Bd.*,
57 F.4th 1023 (D.C. Cir. 2023) ........ 35

*Am. Hosp. Ass'n v. Bowen*,
834 F.2d 1037 (D.C. Cir. 1987) ........ 35

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 8

*Azar v. Allina Health Servs.*,
587 U.S. 566 (2019) ........ 36

*Batterton v. Marshall*,
648 F.2d 694 (D.C. Cir. 1980) ........ 35

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 8

*Benjamin v. Aroostook Med. Ctr., Inc.*,
57 F.3d 101 (1st Cir. 1995) ........ 16

*Bennett v. Spear*,
520 U.S. 154 (1997) ........ 20

*Bos. Bit Labs, Inc. v. Baker*,
11 F.4th 3 (1st Cir. 2021) ........ 23

*Butler v. Biocore Med. Techs., Inc.*,
348 F.3d 1163 (10th Cir. 2003) ........ 16

*Byrd v. United States*,
584 U.S. 395 (2018) ........ 24

*Cal. Cmtys. Against Toxics v. EPA*,
934 F.3d 627 (D.C. Cir. 2019)........................................................................................ 20

*Calvary Chapel of Bangor v. Mills*,
52 F.4th 40 (1st Cir. 2022) ............................................................................................ 23

*Camara v. Municipal Court*,
387 U.S. 523 (1967)................................................................................................ 27, 28

*Carlson v. Landon*,
342 U.S. 524 (1952)........................................................................................................ 30

*Centro de Trabajadores Unidos v. Bessent*,
167 F.4th 1218 (D.C. Cir. 2026) .................................................................................... 22

*Chadwick v. WellPoint, Inc.*,
561 F.3d 38 (1st Cir. 2009) .............................................................................................. 9

*Chaplaincy of Full Gospel Churches v. Navy*,
697 F.3d 1171 (D.C. Cir. 2012)...................................................................................... 12

*City of El Cenizo v. Texas*,
890 F.3d 164 (5th Cir. 2018) ..................................................................................... 27, 30

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)..................................................................................................10, 11

*City of Los Angeles v. Patel*,
576 U.S. 409 (2015)........................................................................................................ 27

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)......................................................................................9, 11, 13, 18

*Conn v. Gabbert*,
526 U.S. 286 (1999)........................................................................................................ 16

*DaimlerChrysler Corp. v. Cuno,*
547 U.S. 332 (2006).......................................................................................................... 8

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021).................................................................................................. 34, 35

*FDA v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024)................................................................................................*passim*

*Fed. Defs. of San Diego, Inc. v. U.S. Sent'g Comm'n*,
680 F. Supp. 26 (D.D.C. 1988) .......... 15

*Fla. Audubon Soc'y v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996).......... 19

*Flores ex rel. Galvez-Maldonado v. Meese*,
913 F.2d 1315 (9th Cir. 1990) .......... 29

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015).......... 17

*Foretich v. United States*,
351 F.3d 1198 (D.C. Cir. 2003).......... 16

*ForUsAll, Inc. v. Dep't of Lab.*,
691 F. Supp. 3d 14 (D.D.C. 2023) .......... 22

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000).......... 23

*Giragosian v. Ryan*,
547 F.3d 59 (1st Cir. 2008) .......... 9

*Gordo-González v. United States*,
873 F.3d 32 (1st Cir. 2017) .......... 8

*Great Lakes Dredge & Dock Co. v. Huffman,*
319 U.S. 293 (1943).......... 38-39

*Griffin v. Wisconsin*,
483 U.S. 868 (1987).......... 27, 28, 31, 33

*Haaland v. Brackeen*,
599 U.S. 255 (2023).......... 20

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982).......... 13, 17

*Hochendoner v. Genzyme Corp.*,
823 F.3d 724 (1st Cir. 2016) .......... 9

*Hussen v. Noem*,
822 F. Supp. 3d 944 (D. Minn. 2026) ..........11

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
110 F.4th 295 (1st Cir. 2024) ............................................................................ 13, 18, 19

*Kidd v. Mayorkas*,
734 F. Supp. 3d 967 (C.D. Cal. 2024)............................................................................ 33

*K-Mart Corp. v. Oriental Plaza, Inc.*,
875 F.2d 907 (1st Cir. 1989) ............................................................................................ 37

*Kowalski v. Tesmer*,
543 U.S. 125 (2004)........................................................................................................... 16

*LaFrance v. Bohlinger*,
499 F.2d 29 (1st Cir. 1974) ........................................................................................ 25, 26

*Lopez v. INS*,
758 F.2d 1390 (10th Cir. 1985)......................................................................................... 31

*Lopez-Lopez v. Cnty. of Allegan*,
321 F. Supp. 3d 794 (W.D. Mich. 2018)........................................................................... 31

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)..................................................................................................... 14, 18

*Macauley v. Waterman S.S. Corp.*,
327 U.S. 540 (1946)........................................................................................................... 38

*Mass. Coal. for Immigr. Reform v. DHS*,
621 F. Supp. 3d 84 (D.D.C. 2022) .................................................................................... 22

*McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Ords. of Jud. Conf. of U.S.*,
264 F.3d 52 (D.C. Cir. 2001)............................................................................................. 15

*Meese v. Keene*,
481 U.S. 465 (1987)........................................................................................................... 15

*Mendoza v. Perez*,
754 F.3d 1002 (D.C. Cir. 2014)......................................................................................... 35

*Metro. Wash. Chapter, Associated Builders & Contractors, Inc. v. D.C.*,
62 F.4th 567 (D.C. Cir. 2023) ............................................................................................ 16

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)............................................................................................................. 34

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......... 9, 10

*Narrigan v. Goldberg*,
170 F.4th 14 (1st Cir. 2026) .......... 10

*National Mining Ass'n v. McCarthy*,
758 F.3d 243 (D.C. Cir. 2014) .......... 22

*Nat'l Ass'n of Home Builders v. Norton*,
415 F.3d 8 (D.C. Cir. 2005) .......... 21

*New England Synod v. DHS*,
25-40102-FDS, 2026 WL 412329 (D. Mass. Feb. 13, 2026) .......... 20

*Nielsen v. Preap*,
586 U.S. 392 (2019) .......... 32

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 37

*Noem v. Vasquez Perdomo*,
146 S. Ct. 1 (2025) .......... 11, 12, 26

*Rakas v. Illinois*,
439 U.S. 128 (1978) .......... 24

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
102 F.3d 12 (1st Cir. 1996) .......... 37

*Samuels v. Mackell,*
401 U.S. 66 (1971) .......... 38

*Sherman v. U.S. Parole Comm'n*,
502 F.3d 869 (9th Cir. 2007) .......... 31, 32

*Sierra Club v. EPA*,
955 F.3d 56 (D.C. Cir. 2020) .......... 21, 22

*Simmons v. United States*,
390 U.S. 377 (1968) .......... 24

*Soundboard Ass'n v. FTC*,
888 F.3d 1261 (D.C. Cir. 2018) .......... 22

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998)........................................................................................................ 18

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)........................................................................................................ 3

*Tenorio-Serrano v. Driscoll*,
324 F. Supp. 3d 1053 (D. Ariz. 2018)........................................................................... 31

*Thornton v. Ipsen Biopharmaceuticals, Inc.*,
126 F.4th 76 (1st Cir. 2025)............................................................................................ 8

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)........................................................................................................ 9

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)................................................................................................ 39, 40

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
578 U.S. 590 (2016)...................................................................................................... 20

*U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*,
647 F.3d 377 (1st Cir. 2011)............................................................................................ 8

*United States v. Beaudion*,
979 F.3d 1092 (5th Cir. 2020)........................................................................................ 25

*United States v. Leake*,
No. 19-CR-194, 2020 WL 3489523 (D.D.C. June 26, 2020)......................................... 25

*United States v. Lucas*,
499 F.3d 769 (8th Cir. 2007)............................................................................ 27, 28, 30

*United States v. Malagerio*,
49 F.4th 911 (5th Cir. 2022)........................................................................................... 30

*United States v. Salerno*,
481 U.S. 739 (1987)...................................................................................................... 27

*United States v. Soule*,
908 F.2d 1032 (1st Cir. 1990)........................................................................................ 25

*United States v. Symonevich*,
688 F.3d 12 (1st Cir. 2012)........................................................................................... 25

*United States v. Texas*,
599 U.S. 670 (2023) ... 9, 39, 40

*Valencia Cardenas v. Chestnut*,
No. 1:26-CV-02073, 2026 WL 785871 n.1 (E.D. Cal. Mar. 20, 2026) ... 33

*Vasquez Perdomo v. Noem,*
148 F.4th 656 (9th Cir. 2025) ... 26

*Whitmore v. Arkansas*,
495 U.S. 149 (1990) ... 18

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ... 37, 38

*Wyman v. James*,
400 U.S. 309 (1971) ... 28

**U.S. Constitution**

U.S. Const. amend. IV ... 24

**U.S. Code**

5 U.S.C. § 553 ... 35

5 U.S.C. § 703 ... 40

5 U.S.C. § 704 ... 20

5 U.S.C. § 705 ... 37

8 U.S.C. § 1101 et seq. ... 32

8 U.S.C. § 1225 ... 28

8 U.S.C. § 1226 ... 28, 32, 36

8 U.S.C. § 1231 ... 28

8 U.S.C. § 1357 ... 28

28 U.S.C. § 2202 ... 38

Immigration and Nationality Act of 1952,
Pub. L. No. 82–414, 66 Stat. 163 (1952) ... 32

**Rules**

Fed. R. Civ. P. 12 .......... 8

Fed. R. Civ. P. 56 .......... 9

**Regulations**

8 C.F.R. § 241.2 .......... 36

8 C.F.R. § 241.2 (1952) .......... 32

8 C.F.R. § 287.8 .......... 32

**Other Authorities**

Administrative Procedure Act, S. Doc. No. 248, 79th Cong., 2d Sess. 36-37 (1946) .......... 40

C-SPAN, DHS Secretary Kristi Noem Testifies on Agency Oversight Hearing, Part 1, (Mar. 3, 2026), https://www.c-span.org/program/senate-committee/homeland-security-secretary-noem-testifieson-agency-oversight-hearing-part-1/674062 .......... 12

M. Redish, *Moore's Fed. Practice*, § 101.99 .......... 23

Markwayne Mullin's Senate Confirmation Hearing to Become Homeland Security Secretary, Face the Nation (Mar. 18, 2026), https://www.youtube.com/watch?v=zUtGVXuRRBI .......... 7

Sample Warrant of Removal, https://www.ice.gov/sites/default/files/documents/Document/2017/I-205_SAMPLE.PDF .......... 3

## INTRODUCTION

Several advocacy organizations bring this lawsuit to enforce the alleged violations of others' Fourth Amendment rights. In May 2025, Defendants circulated an internal guidance memorandum authored by former Acting Director of U.S. Immigration and Customs Enforcement ("ICE") Todd Lyons. Am. Compl., Ex. A, at 1-3, ECF No. 11-1 (the "Lyons Guidance"), relaying that if certain conditions are met, ICE officers may use a Form I-205 to arrest an alien subject to a final order of removal in his place of residence. Plaintiffs argue that the practice relayed in this guidance document is a policy that violates aliens' Fourth Amendment rights.

But Plaintiffs are not aliens, nor do they have any members who are aliens. Instead, they are advocacy organizations who provide training, education, and counseling services to immigrants. Plaintiffs allege they are harmed by having to spend more time and resources changing their educational materials and by redirecting their resources to broader community outreach initiatives. Additionally, they allege that their credibility has been affected because they previously advised such uses of warrants were unlawful and that they are afraid of "warrantless entr[ies]" into their premises although the Guidance discusses using a Form I-205 only in a place of residence.

None of these injuries suffices for Article III standing. Instead, all are indirect harms that are, at best, indirectly caused by the guidance document and are precisely the types of injuries foreclosed by *FDA v. Alliance for Hippocratic Medicine*. *See* 602 U.S. 367, 394 (2024) ("*Alliance*") ("[A]n organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action."). Additionally, the Lyons Guidance is not a final agency action; instead, it is a guidance document that allows officers to choose whether to use a Form I-205 to make arrests of aliens subject to a final order of removal in their places of residence.

And even if the Court had jurisdiction, it should dismiss this action as an attempt to vicariously assert others' Fourth Amendment rights, an avenue foreclosed by the Supreme Court. *See Alderman v. United States*, 394 U.S. 165, 174 (1969) ("We adhere . . . to the general rule that Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.").

And even if the Court were to address the merits of Plaintiffs' claims, all fail as a matter of law. The Lyons Guidance provides that ICE officers may choose to make an arrest at a person's residence if the person is an alien with a final order of removal. Plaintiffs characterize this practice as a "warrantless" arrest that does not comply with the Fourth Amendment. That characterization, however, is wrong and based on a misapprehension of a "warrantless" arrest. Administrative warrants have a long history in the context of immigration, and the Supreme Court recognized over sixty years ago that there is "impressive historical evidence of acceptance of the validity of statutes providing for administrative deportation arrest from almost the beginning of the Nation." *Abel v. United States*, 362 U.S. 217, 234 (1960).

And Plaintiffs' procedural challenges—that the Lyons Guidance was arbitrary and capricious and that the Lyons Guidance required notice-and-comment rulemaking—also fail. The decision to implement the Lyons Guidance easily satisfies the deferential arbitrary-and-capricious standard, and there was no requirement for notice-and-comment rulemaking because the Lyons Guidance covers purely internal operations.

The Court should thus dismiss the case with prejudice.

## BACKGROUND

### I. The Lyons Guidance

Plaintiffs challenge a specific memorandum authored by the former Acting Director of ICE: the Lyons Guidance. The Lyons Guidance provides that "ICE immigration officers *may* arrest

and detain aliens subject to a final order of removal issued by an immigration judge, the Board of Immigration Appeals (BIA), or a U.S. district court or magistrate judge in their place of residence" and that "ICE immigration officers should consider all available enforcement mechanisms, including the use of a Form I-205 to arrest an alien in their place of residence." Lyons Guidance at 2.[2] The Lyons Guidance makes clear that before Form I-205 is used for that purpose, "officers and agents must ensure the Form I-205 is properly completed and is supported by a final order of removal issued by an immigration judge, the BIA, a U.S. district court, or a magistrate judge" and emphasizes that "[t]his is essential because that order establishes probable cause." *Id.* at 2.[3]

Arresting officers "must also have reason to believe that the subject alien resides at and is currently located in the address where the Form I-205 is to be served." *Id.* Form I-205s are not to be used to "effectuate an arrest in a third-party residence." *See id.* Form I-205s are also limited to arresting the subject alien and cannot be used as a search warrant, except to "a limited search of the immediate area to ensure officer safety only." *Id.* at 2-3. The Lyons Guidance also provides that immigration officers must "knock and announce" their presence, "should use only a necessary and reasonable amount of force to enter a residence," and entry should occur only between the hours of 6:00 a.m. and 10:00 p.m. *Id.* at 2-3. And although the Lyons Guidance is applicable nationwide, it was fully implemented in Minnesota, Louisiana, and Texas only to give DHS an

---

[2] The Lyons Guidance is attached to the Amended Complaint, *see* Lyons Guidance at 1-3, and is also incorporated by reference, *see, e.g.*, Am. Compl. ¶¶ 5, 49-60, ECF No. 11, so the Court may consider it when deciding a Rule 12(b)(6) motion. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other . . . documents incorporated into the complaint by reference . . . .").

[3] A Form I-205 must contain information including (1) the full name of the alien, (2) the place and date of entry, and (3) whether the final order of removal was authorized by an immigration judge, a designated official, the BIA, or a federal court. *See* Sample Warrant of Removal, available at https://www.ice.gov/sites/default/files/documents/Document/2017/I-205_SAMPLE.PDF (last visited on July 2, 2026). As Form I-205s are incorporated by reference into the Complaint, *see, e.g.*, Am. Compl. ¶¶ 31-35, the Court may consider them. *See Tellabs*, 551 U.S. at 322.

opportunity to evaluate the utility and impact prior to using it in other Areas of Responsibility. Ex. A, Decl. of Liana J. Castano ("Castano Decl.") ¶ 9. The Lyons Guidance also makes clear that it "serve[s] as general guidance for consideration prior to and when effectuating an arrest in an alien's place of residence using a Form I-205 in combination with a final order of removal" and that it "does not, is not intended to, and may not be construed to create or modify any right or benefit, substantive or procedural, enforceable at law by any party against the United States, its agencies, its officers, or any person." Lyons Guidance at 3.

## II. The Amended Complaint's Allegations

The Amended Complaint alleges that Plaintiffs are three nonprofit organizations who provide educational and other services. Am. Compl. ¶¶ 79-80. Plaintiff Greater Boston Latino Network ("GBLN") contains seven nonprofit member organizations that each provide educational, healthcare, and career-related services and focus on objectives such as ESL classes, owning affordable housing units, and "advancing Latinx leadership in decision-making positions at the local and state level." *Id.* ¶¶ 14-15. GBLN's organizations also provide information regarding the rights of those in the immigrant community. *Id.* ¶ 16. Plaintiff Brazilian Worker Center ("BWC") is a nonprofit that has "a mission to empower immigrants and promote economic and social justice" and "provides support to asylum seekers and individuals." *Id.* ¶¶ 17-18. Like GBLN, BWC "provides training, education, and support regarding immigration enforcement," and "counseling" that includes "advice to immigrants regarding their Fourth Amendment rights." *Id.* ¶ 19. Plaintiff Massachusetts Communities Action Network ("MCAN") is a faith- and values-based nonprofit that "engages in immigrant rights work" by "supporting DACA recipients and TPS holders and uplifting immigrant-owned businesses" and providing "trainings to immigrants regarding their rights with respect to immigration enforcement." *Id.* ¶¶ 22-23.

Plaintiffs allege that they are harmed by the Lyons Guidance because "Plaintiffs can no longer safely advise community members . . . that immigration enforcement officers may not enter their homes without a judicial warrant," and because they must now "expend considerable time and resources" to change their training materials and retrain staff. *Id.* ¶¶ 75-76. Plaintiffs also allege that they must "divert their limited resources away from their other core activities." *Id.* ¶ 76; *see also id.* ¶ 86 ("[T]he Plaintiffs must now expend substantial resources, including staff time, adjusting to account for the change announced by the Lyons [Guidance] and its uncertain impact."). Plaintiffs also allege that they must "expand the target audiences of their trainings, necessitating additional staffing, time, and other resource expenditures." *Id.* ¶ 89. They also allege that Defendants' ability to conduct searches without a judicial warrant is important to "Plaintiffs and the community members they serve" as there are "many [community members] who[] are currently in immigration proceedings—with pending asylum applications, TPS, or otherwise seeking adjustment to their immigration status." *Id.* ¶¶ 77-78. Plaintiffs also allege that they are harmed because the alleged change from "well-established warrant requirements" has caused them to modify their educational services and trainings and thus affected their "ability to appropriately counsel community members." *See id.* ¶¶ 79-84. And Plaintiffs allege that their credibility has also been affected because they must now provide different advice about whether ICE officers can enter homes without a judicial warrant. *Id.* ¶ 85. BWC alleges that it is now doing more one-on-one counseling for community members, *id.* ¶ 90, while MCAN is fielding more calls from community members asking for advice. *Id.* ¶ 91. Plaintiffs finally allege that they "are now afraid that their buildings will be subject to forced, warrantless entry," but provide no facts supporting that allegation. *Id.* ¶ 96. There are no allegations that any Plaintiff contains any member who either has been the subject of an administrative warrant or provides legal services to anyone who has.

Plaintiffs allege five causes of action. *First*, they allege a violation of the APA because the Lyons Guidance, in their view, violates the Fourth Amendment of the U.S. Constitution. Am. Compl. ¶¶ 99-106. *Second*, they argue that the Lyons Guidance violates the APA because it violates DHS's regulations. *Id.* ¶¶ 107-111. *Third*, they argue that implementation of the Lyons Guidance is arbitrary and capricious because Defendants did not address the reliance interests in prior practice. *Id.* ¶¶ 112-118. *Fourth*, Plaintiffs allege that the Lyons Guidance required notice-and-comment rulemaking. *Id.* ¶¶ 119-128. *Fifth*, they seek a declaration that the "Defendants have committed numerous violations of the APA." *Id.* ¶¶ 129-32.

## III. Statement of Supplemental Undisputed Material Facts

1. The Lyons Guidance states that a Form I-205 may be used "to arrest aliens subject to final orders of removal in their place of residence." *See* Lyons Guidance at 1.

2. Any use of a Form I-205 relied upon to enter a residence must be "supported by a final order of removal issued by an immigration judge, the BIA, a U.S. district court, or a magistrate judge." Lyons Guidance at 2.

3. All Plaintiffs are nonprofit advocacy organizations that maintain their principal places of business and operate in Massachusetts. *See* ECF No. 27-4 ("GBLN Decl.") ¶ 6 ("All GBLN member organizations maintain their principal places of business in Boston, Massachusetts"); ECF No. 27-5 ("BWC Decl.") ¶ 4 ("The BWC is located in Allston, Massachusetts"); ECF No. 27-6 ("MCAN Decl.") ¶ 2 ("MCAN has eight affiliates throughout Massachusetts" and its "principal places of business are Milton and Framingham, Massachusetts").

4. No Plaintiff is an alien, nor does any Plaintiff have any members who are aliens. *See* Am. Compl. ¶¶ 14-24; GBLN Decl. ¶ 4 ("All GBLN member organizations are non-profits that provide services to the Latinx community."); BWC Decl. ¶ 1 (BWC "support[s] immigrants"); MCAN Decl. ¶¶ 2, 5 (members are advocacy groups).

5. No Plaintiff is the subject of a final order of removal or has been subjected to the use of an administrative warrant to make an arrest in a home. *See generally* Am. Compl.; GBLN Decl.; BWC Decl.; MCAN Decl.

6. Although the Lyons Guidance applies nationwide, when it was operational, it was fully implemented in Minnesota, Louisiana, and Texas only so that DHS could evaluate the utility and impact prior to using it in other Areas of Responsibility. Castano Decl. ¶ 9.

7. There is no evidence that an administrative warrant has been used to make an arrest in any home in the District of Massachusetts. *See* Mem. of Law in Support Pls.' Motion for Partial Summary Judgment or, in the Alternative, Motion for Stay at 4 ¶ 16, ECF No. 27 ("Pls.' MSJ") (noting examples of its use in Minnesota); ECF Nos. 27-9 – 27-13 (Pls.' MSJ Exs. 8-12) (same); *see also* BWC Decl. ¶ 21 ("BWC became aware of ICE's warrantless home arrests in Minnesota").

8. On March 5, 2026, the President nominated Markwayne Mullin to serve as the Secretary of Homeland Security, and during his March 18 Senate confirmation hearing, he testified that if confirmed as head of the agency, "[ICE officers] will not enter a home without a judicial warrant unless [they] are pursuing the individual that runs into a house." *See Markwayne Mullin's Senate Confirmation Hearing to Become Homeland Security Secretary*, Face the Nation (Mar. 18, 2026), https://www.youtube.com/watch?v=zUtGVXuRRBI, at 1:13:23-1:13:34.

9. By letter dated May 8, 2026, Secretary Markwayne Mullin publicly confirmed to Senator Richard Blumenthal that he had paused the practice of entering residences with Form I-205 warrants while he assesses the policy. Castano Decl. ¶ 10. That assessment is ongoing. *Id.*

10. Relevant ICE staff have been made aware of the decision to pause the practice of entering residences with Form I-205 warrants while Secretary Mullin assesses the policy. *Id.* ¶ 11.

11. ICE's Enforcement and Removal Operations ("ERO")—the subcomponent of ICE that identifies, arrests, and removes aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally, *id.* ¶ 5—will not execute Form I-205 warrants inside residences without consent during this pause and will follow appropriate guidance moving forward. *Id.* ¶ 12.

## LEGAL STANDARD

On a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), a district court must "accept the well-pleaded factual averments contained" in the complaint, but the "party seeking to invoke the jurisdiction of a federal court must bear the burden of demonstrating the existence of such jurisdiction." *Gordo-González v. United States*, 873 F.3d 32, 35 (1st Cir. 2017) (quotation modified); *see also DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 342 n.3 (2006) ("the party asserting federal jurisdiction when it is challenged has the burden of establishing it").

To survive a motion to dismiss under Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Accordingly, the complaint must "set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 384 (1st Cir. 2011) (citation omitted). A plaintiff "must plead facts sufficient to 'nudge the plaintiff's claims across the line from conceivable to plausible.'" *Thornton v. Ipsen Biopharmaceuticals, Inc.*, 126 F.4th 76, 80 (1st Cir. 2025) (quotation modified). The court is "generally limited to considering facts and documents

that are part of or incorporated into the complaint," plus matters "of public record" or "susceptible to judicial notice." *Giragosian v. Ryan*, 547 F.3d 59, 65 (1st Cir. 2008) (citation modified).

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). All reasonable inferences must be examined in the light most favorable to the nonmoving party. *See, e.g.*, *Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 43 (1st Cir. 2009).

## ARGUMENT

### I. This Court Does Not Have Jurisdiction

#### A. All Plaintiffs Have Failed to Allege Article III Standing

"Federal courts are courts of limited jurisdiction." *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730 (1st Cir. 2016). To invoke the Court's jurisdiction, a plaintiff must have standing, meaning (1) it has suffered or is likely to suffer an injury in fact; (2) the injury was likely caused by the defendant; and (3) the injury is likely to be redressed by the requested judicial relief. *See Alliance*, 602 U.S. at 380; *United States v. Texas*, 599 U.S. 670, 676 (2023). Standing cannot be asserted "in gross," as Plaintiffs must have standing for "each claim that they press against each defendant," *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (citation omitted), and "for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Finally, for a plaintiff to pursue "forward-looking" relief such as an injunction, a party must show that the plaintiff "face[s] 'a real and immediate threat of repeated injury.'" *Murthy*, 603 U.S. at 58 (citation omitted).

Failing to follow the above principles would ignore Article III standing as "a bedrock constitutional requirement," *Texas*, 599 U.S. at 675, and "usurp the powers of the political branches." *Id.* at 676 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)). As the Supreme Court has cautioned, "Article III does not contemplate a system where 330 million citizens can come to federal court whenever they believe that the government is acting contrary to

the Constitution or other federal law." *Alliance*, 602 U.S. at 382. The same requirements exist when a plaintiff "seek[s] only declaratory judgment" and when a plaintiff seeks prospective declaratory or injunctive relief, it must demonstrate "a continuing injury or a sufficient threat that the injury will recur." *Narrigan v. Goldberg*, 170 F.4th 14, 17 (1st Cir. 2026) (citation omitted). As discussed below, this Court lacks jurisdiction here for several reasons. Accordingly, this case should be dismissed.

**1. All alleged injuries are speculative and cannot support forward-looking declaratory and injunctive relief.**

Plaintiffs seek only forward-looking relief, by "seeking a declaratory judgment and injunctive relief from the Court to hold unlawful, vacate, and set aside the Lyons [Guidance] pursuant to the [APA] and to enjoin the Defendants and their officers from implementing or effectuating it." Am. Compl. ¶ 10; *see also id.* at 37-38 (Prayer for Relief). They are thus required to "establish a *substantial* risk of future injury," not a "speculative" one. *Murthy*, 603 U.S. at 69 (emphasis added).

Plaintiffs do not have standing under *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), to pursue that relief. The *Lyons* Court explained that a plaintiff who had previously been placed in a chokehold by a police officer could not seek an injunction to end the alleged chokehold policy even though he believed the same conduct could happen in the future. *Id.* at 105. That was so because he could not demonstrate that he had "a real and immediate threat" of being placed in a chokehold in the future because there was no evidence that all police officers choked citizens at every encounter or that the governmental entity always acted in such a manner. *Id.* at 105-06. As the Court explained, the plaintiff "is no more entitled to an injunction than any other citizen of Los Angeles" because "a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional." *Id.* at 111.

*Clapper v. Amnesty International* likewise instructs that a plaintiff lacks standing when it cannot articulate specific facts demonstrating that harm is imminent. There, the Supreme Court held that plaintiffs—who alleged their communications with foreign contacts were being targeted and intercepted by the government pursuant to a statute—lacked standing because they "merely speculate[d] and ma[d]e assumptions about whether their communications with their foreign contacts w[ould] be acquired" without setting forth "specific facts" demonstrating such targeting. 568 U.S. at 411-12. Even if the plaintiffs demonstrated that "the targeting of their foreign contacts [wa]s imminent," it remained speculative that the government would use the specific statute. *Id.* at 413. And even if the plaintiffs demonstrated that the government would seek authorization from the Foreign Intelligence Surveillance Court to target their communications, it was speculative that the "court w[ould] authorize such surveillance," meaning that there would be "guesswork as to how independent decisionmakers will exercise their judgment." *Id.*

Here, Plaintiffs cannot demonstrate that they have a substantial risk of any future injury entitling them to a broad injunction restricting immigration officers from operating under an internal guidance memorandum. Plaintiffs' standing theory is more attenuated than that asserted in *Lyons*, which itself was insufficient to demonstrate Article III standing. "[L]ike in *Lyons*, plaintiffs seek a forward-looking injunction to enjoin law enforcement" while "hav[ing] no good basis to believe that law enforcement will" violate their constitutional rights "in the future." *See Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 2 (2025) (Kavanaugh, J., concurring). "Absent a sufficient likelihood that [they] will [] be wronged," plaintiffs are "no more entitled to an injunction than any other citizen . . . ; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional." *Lyons*, 461 U.S. at 111; *see also Hussen v. Noem*, 822 F. Supp. 3d 944, 1000 (D. Minn. 2026) (finding that plaintiffs

could not seek forward-facing injunctive relief because they had "no good basis to believe that law enforcement will unlawfully stop [or arrest] *them* in the future based on the prohibited factors—and certainly no good basis for believing that any stop [or arrest] of the plaintiffs is imminent." (alterations and emphasis in original) (quoting *Vasquez Perdomo*, 146 S. Ct. at 3 (Kavanaugh, J., concurring))). Without a concrete, imminent risk of an arrest pursuant to an administrative warrant in their places of residence, Plaintiffs' injunctive claim fails for lack of standing. *See Chaplaincy of Full Gospel Churches v. Navy*, 697 F.3d 1171, 1175 (D.C. Cir. 2012) ("Plaintiffs must show that they face an imminent threat of future injury." (quotation modified)).

Plaintiffs have not even pleaded facts demonstrating that there is any chance they are likely to suffer an injury, much less can they show they face a substantial risk of injury. Plaintiffs have not demonstrated that any arrest has been made in Massachusetts pursuant to an administrative warrant—which makes sense, given that the practice was in effect only in other States, Castano Decl. ¶ 9—so it is speculative to believe that any Plaintiff will be subjected to the practice, especially because Plaintiffs are organizations. That speculation is magnified because out of 400,000 arrests made by ICE, administrative warrants were used to enter homes approximately 28 times. *See* C-SPAN, *DHS Secretary Kristi Noem Testifies on Agency Oversight Hearing, Part 1*, at 40:30–41:19, (Mar. 3, 2026), https://www.c-span.org/program/senate-committee/homeland-security-secretary-noem-testifieson-agency-oversight-hearing-part-1/674062, *cited by* Pls.' MSJ at 4 n.3. Moreover, even though Plaintiffs say they "fear [] warrantless invasions in other private spaces beyond the home, including the Plaintiffs' workplaces and events," Am. Compl. ¶ 96, they have provided no facts showing that arrests have occurred anywhere beyond the home, and the language of the Lyons Guidance—which applies only to arrests of aliens "in their place of residence," Lyons Guidance at 1—belies that argument. Plaintiffs' proffered speculation of future

harm is thus insufficient to demonstrate any realistic immediate threat that they will be subjected to an arrest pursuant to a Form I-205 in their places of residence. *See Clapper*, 568 U.S. at 401.

**2. No Plaintiff has pleaded an injury in fact.**

Because Plaintiffs are organizations, two kinds of standing are available to them: either "organizational standing," whereby they may "sue on their own behalf for injuries they have sustained," *Alliance*, 602 U.S. at 393 (citation omitted); or "associational standing," whereby an organization may sue on behalf of its members. *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 110 F.4th 295, 308 & n.7 (1st Cir. 2024). Plaintiffs allege organizational standing by alleging that "[t]he Lyons [Guidance] and the policy it purports to authorize directly affect, interfere with, and perceptibly impair the Plaintiff's core activities." Am. Compl. ¶ 74. Although Plaintiffs GBLN and BWC do have members, *see id.* ¶¶ 14, 18, and thus could hypothetically plead associational standing, here, the analysis is the same because all GBLN's members are organizations alleged to have the same or similar injuries as GBLN itself, *see id.* ¶ 80, and BWC does not allege any specific harms of its members separate from the organization itself. *See id.* ¶ 81.

To have standing "on [its] own behalf," an organization must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals. *Alliance*, 602 U.S. at 393-94 (citation omitted). And like an individual, an organization may not establish standing based on the intensity of its interest or because of strong opposition to the government's conduct, "no matter how longstanding the interest and no matter how qualified the organization," *id.* at 394 (citation omitted); rather, the organization must show "far more than simply a setback to the organization's abstract social interests." *Id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

Here, Plaintiffs cannot make the requisite showing. Plaintiffs allege that they must use their time and resources to change training materials and retrain staff while also "divert[ing] their limited resources away from their other core activities." Am. Compl. ¶¶ 75-76; *see also id.* ¶ 86

("[T]he Plaintiffs must now expend substantial resources, including staff time, adjusting to account for the change announced by the Lyons [Guidance] and its uncertain impact."). Plaintiffs also allege that they have had to spend more on staffing and other resources so they can "expand the target audiences of their trainings" and "increase[e] [] one-on-one counseling availability for community members." *Id.* ¶¶ 89-90. But these alleged self-inflicted harms are insufficient to demonstrate an injury in fact, which must be "concrete and particularized," and "actual or imminent, not conjectural, or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted). These assertions of standing are foreclosed by *Alliance*. There, the Supreme Court held that several medical associations lacked organizational standing to challenge the approval by the Food and Drug Administration ("FDA") of mifepristone. The Court so held despite those organizations' allegations that the FDA's actions "impaired" their "ability to provide services and achieve their organizational missions" and "caused" the associations to expend "considerable resources" to conduct their own research and engage in public advocacy and public education, all to the detriment of the organizations' other priorities. 602 U.S. at 394. The reasoning of *Alliance* applies with equal force here. Like those medical associations, Plaintiffs allege no more than "simply a setback to the organization's abstract social interests" and an "impair[ment]" to their "ability to provide services and achieve their organizational missions." *Id.* (citation omitted). Regarding Plaintiffs' alleged expenditure of resources, *Alliance* makes clear that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing." *Id.*

Plaintiffs also allege that they are injured because there has been an "increased demand for counseling services," because the Lyons Guidance "frustrates the Plaintiffs' efforts to counsel community members," and because the alleged change from "well-established warrant

requirements" has caused them to modify their educational services and trainings and thus affected their "ability to appropriately counsel community members" since " Plaintiffs must now explain the change in ICE policy and the attendant risks, which requires additional time and resources." *See* Am. Compl. ¶¶ 75-76, 79-84; *see also id.* ¶ 92 ("To generate updated materials, trainings, and guidance, each Plaintiff is now spending significant time—which would otherwise be spent on other core activities—to monitor implementation of the Lyons [Guidance] and reports of ICE conducting warrantless home arrests."). But increased complexity or workload in legal representation is not enough for lawyers to demonstrate an injury in fact. *See Fed. Defs. of San Diego, Inc. v. U.S. Sent'g Comm'n*, 680 F. Supp. 26, 28 (D.D.C. 1988) (no injury in fact where criminal defense lawyers alleged that their workload "will be more complex and will markedly increase," because the harm is no different from those stemming from any changes in law). Likewise, any increased complexity in counseling about legal requirements by organizations is not an injury. Indeed, explaining ICE's policy to community members is purportedly part of Plaintiffs' mission. *See* Am. Compl. ¶¶ 75-76. That the explanation is now slightly different is no injury.

Plaintiffs also allege that the Lyons Guidance "threaten[s] the Plaintiffs' credibility as trusted authorities on the Fourth Amendment's protections and limits on ICE action, especially with respect to home entry." Am. Compl. ¶ 85. Although a reputational injury can "suffice for purposes of constitutional standing," it cannot be "too vague and unsubstantiated." *McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Ords. of Jud. Conf. of U.S.*, 264 F.3d 52, 57 (D.C. Cir. 2001). Instead, like with all other injuries, a plaintiff must demonstrate a direct and concrete reputational harm, such as a "substantial[] harm [to a political candidate's] chances for reelection" and adverse effects to "his reputation in the community" due to the government's labeling films as "political propaganda," *see Meese v. Keene*, 481 U.S. 465, 473-75 (1987), or

damage to an attorney's professional reputation because of an order finding he committed ethical misconduct. *See Butler v. Biocore Med. Techs., Inc.*, 348 F.3d 1163, 1168 (10th Cir. 2003); *see also Foretich v. United States*, 351 F.3d 1198, 1212 (D.C. Cir. 2003) (reputational harm alleged when a government entity abrogated an individual's parental rights). Plaintiffs do not come close to demonstrating a similar harm; they do not specify how their credibility could be harmed as a result of Defendants' following the Lyons Guidance, which has no direct implication on Plaintiffs.

Plaintiffs further allege that whether Defendants conduct searches without a judicial warrant "is of critical importance to the Plaintiffs and the community members they serve" because many "community members" are currently in various immigration proceedings (meaning they have not received final orders of removal). Am. Compl. ¶¶ 77-78. But those allegations merely assert the rights of third parties, and it is well-established that "ordinarily, a party 'must assert [its] own legal rights' and 'cannot rest [its] claim to relief on the legal rights . . . of third parties.'" *Metro. Wash. Chapter, Associated Builders & Contractors, Inc. v. D.C.*, 62 F.4th 567, 573 (D.C. Cir. 2023) (citation omitted); *see also Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) ("[W]e have not looked favorably upon third-party standing."); *Conn v. Gabbert*, 526 U.S. 286, 292-93 (1999) (rejecting an attorney's attempt to adjudicate the rights of a client); *Benjamin v. Aroostook Med. Ctr., Inc.*, 57 F.3d 101, 107 (1st Cir. 1995) (finding that patients could not sue on behalf of doctors because it is presumed "that the party bringing the litigation will be the 'most effective advocate of the rights at issue.'" (citation omitted)).

In their Motion for Summary Judgment, Plaintiffs also argue that they are injured because one core activity is providing community members with information about their Fourth Amendment rights. *See* Pls.' MSJ at 27. Specifically, Plaintiffs argue that "the Lyons [Guidance] vitiates Plaintiffs' ability to provide community members with clear and reliable advice on their

constitutional rights" and "forces them to expend their resources—both time and money—modifying now-outdated Fourth Amendment materials and retraining community leaders and members." *Id.* But after *Alliance*, it is clear that these alleged injuries are insufficient, as organizations "cannot spend [their] way into standing simply by expending money to gather information and advocate against the defendant's action." 602 U.S. at 394. It is "incorrect" to argue that "standing exists when an organization diverts its resources in response to a defendant's actions." *Id.* at 395. It is true that the Supreme Court did allow standing for an informational injury in the "unusual case" of *Havens*, but there, a defendant that owned and operated apartment complexes was alleged to have conducted racial steering by providing false information about apartment availability to Black employees of an organization that provided housing counseling and referral services. *See Alliance*, 602 U.S. at 395 (citing *Havens*, 455 U.S. at 366 & n.1, 368). The defendant's provision of false information harmed the organization by "directly affect[ing] and interfer[ing] with [the organization's] core business activities" because the organization could not provide accurate "counseling and referral services for low- and moderate-income homeseekers." *Id.* (quoting *Havens*, 455 U.S. at 379). The Court likened the harm "to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.* That is not the kind of injury Plaintiffs allege here. Instead, Plaintiffs' injuries here are abstract or a voluntary diversion of resources to provide advice, training, and education. *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 920 (D.C. Cir. 2015) (shifting resources to educate members and advocate was insufficient).

Finally, Plaintiffs allege that they "are now afraid that their buildings will be subject to forced, warrantless entry," Am. Compl. ¶ 96, but provide no facts supporting that allegation. This allegation is merely a "highly speculative fear" that cannot demonstrate an injury in fact fairly

traceable to the challenged conduct. *See Clapper*, 568 U.S. at 410. For this to be an injury, the Court would have to assume that (1) Defendants will extend the practice of utilizing a "Form I-205 to arrest an alien in their place of residence" to target other buildings despite the Lyons Guidance's plain language, *see* Lyons Guidance at 2, *quoted by* Am. Compl. ¶ 54; (2) Defendants will choose to target "Plaintiffs' workplaces and events," Am. Compl. ¶ 96; and (3) in doing so, Defendants will choose to use a Form I-205. That is the type of speculation that cannot demonstrate that the "threatened injury [is] certainly impending" sufficient to "constitute injury in fact." *Clapper*, 568 U.S. at 410 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

**3. Plaintiffs have failed to plead the Lyons Guidance caused any injury.**

Even if the Plaintiffs could establish an injury in fact, they cannot establish that their alleged injuries are caused or are likely to be caused by the Lyons Guidance. Causation requires "a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). The chain of causation between the illegal conduct and the injury must be "sufficiently direct," *In re Fin. Oversight*, 110 F.4th at 319 (citation omitted), and cannot be "too speculative or too attenuated." *Alliance*, 602 U.S. at 382-83. Unregulated parties—like Plaintiffs here—often "have more difficulty establishing causation" because in such a circumstance, causation "ordinarily hinge[s] on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well." *Id.* (quoting *Lujan*, 504 U.S. at 562). Thus, the plaintiff must demonstrate "a predictable chain of events leading from the government action to the asserted injury," showing that any third parties "will likely react in predictable ways" and that those actions will then "likely injure the plaintiffs." *Id.* at 383, 385 (citation omitted). The causation requirement "rules out attenuated links . . . where the government action is so far removed from its distant (even if predictable) ripple effects." *Id.* at 383.

Here, Plaintiffs have not demonstrated that any alleged injuries are "fairly traceable" to the Lyons Guidance. Recall that Plaintiffs' alleged injuries relate to the alleged diversion of their resources from other activities, an increased demand in their counseling services and trainings, Plaintiffs' reputation in respect to the advice they provide regarding the Fourth Amendment's requirements, and their speculative fears that "their buildings will be subject to a forced, warrantless entry." *See supra* Part I.A.2.

None of those alleged injuries is directly related to the Lyons Guidance; instead, all are "attenuated links" that either relate to Plaintiffs' intervening decisions or the "distant (even if predictable) ripple effects." *Alliance*, 602 U.S. at 383. Plaintiffs have failed to present "a predictable chain of events" demonstrating how these injuries are directly caused by the implementation of a guidance memorandum. *See id.* at 385. Allowing these advocacy Plaintiffs to challenge general immigration guidance any time a new internal policy is implemented because of claimed confusion and reputational injuries due to the advice they previously provided would be "an unprecedented and limitless approach" allowing immigration advocacy groups "to sue in federal court to challenge almost any policy affecting [immigration]." *Id.* at 391-92. The Court should thus find there is no causation as "there would be no principled way to cabin such a sweeping doctrinal change," which "would seemingly not end until virtually every citizen had standing to challenge virtually every government action that they do not like." *Id.* at 392.

**4. Plaintiffs cannot show any injury is redressable by a court order.**

To satisfy the redressability prong of standing, "the plaintiff must allege 'that a favorable resolution of [its] claim would likely redress the professed injury'" by "lessen[ing] its injury." *In re Fin. Oversight*, 110 F.4th at 319 (quotation modified). *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663-64 (D.C. Cir. 1996) (en banc) ("Redressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by

the plaintiff."(footnote omitted)). Although causation and redressability "are often 'flip sides of the same coin,'" "[r]edressability can still pose an independent bar in some cases." *Alliance*, 602 U.S. at 380-81 & n.1 (citation omitted).

Here, redressability poses an independent bar because enjoining Defendants from "implementing or effectuating the Lyons [Guidance]" will not remove the option of utilizing a Form I-205 to conduct an administrative immigration arrest. That is so because the Lyons Guidance is merely a guidance document that reflects that Form I-205s may be used to conduct administrative immigration arrests under existing law and reminding officers to "consider all available enforcement mechanisms." Lyons Guidance at 1-2. Thus, enjoining Defendants from taking any further actions pursuant to the Lyons Guidance would not serve to address Plaintiffs' asserted injuries. And the Court lacks authority to grant the requested broad injunction here, because entering an injunction "would not give petitioners legally enforceable protection from the allegedly imminent harm." *See Haaland v. Brackeen*, 599 U.S. 255, 292 (2023).

### B. Plaintiffs Do Not Challenge Any Final Agency Action

Plaintiffs do not identify any final agency action, which is a prerequisite to judicial review under the APA. *See* 5 U.S.C. § 704. Agency action is final—and therefore reviewable in a judicial action brought pursuant to the APA—only when it "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). Whether there are any direct and appreciable legal consequences is a "pragmatic inquiry" that examines "the concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it." *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019), *cited by New England Synod v. DHS*, No. CV 25-40102-FDS, 2026 WL 412329, at *26 (D. Mass.

Feb. 13, 2026). As the D.C. Circuit explained in *Sierra Club v. EPA*, 955 F.3d 56 (D.C. Cir. 2020), there is no final agency action where the challenged act "imposes no obligations, prohibitions or restrictions on regulated entities" and "does not subject them to new penalties or enforcement risks." *Id.* at 63. "[I]f the practical effect of the agency action is not a certain change in the legal obligations of a party, the action is non-final for the purpose of judicial review." *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005).

Here, the now-paused Lyons Guidance—even when it was in effect—is nothing more than a guidance document; it does not *require* any officer or agent to use a Form I-205 to enter an alien's place of residence and merely "informs the use of Forms I-205 and provides to ICE law enforcement personnel a reminder of the general limitations and exceptions that may apply when effectuating arrests in an alien's residence." Lyons Guidance at 2. The Lyons Guidance states that "ICE immigration officers *may* arrest and detain aliens subject to a final order of removal [] in their place of residence" using a Form I-205 under certain circumstances, but it does not require its use in such manner. *Id.* at 1 (emphasis added). Instead, "ICE immigration officers should consider all available enforcement mechanisms, including the use of a Form I-205 to arrest an alien in their place of residence." *Id.* at 2. That language indicates that no legal consequences flow from the Lyons Guidance; ICE officers may use Form I-205s—coupled with a verification that there is a final order of removal issued by a judge and that "the subject alien resides at and is currently located in the address where the Form I-205 is to be served," *id.* at 2—to make arrests of aliens subject to a final order of removal at their place of residence, but they can also pursue other available enforcement mechanisms. Moreover, the Lyons Guidance makes clear that it is a "general guidance for consideration" by officers making arrests that does not create any substantive rights or benefits. *Id.* at 3.

The Lyons Guidance is thus like other agency guidance that courts have held did not constitute final agency action. *See, e.g.*, *Mass. Coal. for Immigr. Reform v. DHS*, 621 F. Supp. 3d 84, 96 (D.D.C. 2022) (revision of DHS manual's general instructions was not final agency action because those instructions "do not bind DHS or any of its components to a particular decision" and "components remain free" to conduct their decisionmaking in the same way they did previously); *ForUsAll, Inc. v. Dep't of Lab.*, 691 F. Supp. 3d 14, 28-29 (D.D.C. 2023) (guidance that cautioned fiduciaries regarding purchasing cryptocurrencies was not a final agency action because it did not "withdraw discretion from the Department going forward"). For example, in *Sierra Club*, in which the D.C. Circuit found that a guidance document pertaining to air quality could not be challenged because permitting authorities retained a significant amount of discretion—including the freedom to ignore it entirely—after its publication and it did not impose binding duties, obligations, prohibitions, or restrictions, nor did it compel action by either the recipient or the agency. 955 F.3d at 64. Likewise, in *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1268 (D.C. Cir. 2018), the court found that no final agency action existed for a letter sent by FTC staff when it neither bound the Commission's staff nor any state permitting authorities. And in *National Mining Ass'n v. McCarthy*, 758 F.3d 243 (D.C. Cir. 2014), the agency guidance was not final agency action because it "impos[ed] no obligations or prohibitions on regulated entities" and permitting authorities were "free to ignore it." *Id.* at 252. Finally, in *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218 (D.C. Cir. 2026), the D.C. Circuit held that an executed memorandum between DHS and the Internal Revenue Service was not a final agency action because it "merely clarifie[d] IRS's existing duties under a statute." *Id.* at 1236 (citation modified). Likewise, the Lyons Guidance here does not bind ICE officials or require any decision by anyone within ICE

and thus cannot be considered final agency action. Accordingly, Plaintiffs' APA challenge to that guidance fails for lack of final agency action.

### C. The Case Is Moot Because Defendants Are No Longer Implementing the Lyons Guidance.

This case is also moot because the practice of entering residences with Form I-205 warrants is not in effect. A case is moot when it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (citation omitted). In the First Circuit, a case is moot and not subject to the voluntary cessation exception when a change to "the challenged activity occurs because of reasons unrelated to the litigation." *ACLU of Mass. v. U.S. Conf. of Cath. Bishops*, 705 F.3d 44, 55 (1st Cir. 2013) (quoting M. Redish, *Moore's Fed. Practice*, § 101.99[2]); *see Calvary Chapel of Bangor v. Mills*, 52 F.4th 40, 48 (1st Cir. 2022) ("[T]he Governor has shown that she changed course for reasons unrelated to the litigation."); *Bos. Bit Labs, Inc. v. Baker*, 11 F.4th 3, 10 (1st Cir. 2021) ("the circumstances suggest that Governor Baker issued Order 69 not to avoid a court judgment, but in response to the progress made in battling the pandemic").

Here, that test is met because the Lyons Guidance is no longer in use because of the change in leadership at the Department of Homeland Security, not because of any consideration about this or any other litigation. And the Lyons Guidance will not be used absent further guidance from the Secretary; immigration officers will thus not execute Form I-205 warrants inside residences without consent without such guidance. *See* Castano Decl. ¶¶ 12.

## II. Plaintiffs Fail to State a Claim

Even if this Court had Article III jurisdiction, the Court should still dismiss the case because Plaintiffs have failed to state a claim for several reasons. For Counts 1, 2, & 5 pertaining to the Fourth Amendment, Plaintiffs fail to state a claim both because they cannot assert the Fourth

Amendment rights of others under binding Supreme Court precedent and because the use of Form I-205s to make arrests of aliens in their places of residence is lawful under the Fourth Amendment. Similarly, Plaintiffs' claims that the Lyons Guidance is arbitrary and capricious (Count 3) and that it required notice-and-comment rulemaking (Count 4) fail because Defendants acted within the zone of reasonableness and there was no requirement for notice-and-comment rulemaking as the Lyons Guidance covers purely internal operations.

### A. Plaintiffs Cannot State a Claim for a Violation of the Fourth Amendment Because They Allege Violations Only for Third Parties

Plaintiffs cannot assert the Fourth Amendment claims at issue here (Counts 1, 2, & 5) because they have no cognizable Fourth Amendment interest in the arrests that occurred, a concept that has sometimes been called by the "useful shorthand" of "Fourth Amendment standing," even though "it is not a jurisdictional question." *Byrd v. United States*, 584 U.S. 395, 410-11 (2018). The question of Fourth Amendment standing—"which is whether the person claiming a constitutional violation 'has had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge,'" *id.* at 403 (quoting *Rakas v. Illinois*, 439 U.S. 128, 133 (1978))—is a "separate question" from "[w]hether a warrant is required." *Id.*

The Fourth Amendment protects "[t]he right of the people to be secure in *their* persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV (emphasis added). The Supreme Court has long held that only persons who allege that their "own Fourth Amendment rights" were infringed may bring a Fourth Amendment claim because "Fourth Amendment rights are personal in nature" and "may not be asserted vicariously." *Rakas*, 439 U.S. at 133, 140; *see also, e.g.*, *Alderman*, 394 U.S. at 174 ("We adhere . . . to the general rule that Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted."); *Simmons v. United States*, 390 U.S. 377, 389 (1968) ("[W]e have []

held that rights assured by the Fourth Amendment are personal rights, and that they may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure.”).

Applying this rule, the First Circuit has said that “persons not themselves the victims of illegal government conduct typically lack standing to assert the constitutional rights of others.” *LaFrance v. Bohlinger*, 499 F.2d 29, 34 (1st Cir. 1974). And it has “declined to extend the benefits of the exclusionary rule to defendants whose personal Fourth Amendment rights have not been infringed upon.” *See United States v. Symonevich*, 688 F.3d 12, 20 (1st Cir. 2012); *see also United States v. Soule*, 908 F.2d 1032, 1035 (1st Cir. 1990) (“*Rakas* . . . makes clear beyond question that the proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure.” (citation modified)). Likewise, other courts have applied that doctrine to allow only those whose personal rights were allegedly violated to challenge alleged unlawful searches and seizures while preventing challenges based on the alleged rights of third parties. *See, e.g.*, *United States v. Beaudion*, 979 F.3d 1092, 1097 (5th Cir. 2020) (finding that a person could not challenge the propriety of a search of someone else’s phone and stating that “those invoking the [Fourth] Amendment can vindicate only their *personal* security against unreasonable searches and seizures”); *United States v. Leake*, No. 19-CR-194, 2020 WL 3489523, at *5 (D.D.C. June 26, 2020) (Jackson, J.) (stating that “[a] defendant who is unable to establish that the evidence at issue was unlawfully procured through a violation of his own Fourth Amendment rights is sometimes said to lack ‘standing’ to seek suppression of that evidence” and finding that the defendant could not challenge an alleged trespass because his Fourth Amendment rights were not violated).

Here, Plaintiffs have pleaded nothing demonstrating that any of their personal rights were violated and have failed to plead any facts explaining why they can assert the alleged Fourth Amendment violations of third parties. While some courts have entertained suits brought by associations purporting to vindicate their members' Fourth Amendment rights, in those cases the associations pleaded that their individual members had standing to sue in their own right, the organization had an interest in defending its members' rights, and the litigation did not require the personal participation of the members. *See, e.g.*, *Vasquez Perdomo v. Noem*, 148 F.4th 656, 677 (9th Cir. 2025).[4] Here, however, Plaintiffs do not have any members who are immigrants. *See* Am. Compl. ¶¶ 14-24; GBLN Decl. ¶ 4 ("All GBLN member organizations are non-profits that provide services to the Latinx community."); BWC Decl. ¶ 1 (BWC "support[s] immigrants"); MCAN Decl. ¶¶ 2, 5 (members are advocacy groups). Yet, the Amended Complaint's allegations make clear that this challenge's focus is to enforce the rights of aliens in their homes.[5] But Plaintiffs have no right to assert the Fourth Amendment rights of others, particularly not the rights of persons who are not even members of Plaintiffs' associations. Those claims belong to the person whose Fourth Amendment right was allegedly infringed, and no one else. *See LaFrance*, 499 F.2d at 34 ("[P]ersons not themselves the victims of illegal government conduct typically lack standing to assert the constitutional rights of others."); *see also Alderman*, 394 U.S. at 174. Accordingly, this Court cannot decide whether there is any Fourth Amendment violation.

---

[4] In *Vasquez Perdomo*, the Supreme Court stayed the district court's decision finding that nonprofit organizations had established Article III standing to bring a claim that defendants were denying detainees access to counsel in violation. *See* 146 S. Ct. at 1.

[5] *See, e.g.*, Am. Compl. ¶ 2 ("A person's home is particularly sacrosanct under our Constitution."); ¶ 3 (discussing case law regarding "searches and seizures inside a home" (citation omitted)); ¶ 8 ("For years, the Plaintiffs assured the Massachusetts immigrant community that ICE officers could not enter their homes without a validly issued judicial warrant."); ¶¶ 29-35 (allegations relating to the Fourth Amendment's requirements "into constitutionally protected areas, chiefly the home"); ¶¶ 49-60 (allegations relating to the use of a Form I-205 to enter residents' homes).

### B. Administrative Warrants May Be Permissibly Used in the Manner Described in Lyons Guidance

Three of Plaintiffs' claims depend on the notion that the Lyons Guidance violates the Fourth Amendment (Counts 1, 2, & 5). Plaintiffs face a high bar as they bring a facial challenge, arguing that the guidance violates the Fourth Amendment whenever invoked. Although such challenges may be brought, *City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015), "[s]uch a challenge is 'the most difficult . . . to mount successfully.'" *City of El Cenizo v. Texas*, 890 F.3d 164, 187 (5th Cir. 2018) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). That is so because when "[b]ringing a facial challenge, it is not enough for the plaintiffs to demonstrate that [the challenged policy] mandate will often cause Fourth Amendment violations"; instead, "[t]hey must establish that the mandate 'is unconstitutional in all of its applications.'" *Id.* (citation omitted).

Plaintiffs cannot meet that burden because administrative warrants have long been recognized as permissible under the Fourth Amendment in the context of immigration, as well as others. The touchstone of the Fourth Amendment is that any searches and seizures must be "reasonable." *See, e.g.*, *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987); *United States v. Lucas*, 499 F.3d 769, 777 (8th Cir. 2007) (en banc) (plurality). Although a judicial warrant is ordinarily required, "special needs, beyond the normal need for law enforcement [can] make the warrant and probable-cause requirement impracticable." *Griffin*, 483 U.S. at 873 (citation omitted). Determining reasonableness involves balancing the need to arrest against the invasion caused by the arrest. *Cf. Camara v. Municipal Court*, 387 U.S. 523, 536-37 (1967). For example, in *Griffin*, the Supreme Court held that a state law complied with the Fourth Amendment when it authorized probation officers to make warrantless searches when the officer believed the probationer's home contained contraband, finding that the probation system could "justify departures from the usual warrant and probable-cause requirements . . . as long as their searches meet 'reasonable legislative

or administrative standards.'" *Griffin*, 483 U.S. at 873-74 (quoting *Camara*, 387 U.S. at 538); *see also Wyman v. James*, 400 U.S. 309, 326 (1971) (concluding that home visits to ensure compliance with welfare rules was permissible without a judicial warrant). And in *Lucas*, the Eighth Circuit justified such a departure because "[w]hatever expectation of privacy an escaped convict might have must be weighed against the strong interest the government has in bringing him back into custody." *Lucas*, 499 F.3d at 777.

Congress authorized Form I-205 warrants through a statute that, like the probation search statute in *Griffin*, advanced a reasonable legislative interest in enforcing immigration laws. As discussed *infra*, courts have recognized that Congress has provided broad authority to immigration enforcement agencies to address the problem of illegal aliens. The INA grants immigration officers the authority to arrest aliens and detain them prior to removal. *See, e.g.*, 8 U.S.C. §§ 1225, 1226, 1231, 1357. Specifically, the INA provides that "[o]n a warrant issued by the [Secretary], an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States," *id.* § 1226(a); that "when an alien is ordered removed, the [Secretary] shall remove the alien from the United States within a period of 90 days," *id.* § 1231(a)(1)(A); and that "[d]uring the removal period, the [Secretary] shall detain the alien." *See id.* § 1231(a)(2)(A). These statutes reflect Congress' long-held judgment that aliens subject to a final order of removal have a diminished expectation of privacy in their homes because they have already been ordered to leave the country, and any expectation an alien has must be weighed against the strong interest the government has in enforcing its federal immigration laws. *Cf. Lucas*, 499 F.3d at 777.

Additionally, long ago, the Supreme Court described the use of administrative warrants as a "long-sanctioned practice of government" and stated that "[s]tatutes authorizing administrative arrest to achieve detention pending deportation proceedings have the sanction of time." *Abel*, 362

U.S. at 230. In *Abel*, without a warrant, Federal Bureau of Investigation officers pushed open the door and entered the hotel room of an alleged spy, "his then abode," while he was undressed. *Id.* at 221. The spy would not cooperate with those officers, so they signaled for two Immigration and Naturalization Service ("INS") officers—the precursor to ICE— who were waiting in the hotel room next door. *Id.* at 223. That second group of officers served a warrant signed by "the District Director of the I.N.S." upon the spy. *Id.* at 222-23.

In the district court, the spy moved to suppress items seized during his arrest. *Id.* at 218. He lost that motion, and was tried, convicted, and sentenced to thirty years' imprisonment. *Id.* In the Supreme Court, the spy argued that this administrative warrant "was invalid, because it did not satisfy the requirements for 'warrants under the Fourth Amendment.'" *Id.* at 230. Although the Court chose not to answer that question—because the argument was "expressly disavowed" in the proceedings below, *id.*—in what has been recognized as "forceful dicta,"[6] the Supreme Court explained that its reading of history confirmed that administrative warrants are lawful under the Fourth Amendment. The Court examined the iteration of the INA then in effect, noting that it "g[ave] authority to the Attorney General or his delegate to arrest aliens pending deportation proceedings under an administrative warrant, not a judicial warrant." *Id.* at 232. And implementing regulations allowed "District Directors of the I.N.S." to "issue these administrative warrants" in "their discretion." *Id.* (citation modified). Thus, "[t]he arrest procedure followed in the [spy's] case fully complied with the statute and regulations." *Id.* at 232-33.

The Court went further, however, observing that "[t]he constitutional validity of this long-standing administrative arrest procedure in deportation cases has never been directly challenged

---

[6] *Flores ex rel. Galvez-Maldonado v. Meese*, 913 F.2d 1315, 1337 (9th Cir. 1990) *rev'd en banc*, 942 F.2d 1352 (9th Cir. 1991), *rev'd on other grounds sub nom. Reno v. Flores*, 507 U.S. 292 (1993).

in reported litigation," nor has anyone challenged "the constitutional validity of administrative deportation warrants," despite the Court having "upheld administrative deportation proceedings." *Id.* at 233-34. The Court also stated that its precedent supported that such administrative arrests were lawful. *Id.* at 234 (citing *Carlson v. Landon*, 342 U.S. 524 (1952)). The Court thus concluded it need not consider the issue further "[i]n the presence of this impressive historical evidence of acceptance of the validity of statutes providing for administrative deportation arrest from almost the beginning of the Nation." *Id.*

Circuit courts have long understood that *Abel*'s reasoning means that administrative warrants are lawful under the Fourth Amendment. The Fifth Circuit recently observed that "[i]t [was] undisputed that *federal* immigration officers may seize aliens based on an administrative warrant attesting to probable cause of removability." *City of El Cenizo*, 890 F.3d at 187 (citing *Abel*, 362 U.S. at 233–34); *see also United States v. Malagerio*, 49 F.4th 911, 915 (5th Cir. 2022) ("In the immigration context, administrative warrants can be issued without probable cause that a crime has been committed and without the involvement of 'a neutral and detached magistrate.'" (footnote omitted) (quoting *Lucas*, 499 F.3d at 777)). And relying on *Abel*, the Eighth Circuit held that an administrative warrant used to investigate an apartment for an escaped convicted felon based on a corroborated tip and arrest was permissible under the Fourth Amendment when "the administrative official responsible for the custody of prisoners issued a warrant to retake an inmate who had already been convicted of a crime beyond a reasonable doubt and had fled from his lawful custody." *Lucas*, 499 F.3d at 776. The *Lucas* court reasoned that the felon's Fourth Amendment rights were not violated because his "reasonable expectation of privacy was limited by his status as an escapee and the officers possessed both a valid administrative warrant and reasonable cause to believe" he was in the location. *Id.* at 779. Similarly, the Tenth Circuit stated that the fact that

aliens "may be arrested [by] administrative warrant issued without an order of a magistrate" was but one area where aliens did not have the same constitutional rights afforded to citizens. *See Lopez v. INS*, 758 F.2d 1390, 1393 (10th Cir. 1985) (citing *Abel*, 362 U.S. 217). Likewise, the Ninth Circuit stated that "deportation statutes going back to 1798 'have ordinarily authorized the arrest of deportable aliens by order of an executive official,' evidencing an 'overwhelming historical legislative recognition of the propriety of administrative arrest for deportable aliens.'" *Sherman v. U.S. Parole Comm'n*, 502 F.3d 869, 878 (9th Cir. 2007) (quoting *Abel*, 362 U.S. at 233).

District courts have similarly applied *Abel*'s reasoning to conclude that immigration law enforcement may use administrative warrants for deportation purposes. *See, e.g.*, *Lopez-Lopez v. Cnty. of Allegan*, 321 F. Supp. 3d 794, 799 (W.D. Mich. 2018) ("Specifically in the immigration context, federal law enforcement officers have a long history of using administrative warrants and arrests for purposes of deportation, dating back to 1798." (citing *Abel*, 362 U.S. at 233)); *Tenorio-Serrano v. Driscoll*, 324 F. Supp. 3d 1053, 1066 (D. Ariz. 2018) (holding that a judicial warrant is not required for ICE to arrest individuals suspected of being removable).

Likewise, the Supreme Court has never overruled or criticized *Abel*'s reasoning, and even though the Court did not cite *Abel* in *Griffin*, that decision supports that administrative warrants can be used to make searches without a judicial warrant when a regulatory "regime would [] be unduly disrupted by a requirement of probable cause," as here. *See* 483 U.S. at 878. The Court also rejected that a "neutral judge" was necessary to conduct an administrative search, as that could be completed by a "neutral magistrate" or "neutral officer." *Id.* at 877 n.5.

Further, the text of the governing statutes and regulations remain virtually the same as those in effect at the time of *Abel*. The current version of the INA states that an alien may be arrested

and detained "[o]n a warrant issued by the [Secretary]." 8 U.S.C. § 1226(a).[7] The historical version of the statute in effect when *Abel* was decided stated: "Pending a determination of deportability in the case of any alien . . . , such alien may, upon warrant of the Attorney General, be arrested and taken into custody." *See* Immigration and Nationality Act of 1952, Pub. L. No. 82–414, § 242(a), 66 Stat. 163, 208–09 (1952); *see also Abel*, 362 U.S. at 232 ("The present form of the legislation giving authority to the Attorney General or his delegate to arrest aliens pending deportation proceedings under an administrative warrant, not a judicial warrant within the scope of the Fourth Amendment, is [§] 242(a) of the Immigration and Nationality Act of 1952."). And the current governing regulation states that several types of supervisory officers may issue "[a] Form I-205, Warrant of Removal, based on the final administrative removal order in the alien's case." 8 C.F.R. § 241.2(a)(1). And when *Abel* was decided, the historical version of the governing regulation allowed "District Directors of the I.N.S." to issue administrative warrants. *See Abel*, 362 U.S. at 232 (citing and quoting 8 C.F.R. § 241.2(a) (1952)).

Plaintiffs also argue that 8 C.F.R. § 287.8(c)(2)(ii)—which states that "[a] warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained"—requires the use of a judicial warrant. *See* Pls.' MSJ at 18-19. But that requirement is not in the text, and an administrative warrant is sufficient. That the statute and implementing regulations use the word "warrant" does not mean that the requirements for a *judicial* warrant must be met. *See Sherman*, 502 F.3d at 882-83 (holding that a statute that required a "warrant" to be issued by a parole commission did not mean that Congress adopted the requirements for the Warrant Clause under the Fourth Amendment).

---

[7] Congress has empowered the Secretary to enforce the Immigration and Nationality Act. *See* 8 U.S.C. § 1101 *et seq*.; *Nielsen v. Preap*, 586 U.S. 392, 398 (2019).

To be sure, there is a non-binding recent district court opinion holding that under the Fourth Amendment, "an administrative warrant is insufficient to enter the constitutionally protected areas of a home." *Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 979-80 (C.D. Cal. 2024). And a few other courts have followed *Kidd*'s reasoning. *See, e.g.*, *Valencia Cardenas v. Chestnut*, No. 1:26-CV-02073, 2026 WL 785871, at *1 n.1 (E.D. Cal. Mar. 20, 2026). But this Court should not follow *Kidd*. The court in *Kidd* did not address *Abel*'s reasoning, stating only that "the Supreme Court has expressly declined to consider whether an administrative warrant satisfied the requirements for 'warrants' under the Fourth Amendment." *Kidd*, 734 F. Supp. 3d at 979 (citing *Abel*, 362 U.S. at 230). That was, in part, due to a stipulation wherein the parties agreed to not argue that an administrative warrant can allow entry into a residence, but the Court also stated that "even if the Court were to consider administrative warrants, Defendants' arguments would still fall short." *Id.* at 978-79. In dicta, the *Kidd* court then stated that an administrative warrant was insufficient because it "lack[ed] the independent assurance guaranteed by the Fourth Amendment," *id.* at 979, but it did not examine *Abel* or any other cases involving administrative warrants in its reasoning. This Court should thus ignore *Kidd* and should instead follow the clear command of *Abel* and the decades of precedent supporting its reasoning since it was issued.

Plaintiffs also appear to argue that even if administrative warrants may be permissibly used to make arrests in other places, they may not be used to make an arrest in a home and that a judicial warrant is required. *See, e.g.*, Am. Compl. ¶ 8 ("For years, the Plaintiffs assured the Massachusetts immigrant community that ICE officers could not enter their homes without a validly issued judicial warrant."), ¶¶ 30-31 (alleging that judicial warrants are required to make arrests into "a home or other private space"). But the Supreme Court has sanctioned administrative searches conducted in homes, *Griffin*, 483 U.S. at 873 (finding an administrative "search of [petitioner's]

home satisfied the demands of the Fourth Amendment," despite the fact that there was no warrant), and the Court stated that administrative arrests were a "a long-sanctioned practice of government," even though the spy was arrested in a hotel room that functioned as the person's "abode." *See Abel*, 362 U.S. at 221, 230. Plaintiffs thus posit a distinction without a difference.[8]

**C. The Lyons Guidance Is Otherwise Lawful Under the APA.**

Plaintiffs also allege that the Lyons Guidance violated the APA for procedural reasons, alleging that (1) the Lyons Guidance was arbitrary and capricious (Count 3); and (2) the Lyons Guidance required notice-and-comment rulemaking (Count 4). Neither has merit.

***Arbitrary and capricious review.*** The Lyons Guidance is not subject to arbitrary-and-capricious review because, as stated above, it does not constitute final agency action. But even if it was, judicial review under the APA's arbitrary-and-capricious standard "is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). That review is "narrow." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). All that is required is for the agency to "act[] within a zone of reasonableness." *Prometheus*, 592 U.S. at 423.

Here, the Lyons Guidance easily satisfies this highly deferential review. Former Acting Director Lyons decided that ICE officers may use administrative warrants to arrest aliens subject to final orders of removal in their place of residence because the Constitution, INA, and immigration regulations allow for such enforcement. Lyons Guidance at 1. Although Plaintiffs conclusorily allege that "Defendants do not address any reliance interests engendered by centuries-

[8] In any event, Form I-205 administrative warrants are only issued after a final order of removal is entered, which would include circumstances in which a neutral and detached magistrate has found that a final order of removal is warranted upon completion of proceedings. *See* Lyons Guidance at 1-2. (all persons who may be arrested and detained under the Lyons Guidance have to be "subject to a final order of removal issued by an immigration judge, the [BIA], or a U.S. district court judge or magistrate judge").

old warrant practices pursuant to the Fourth Amendment, nor do they provide any explanation or reasoning for the significant policy change outlined in the Lyons Memo," Am. Compl. ¶ 116, Plaintiffs do not substantiate what they believe Defendants failed to consider when implementing their internal guidance. Plaintiffs instead invite the Court to "substitute its own policy judgment for that of the agency," which is impermissible. *See Prometheus*, 592 U.S. at 423.

***Notice-and-Comment Rulemaking.*** The Lyons Guidance was not subject to notice-and-comment rulemaking. The APA specifically exempts "interpretative rules, general statements of policy, [and] rules of agency organization, procedure, or practice" from the notice-and-comment requirement. *See* 5 U.S.C. § 553(b)(A), (d)(2). "[T]his exception was provided to ensure that agencies retain latitude in organizing their internal operations" and "covers agency actions that do not themselves alter the rights or interests of parties." *Batterton v. Marshall*, 648 F.2d 694, 707 (D.C. Cir. 1980). The D.C. Circuit has "used the term 'procedural exception' as shorthand for that exemption, and [it has] referred to rules promulgated under it as 'procedural rules.'" *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Nat'l Lab. Rels. Bd.*, 57 F.4th 1023, 1034 (D.C. Cir. 2023). This "limited carveout is intended for 'internal house-keeping measures organizing agency activities,'" *id.* (quoting *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C. Cir. 1987)), and "[i]ts purpose is 'to ensure that agencies retain latitude in organizing their internal operations.'" *Id.* (quoting *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014)).

Here, the Lyons Guidance fits comfortably within the procedural exception, as it merely reminds agents to choose among "all available enforcement mechanisms, including the use of a Form I-205" when making "arrest[s] [of] alien[s] in their place of residence . . . in accordance with applicable law and policies." Lyons Guidance at 2. Those enforcement mechanisms are grounded in the statutes and regulations that already provide that immigration officers may arrest and detain

aliens "[o]n a warrant issued by the [Secretary]," 8 U.S.C. § 1226(a), and that supervisory officers may issue "[a] Form I-205, Warrant of Removal, based on the final administrative removal order in the alien's case." 8 C.F.R. § 241.2(a)(1). And all ICE special agents and deportation officers are authorized to execute Form I-205. *Id.* § 241.2(b). There is thus no reason for Defendants to have to go through the notice-and-comment rulemaking process.

Plaintiffs counter that the Lyons Guidance is actually a substantive rule requiring notice-and-comment rulemaking because it is "inconsistent with the Fourth Amendment and DHS regulations" as well as "DHS operating procedures, agency policies, and training materials." *See* Pls.' MSJ at 20-23. On the contrary, a substantive rule is one that has the "force and effect of law," *see Azar v. Allina Health Servs.*, 587 U.S. 566, 573 (2019), which the Lyons Guidance does not because it does not require anything of officers. The Lyons Guidance also is consistent with the Fourth Amendment and the statute and regulations governing DHS. *See supra* Part II.B. While true that taking "a new position inconsistent with . . . existing regulations" can demonstrate that a rule is substantive, Plaintiffs point to no regulation with which the Lyons Guidance is inconsistent. Instead, their argument that the Lyons Guidance is "inconsistent with DHS operating procedures, agency policies, and training materials," *see* Pls. MSJ at 20, depends on a citation to a declaration where a former DHS employee stated that it "conflicted with [his] own understanding of agency policy" and "contradicted [his] understanding of the agency's own position on the constitutional limitations of the I-205 administrative warrant." *See* Decl. of Ryan Schwank, ECF No. 27-3 ¶¶ 8-9. One person's understanding of an agency's policies and training materials is insufficient to demonstrate that an agency created a substantive rule by changing an internal practice.

### D. Plaintiffs Fail to Plead the Other Elements of a Stay.

Plaintiffs alternatively seek a stay under 5 U.S.C. § 705, *see* Pls.' MSJ at 25-35, to which they are not entitled because Plaintiffs cannot make a "clear showing" that they need are entitled to this extraordinary relief. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

***Unlikely to Succeed on the Merits.*** For the reasons stated above, Plaintiffs are unlikely to succeed on the merits of their claim, so the Court should deny the request for a stay.

***Irreparable Harm.*** Plaintiffs spend the majority of their request for a stay arguing that they will be irreparably harmed absent a stay. *See* Pls.' MSJ at 25-33. They profess three alleged harms: (1) their alleged inability "to provide community members with clear counsel on their Fourth Amendment rights," *id.* at 27-30; (2) their diversion of resources away from conducting other core activities, *id.* at 30-32, and (3) their "institutional viability" being "undermine[d]" by the Lyons Guidance "threatening the[ir] community trust and reputation," *id.* at 32-33.

Each alleged harm fails to demonstrate any irreparable harm. As stated above, none of these alleged harms is even a legally cognizable injury, as each contradicts the Supreme Court's clear holdings in *Alliance* that plaintiffs can neither spend their way into standing nor base their standing on claimed confusion and reputational harm with essentially no limit. *See Alliance*, 602 U.S. at 391-94; *supra* Part I.A.2. Irreparable harm requires more than "a tenuous or overly speculative forecast of anticipated harm," as Plaintiffs allege. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996). And even if they were harmed by having to use more resources or by having their reputation harmed, those types of harms can be remedied by money and are thus not irreparable. *See K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 914 (1st Cir. 1989) ("[I]f money damages will fully alleviate harm, then the harm cannot be said to be irreparable.").

***Balance of the Equities.*** Plaintiffs cannot demonstrate the balance of the equities and the public interest—which merge when the government is a defendant, *see Nken v. Holder*, 556 U.S.

418, 435 (2009)—favor an injunction. "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* Here, the public interest disfavors entering an injunction that would hamstring immigration enforcement to substitute Plaintiffs' preferred policies over those of senior, democratically accountable federal officials.

**E. Plaintiffs Are Not Entitled to a Declaratory Judgment.**

Likewise, Plaintiffs are not entitled to a declaratory judgment (Count 5). A declaratory-judgment suit is "essentially an equitable cause of action." *Samuels v. Mackell,* 401 U.S. 66, 70 (1971) (citation omitted). "[T]he Declaratory Judgment Act provides that after a declaratory judgment is issued the district court may enforce it by granting 'further necessary or proper relief,' 28 U.S.C. § 2202, and therefore a declaratory judgment . . . might serve as the basis for a subsequent injunction." *Id.* at 72. "[E]ven if the declaratory judgment is not used as a basis for actually issuing an injunction, the declaratory relief alone has virtually the same practical impact as a formal injunction would." *Id.* As a result, "the same equitable principles relevant to the propriety of an injunction must be taken into consideration by federal district courts in determining whether to issue a declaratory judgment." *Id.* at 73. To be sure, there may be "unusual circumstances" where "a declaratory judgment might be appropriate" even though "an injunction [would] be withheld." *Id.* But "ordinarily," "where an injunction would be impermissible," "declaratory relief should . . . be denied as well." *Id.*; *see Macauley v. Waterman S.S. Corp.,* 327 U.S. 540, 545 n.4 (1946) ("The same principles which justified dismissal of the cause insofar as it sought injunction justified denial of the prayer for a declaratory judgment."); *Great Lakes Dredge*

*& Dock Co. v. Huffman,* 319 U.S. 293, 300 (1943) (noting that the Declaratory Judgment Act "only provided a new form of procedure for the adjudication of rights in conformity" with "established equitable principles.").

Here, any argument that the Court should exercise its equitable discretion to grant declaratory relief implicitly rest on the contention that Plaintiffs should receive injunctive relief. It is unclear what useful purpose a declaratory judgment would do unless it is a springboard to injunctive relief that would enjoin Defendants from implementing the Lyons Guidance. The Court should deny declaratory relief in addition to injunctive relief.

**F. If the Court Grants Any Relief, It Should Be Limited to Affected Members.**

Plaintiffs' case should be dismissed entirely. But in the event that the Court disagrees or determines some relief is warranted, the Supreme Court's *CASA* decision limits any relief only to the three named Plaintiffs and their member organizations because the Court cannot award "relief to nonparties." *Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025). Instead, the Court can only "administer complete relief *between the parties*," meaning the key question "is whether an injunction will offer complete relief *to the plaintiffs before the Court*." *Id.* (citation omitted). Plaintiffs' requested relief is not so limited, as they seek a permanent injunction against Defendants "from implementing or effectuating the Lyons [Guidance]" without limitation. *See* Am. Compl. at 38 (Prayer for Relief C). This Court cannot do that as doing so would "improperly intrude[] on a coordinate branch of Government" by "prevent[ing] the Government from enforcing its policies against nonparties." *CASA*, 606 U.S. at 859 (citation modified).

It similarly does not matter that Plaintiffs seek to vacate the Lyons Guidance. *See* Am. Compl. at 38 (Prayer for Relief B); Pls.' MSJ at 23-24. "[U]niversal relief, whether by way of injunction or vacatur, strains our separation of powers." *Texas*, 599 U.S. at 703 (Gorsuch, J.,

concurring). And vacatur—a remedy not mentioned in the APA's text[9]—is an implied equitable power, not a statutory authority conferred by the APA. *See id.* at 702 (supposing "the APA . . . authorize[s] . . . a more expansive equitable power to vacate agency action (in § 706)"). By asking the Court for vacatur that would have the same effect as a universal injunction, Plaintiffs ask this Court to step outside the confines of Article III, which would "exaggerate [] the role of the Judiciary in our constitutional order, allowing individual judges to act more like a legislature by decreeing the rights and duties of people nationwide." *Id.* "As with universal injunctions, [universal] vacatur can stymie the orderly review of important questions, lead to forum shopping, render meaningless rules about joinder and class actions, and facilitate efforts to evade the APA's normal rulemaking processes. Vacatur can also sweep up nonparties who may not wish to receive the benefit of the court's decision." *Id.* Thus, any ordered relief must be tailored to the injuries of "each plaintiff with standing to sue" in this case. *CASA*, 606 U.S. at 860.

**CONCLUSION**

The Court should dismiss the Amended Complaint with prejudice, as Plaintiffs cannot cure its flaws with further amendment, and deny Plaintiffs' Motion for Summary Judgment.

---

[9] Section 703 of the APA contains the juridical remedies available under the APA. *See* 5 U.S.C. § 703. The text does not mention vacatur and it does not itself create new remedies, but instead looks to pre-existing remedies available in the "form[s] of legal action" known at the time of the APA's enactment. *See, e.g.*, Administrative Procedure Act, S. Doc. No. 248, 79th Cong., 2d Sess. 36-37 (1946).

Dated: July 2, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

ALEXANDER K. HAAS
Branch Director
Federal Programs Branch

/s/ *J. Stephen Tagert*
J. STEPHEN TAGERT
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel.: (202) 305-5486
stephen.tagert@usdoj.gov
*Counsel for Defendants*